## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CARFORA, SANDRA PUTNAM, and JUAN GONZALES (aka Gonzalez), individually and as representatives of a class of similarly situated individuals,<br><br>       *Plaintiffs*,<br> v.<br><br>TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, and TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC,<br><br>       *Defendants*. | No.  21-cv-8384<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

1. This action arises from a fraudulent scheme to enhance corporate profits commenced in 2012 by Defendant TIAA-CREF Individual & Institutional Services, LLC ("TIAA Services") and its corporate parent, Defendant Teachers Insurance and Annuity Association of America (together with TIAA Services, "TIAA").

2. Upon realizing that its share of the market for retirement plan services was eroding and that demographic trends would soon lead to a steep drop in revenues, TIAA instituted a corporate policy requiring the use of fraudulent sales tactics to induce individuals to transfer assets from their low-fee employer-sponsored retirement plans to TIAA's high-fee "Portfolio Advisor" program and other lucrative non-plan products.

3.     A critical component of the scheme was for TIAA to abuse its position as a recordkeeper to employer-sponsored plans to harvest highly confidential and personal financial data regarding plan participants. Armed with this sensitive information, TIAA used it to identify individuals with large account balances nearing retirement as targets for TIAA's sales representatives, who then used manipulative "fear selling" tactics and falsely portrayed TIAA's high-cost non-plan products as the preferred solution without regard to whether the recommendation was in the participants' best interests.

4.     TIAA also concealed sales representatives' conflict of interest, requiring sales representatives to falsely claim that their recommendations were objective and non-commissioned when in fact TIAA's bonus structure created financial incentives to recommend Portfolio Advisor and similar high-cost non-plan products.

5.     As a result of this scheme, TIAA reaped massive and unlawful profits at the expense of employees and retirees who were charged higher fees for products and services that underperformed those available through their employers' tax-favored plans.

6.     TIAA's dishonest actions to benefit itself at participants' expense violated its fiduciary duties under the Employee Retirement Income Security Act (ERISA) as well as ERISA's prohibited transaction rules—duties which are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

7.     TIAA also fraudulently concealed its breaches of fiduciary duty and prohibited transactions, as the facts were only recently revealed following the public release of investigative findings of the U.S. Securities and Exchange Commission and New York State Office of the Attorney General.

8.     To obtain redress for TIAA's misconduct, Plaintiffs bring this action on behalf of a proposed class of similarly situated individuals. Plaintiffs and the class seek an order requiring TIAA to make good all losses sustained by class members and for appropriate equitable relief to disgorge TIAA's ill-gotten profits. *See* 29 U.S.C. §1109(a), §1132(a)(2), §1132(a)(3).

## JURISDICTION AND VENUE

9.     **Subject-matter jurisdiction.** This Court has federal question jurisdiction under 28 U.S.C. §1331 because this action arises under federal law and is brought under 29 U.S.C. §1132(a)(2) and §1132(a)(3).

10.     **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where at least one of the alleged breaches or violations took place, and where at least one defendant resides or may be found.

11.     **Standing.** Plaintiffs and class members were defrauded and sustained damages and financial losses that are fairly traceable to Defendants' breaches of fiduciary duty and other violations of ERISA, and those injuries may be redressed by a judgment of this Court. But for Defendants' misconduct, the assets in Plaintiffs' and class members' retirement plan accounts would have had an

opportunity for continued appreciation within their plans and would not have been subject to the excessive and unreasonable fees or inferior investment performance of TIAA Services' Portfolio Advisor and other TIAA-affiliated non-plan products. But for Defendants' misconduct, TIAA and TIAA Services would not have been unjustly enriched through fees and expenses assessed against Plaintiffs' and class members' Portfolio Advisor accounts, TIAA's wealth management, and other TIAA-affiliated non-plan products. Plaintiffs and all class members have standing to pursue remedies to prevent Defendants from retaining the benefit of their fraud, which is one proper measure of injury or damages. Plaintiffs and all class members also have standing to seek disgorgement or a constructive trust on TIAA's and TIAA Services' ill-gotten profits realized as a result of their breaches of the duty of loyalty and prohibited transactions. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988).

## PARTIES

### I.   Plaintiffs

12.    Plaintiff John Carfora is a retired professor and a participant in the ERISA-governed Dartmouth College 401(a) Defined Contribution Retirement Plan and Loyola Marymount University Defined Contribution Plan.[1] He opened a TIAA

---

[1] ERISA defines "participant" as "any employee or former employee … who is or may become eligible to receive a benefit of any type from an employee benefit plan … or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. §1002(7).

Portfolio Advisor account in September 2015 as a result of Defendants' breaches of fiduciary duty described below.

13.     Plaintiff Sandra Putnam is a retired senior research scientist and a participant in the ERISA-governed Pacific Institute for Research and Evaluation 401(a) Defined Contribution Plan and the Pacific Institute for Research and Evaluation 403(b) Tax-Deferred Annuity Plan. She opened a TIAA Portfolio Advisor account in July 2018 as a result of Defendants' breaches of fiduciary duty described below.

14.     Plaintiff Juan Gonzales (aka Gonzalez) is a university professor and a participant in the ERISA-governed Georgetown University Defined Contribution Retirement Plan and Georgetown University Voluntary Contribution Retirement Plan. He opened a TIAA Portfolio Advisor account in December 2013 as a result of Defendants' breaches of fiduciary duty described below.

## II.    Defendants

15.     Teachers Insurance and Annuity Association of America is a legal reserve life insurance company established under the insurance laws of the State of New York in 1918. Its headquarters and principal place of business is in New York, NY. TIAA's clients include thousands of defined contribution plans which utilize TIAA's investment options (annuities and mutual funds) and administrative services such as recordkeeping of participants' accounts.

16.     TIAA-CREF Individual & Institutional Services, LLC is a wholly owned subsidiary of Teachers Insurance and Annuity Association of America. TIAA

Services is a Delaware limited liability company; its headquarters and principal place of business is in New York, NY. TIAA Services is a registered broker-dealer under the Securities Exchange Act of 1934 and an investment advisor under the Investment Advisers Act of 1940 and provides investment advisory services to individuals.

17.     As explained below, by making rollover recommendations which benefited TIAA and TIAA Services at class members' expense, TIAA and TIAA Services acted as fiduciaries as defined by ERISA, breached their fiduciary duty of loyalty, and engaged in transactions categorically prohibited by ERISA.

## FACTS APPLICABLE TO ALL COUNTS

**I.     Defined contribution plans are institutional investors with the ability to obtain low fees compared to the retail market.**

18.     An employer-sponsored retirement plan may be classified as a defined benefit plan or a defined contribution plan. A defined benefit plan is a traditional pension; the employee is guaranteed a specified monthly payment and the risk of loss falls on the employer who is responsible for ensuring that the plan has sufficient assets to meet its obligations for benefit payments. In contrast, a defined contribution plan shifts the risk of loss to the employees. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Plaintiffs and the class members are participants in defined contribution plans.

19.     In a defined contribution plan, participants contribute pre-tax earnings (often matched by the employer up to a certain percentage) into an individual

account and direct the contributions into one or more options on the plan's investment menu, which is assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

20.     "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* The Department of Labor has illustrated that a 1% difference in fees reduces the average worker's account balance by 28% after 35 years.[2] In dollar terms, this fee differential adds up to nearly $500,000 after 40 years.[3]

---

[2] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.



21.     Defined contribution plans are institutional investors. In contrast to an individual seeking to make a small investment in the retail market at retail prices, a defined contribution plan pools the purchasing power of the combined assets of all of the plan's participants—often thousands of individuals. Thus, employer-sponsored defined contribution plans have the leverage to obtain much lower fees than an individual would be able to obtain in the retail market. As illustrated above, those lower fees produce enhanced retirement savings compared to what an individual could achieve investing outside of a plan.

## II.   TIAA adopted a company-wide policy of providing fraudulent investment advice for the purpose of enhancing TIAA's revenues and profits at the expense of retirement plan participants.

### A.   To combat eroding market share and the imminent decline of its retirement business, TIAA implemented a corporate strategy designed to induce participants to roll assets out of their retirement plans and into TIAA's high-cost non-plan products.

22.     Founded in 1918, TIAA historically has heavily marketed to the higher education market. As a result, TIAA has dominated the market for services to retirement plans sponsored by educational institutions and other nonprofit employers. Currently TIAA has over 15,000 institutional clients, whose plans have more than five million individual participants. TIAA serves as the plans' recordkeeper and provides TIAA-affiliated investment options in which participants can invest, including fixed and variable annuities and mutual funds. As of 2018, TIAA administered nearly $1 trillion in client assets, including $235 billion in its flagship Traditional annuity and $122 billion in the CREF Stock variable annuity.

23.     Although TIAA has publicly proclaimed in marketing materials and elsewhere that it "has operated without profit over the past 100 years," that is misleading at best. *See, e.g.*, Br. for TIAA as Amicus Curiae at 5, *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019) (No. 17-3244). In 1998, Congress revoked the tax-deductible 501(c)(3) charitable organization status of TIAA because it "competed directly with for-profit insurance companies and mutual fund groups."[4]

---

[4] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

24.    In fact, TIAA is organized as a *for-profit* stock life insurance company. TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion.

25.    Consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest-paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. During 2016—in the midst of the fraudulent scheme at issue herein—TIAA's executive compensation disclosures reported that TIAA's CEO received $18.5 million in compensation, $5.1 million more than the CEO of Citigroup. In 2015, TIAA's CEO received $18 million, more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and comparable to the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. As a percentage of assets under management, TIAA's CEO had the very highest compensation rate among peers.





**TIAA CEO Compensation**
**Highest Among Reporting Investment Fund Families**
**as a Percentage of Assets under Mgmt (AUM)**

- ■ TIAA-CREF ($834B AUM)
- ■ Invesco ($784.5B AUM)
- ■ JP Morgan  ($1676B AUM)
- ■ Bank of New York Mellon (Dreyfus) ($1700B AUM)
- ■ Deutsche Bank AG  ($842B AUM)
- ■ Prudential  ($1220B AUM)
- ■ Black Rock  ($4890B AUM)
- ■ State Street  ($2300B AUM)
- ■ Natixis SA  ($884.9B AUM)

26.     As of 2011, TIAA recognized that two factors threatened its institutional retirement plan business. First, TIAA's share of the non-profit plan market faced aggressive competition from industry giants such as Vanguard and Fidelity, which had begun to erode TIAA's assets under management. For example, Notre Dame recently moved $1.3 billion from TIAA to Fidelity, during a year in which a total of $6.4 billion in client assets left TIAA in favor of competitors. Second, demographic trends showed a large segment of participants in TIAA-administered plans—the baby-boomer generation—were nearing retirement. These new retirees were increasingly likely to move their retirement assets to other providers. Based on these threats, TIAA projected in 2011 that its net asset flows would become negative as of 2018 unless it developed a new strategy.

27.     TIAA then created a plan to expand its individual advisory business in the hopes of preventing further losses to competitors and attracting new assets.

28.     A critical component of the new strategy was for TIAA to tout its non-profit heritage. TIAA recognized that its trusted reputation provided a competitive advantage that TIAA relied on in growing its individual business.

29.     The centerpiece of TIAA's new strategy was to aggressively market Portfolio Advisor, a managed account program. Portfolio Advisor places the investor in a model portfolio which often includes TIAA-affiliated funds. The model portfolios invest in securities such as mutual funds and exchange-traded funds.

30.     Portfolio Advisor is not merely a one-time recommendation, but rather an ongoing investment advice program that rebalances the assets if the account deviates from the model portfolio allocation by a certain amount.

31.     Investors pay multiple layers of fees in Portfolio Advisor, in an amount much higher than they would typically pay by retaining assets in an employer-sponsored retirement plan. First, the underlying funds in the portfolio charge a percentage fee or "expense ratio" on all assets under management. On top of that, TIAA Services charges a variable asset-based management fee of up to 1.15%—fees on fees. As noted, a 1% increase in fees equates to a 28% loss for a typical investor.

32.     To implement its strategy of pushing Portfolio Advisor, TIAA Services more than *tripled* the size of its sales force from fewer than 300 "wealth management advisors" ("Advisors") in 2011 to nearly 900 Advisors by 2017.

33.     TIAA Services required Advisors to follow a highly structured pitch

called the Consultative Sales Process. At step one, Advisors cold-call preselected participants in TIAA-administered employer-sponsored plans to offer free financial planning services, often describing the service as an included benefit of the plan.

34.    Step two was a "discovery" meeting to gather additional information about the participant's financial circumstances. TIAA Services trained Advisors to use this meeting to discover "pain points"—a form of "fear selling" used to push the participant to change her or his investments. TIAA had an internal mantra about using fear to generate sales: "If they cry, they buy."

35.    Official sales training material spelled out TIAA's explicit goal of "Making the Client 'Feel the Pain'":



36.    Advisors' goal in uncovering pain points was to cause the participant to

"self-realize" a need for help addressing one or more of four financial planning challenges: asset management and allocation, income distribution, incapacity, and estate planning.

37.     At step three, TIAA Services used the individualized financial information collected in the discovery meeting to prepare a financial plan that incorporated projections and asset allocation recommendations. Advisors then used the financial plan in a follow-up meeting to recommend Portfolio Advisor as a solution to each financial planning challenge.

**B.     TIAA used fraudulent tactics to induce retirement plan participants to move their assets to TIAA's non-plan products and wealth management.**

38.     TIAA Services, acting through its Advisors, carried out its program established at the corporate level to repeatedly misrepresent and omit material facts in advising retirement plan participants to invest in Portfolio Advisor. Pursuant to this corporate policy, TIAA Services and its Advisors falsely stated that they provided objective advice and acted solely in the participant's best interests. For example, a 2012 TIAA Services' marketing brochure repeatedly stated that TIAA Services and its Advisors provided "objective advice," and described TIAA Services' advisory team as "a trusted partner providing … specific investment recommendations" and "working in your best interest."

39.     Based on corporate policy, TIAA Services similarly trained Advisors to emphasize TIAA's "non-profit heritage" and "culture of objectivity and acting solely in the best interest of our clients," and to describe themselves as "objective, [and]

non-commissioned."

40.     Advisors, in accordance with TIAA Services' corporate training materials, repeated these talking points in initial meetings and other communications to participants, emphasizing the "salaried, non-commissioned" and "objective advice" provided by TIAA Services.

41.     TIAA Services' 2012 marketing brochure admitted that it was acting as a fiduciary in providing investment advice to participants. The brochure referred to the "*trusted advice and guidance you'll receive—meeting a fiduciary standard requiring us to ensure that our recommendations are always in your best interest.*" ERISA's fiduciary standard imposes a duty of loyalty—to act solely in the interest of plan participants and for the exclusive purpose of providing benefits to participants.

42.     Those statements were false and misleading. Although TIAA Services was in fact acting as a plan fiduciary, the assertion that its advice *complied* with its fiduciary obligations could not be further from the truth.

43.     Rather than serving participants' best interests exclusively, the recommendations to move assets to Portfolio Advisor and other lucrative non-plan products further the financial interests of TIAA and TIAA Services at the expense of participants. When reviewing Advisors' recommendations, TIAA Services did not even attempt to determine whether those recommendations were actually in participants' best interests.

44.     Contrary to TIAA's false and misleading representations to participants, the Advisors were neither objective nor disinterested. The Advisors

had profound conflicts of interest and significant financial incentives to recommend that participants roll over assets into Portfolio Advisor even though participants' interests would have been better served by remaining invested in their employer-sponsored plans.

### C.   TIAA created powerful incentives for Advisors to steer participants to Portfolio Advisor and other non-plan products, thereby enriching TIAA at participants' expense.

45.     TIAA's "incentive compensation plan" for Advisors was fraught with conflicts of interest. TIAA paid Advisors a base salary plus a performance-based bonus, referred to as variable compensation or annual variable bonus. Contrary to TIAA's express corporate policy to represent that Advisors were "non-commissioned," the bonus was based on an Advisor's annual and cumulative asset growth, as well as achievement of sales goals, graded under a "scorecard" system. Under this incentive compensation plan, Advisors received larger bonuses for convincing participants in low-cost employer-sponsored plans to roll over assets to Portfolio Advisor, which charged higher fees and was much more profitable to TIAA and TIAA Services.

46.     Carol Deckbar, TIAA's head of institutional investment and endowment products and services and formerly executive vice president and chief operating officer, pointedly reminded Advisors at a 2014 convention that their compensation depended on pushing participants into high-cost TIAA proprietary investments: "Where do you think you get your bonuses?"

47.     If an Advisor met certain asset growth targets under TIAA's policy, the

Advisor received a bonus of 10 basis points (0.10%) for all assets rolled over from employer-sponsored plan accounts into Portfolio Advisor. Thus, a $500,000 rollover added $500 to the Advisor's bonus. In contrast, Advisors *received no credit for recommending* that a participant remain invested in the employer-sponsored plan or make a transfer to another option such as a self-directed IRA on which TIAA earned no management fees.

48.     In addition to those bonuses, a larger long-term incentive was in place from 2013 to 2018 based on the total assets under TIAA management during the Advisor's tenure. Advisors received a recurring cumulative growth award for all client assets that remained under TIAA management. Until 2016, the credit for Portfolio Advisor assets was *eight to sixteen times higher* than the credit for assets in employer-sponsored plans. From 2017 to 2018, the multiplier was three. Thus, until 2016, $500,000 invested in an employer-sponsored plan added only $12.50 to the cumulative growth award annually. But if the same $500,000 were rolled over to Portfolio Advisor, that would generate *$100–$200* for the Advisor's cumulative growth award each year that the account remained open.

49.     In short, TIAA's compensation structure made Portfolio Advisor assets much more valuable to an Advisor than assets in an employer-sponsored plan. As of 2013, an Advisor would anticipate that $500,000 invested in an employer-sponsored plan would add only $62.50 to the Advisor's compensation over the next five years, but would be worth $1,500 in bonuses if the Advisor's "fear selling" caused the participant to move $500,000 to Portfolio Advisor. Thus, over a five-year period,

assets invested in Portfolio Advisor were worth *twenty-four times more* than assets invested in employer-sponsored plans.

50.     Portfolio Advisor assets also enhanced the Advisor's "relationship complexity" score until 2017, which was based on the proportion of new assets enrolled in complex products such as Portfolio Advisor, and thus increased the Advisor's scorecard-based bonus.

51.     The variable compensation or bonus represented a substantial portion, and sometimes most, of an Advisor's total compensation. For the typical Advisor, the annual variable bonus was 60% of the base salary. The highest-paid Advisors received an annual variable bonus up to *seven times higher* than their base salaries. These financial incentives caused Advisors to make more recommendations to participants to roll their assets from employer-sponsored plan to Portfolio Advisor and other TIAA non-plan products.

52.     These conflicts of interests were either undisclosed or disclosed in an insufficient or misleading manner. TIAA Services' Forms ADV stated that Advisors could earn additional compensation for "complex" product sales based on the "degree of effort generally required" for those accounts. In fact, managed accounts like Portfolio Advisor did not involve materially greater effort from the Advisor's perspective than TIAA's non-complex or "core" products in employer-sponsored plans.

53.     TIAA Services' supervisors also pressured Advisors to sell Portfolio Advisor. One supervisor instructed his team that managed accounts "should be

presented to 100%" of retirement plan participants and that they were "the right fit for most if not all" participants. Advisors who questioned management's directives were "processed out" of TIAA.

54.    TIAA intentionally targeted the participants with the largest retirement plan accounts and labeled them "WHALES." Supervisors required Advisors to participate in "WHALE calls"—designed to devise strategies to get the participant to move to Portfolio Advisor or other TIAA products. Advisors had to report back to their supervisors about the outcome of sales opportunities from WHALE calls.

55.    Supervisors discouraged sales of self-directed options—which produced either no, or much less revenue, to TIAA—and pushed Advisors to identify "pain points" to make participants "uncomfortable" and motivated to change their investments and to a managed-account option.

56.    TIAA ranked Advisors based on performance and made Advisors' scorecards and progress toward sales goals visible to other Advisors and supervisors at all times. Many supervisors regularly circulated sales rankings to their teams. Supervisors congratulated Advisors who sold new Portfolio Advisor accounts and exhorted Advisors who failed to do so to improve.

57.    TIAA Services placed Advisors who failed to meet sales goals on performance improvement plans, causing many Advisors to resign to avoid potential termination. Yet when Advisors met their annual goals, TIAA Services increased the next year's target, resulting in constant pressure to achieve increased asset

growth.

58.     As a result of the Consultative Sales Process, incentive compensation

plan, and negative pressures on Advisors, annual revenues generated from assets

rolled over to Portfolio Advisor increased from $2.6 million to $54 million—over

2,000%—from 2013 to 2018.

**D.     TIAA fraudulently led participants to believe that it was acting solely in their interests when in reality its investment advice was designed to benefit TIAA at participants' expense**

59.     TIAA Services' training materials instructed Advisors that they wore

more than one "hat," depending on the situation: a fiduciary hat when acting as an

investment adviser representative and a non-fiduciary hat when acting as a

registered broker-dealer representative. TIAA Services sought to use an investment

adviser fiduciary standard through all the preliminary stages of the Consultative

Sales Process right up to but not including the moment when an Advisor provided

an investment recommendation. At that point, TIAA's position was that the

implementation of the advice somehow changed the duty to a lesser one.

60.     TIAA's attempt to draw a distinction between these roles was

inherently misleading, both to participants and to the Advisors themselves. Even

Advisors were confused about this dual-hat system and did not understand how one

hat fell off and another superseded it while in the middle of advising a participant

to remove assets from a retirement plan and implementing that recommendation.

61.     TIAA Services' training was also internally inconsistent. The

compliance training materials warned that terms like "objective" and "non-

commissioned" "*may be misleading*" because the result of the Consultative Sales Process was driven by Advisor financial incentives and not an objective recommendation. But TIAA Services' Consultative Sales Process training required Advisors to use those precise terms in scripted talking points.

62.     TIAA Services' written disclosures were also misleading because they suggested that the financial planning process was subject to a fiduciary duty yet failed to disclose that TIAA Services treated the ultimate investment recommendation as somehow excluded from the financial planning process.

63.     Advisors also did not inform participants when the "hat switch" occurred. The switch occurred during a single meeting, yet Advisors improperly and misleadingly failed to mention when they were taking off one hat and putting on the other. The Consultative Sales Process follow-up meeting usually involved fiduciary investment advice based on the participant's personal financial circumstances and goals immediately followed by a recommendation to roll assets from the employer-sponsored plan account to Portfolio Advisor (which TIAA wrongly claimed was non-fiduciary advice). Yet TIAA Services did not require real-time disclosure of the "hat switch."

### E.     TIAA fraudulently portrayed the merits of Portfolio Advisor, which charged much higher fees than employer-sponsored plans for worse performance

64.     Advisors used an incomplete and misleading comparison of the pros and cons of rolling assets to Portfolio Advisor compared to remaining in employer-sponsored plans.

65.     Regarding fees and expenses, Advisors generally failed to inform participants of the fees and expenses of moving assets to Portfolio Advisor compared to remaining in the employer-sponsored plan. TIAA Services supervisors and trainers discouraged discussing the fees of Portfolio Advisor. Although TIAA Services disclosed the Portfolio Advisor management fee in writing, Advisors were not required to provide comparative fee information for the participant's plan until mid-2017. Employer-sponsored plans, by virtue of their size and pooled bargaining power, can command much lower fees than TIAA's Portfolio Advisor and other non-plan products. Not until late 2018 did TIAA Services provide Advisors with a tool to calculate the fee differential between Portfolio Advisor and the individual's plan, which could be a large amount.

66.     As to services, TIAA Services supervisors and trainers encouraged Advisors to misleadingly inform participants that if they did not roll over assets to Portfolio Advisor, their only other option was to manage their employer-sponsored plan accounts entirely by themselves, while contrasting the difficulties of self-directed investment with the benefits of a managed account like Portfolio Advisor.

67.     This was misleading because managed account services like Portfolio Advisor were available for free in most participants employer-sponsored plans through Morningstar, a neutral third-party investment research firm. Other advertised features of Portfolio Advisor were also available through employer-sponsored plans at a much lower cost than the management fee charged on Portfolio Advisor accounts. Advisors failed to consistently and meaningfully disclose these

22

plan-based options.

68.    Advisors also failed to consistently disclose other advantages of
employer-sponsored plans compared to Portfolio Advisor, such as greater
protections from creditors and more flexible withdrawal options.

69.    TIAA Services also had no basis to conclude that Portfolio Advisor
would serve participants' best interests from a performance perspective. From 2012
through 2017, TIAA Services had no comparative data showing that assets invested
in Portfolio Advisor outperformed similarly allocated investments in employer-
sponsored plans on either an absolute, net-of-fees, or risk-adjusted basis. In fact,
TIAA Services became aware of complaints in February 2018 that individuals had
learned from Morningstar advice that projected performance in Portfolio Advisor
was worse than the projected performance of assets in employer-sponsored plans. A
more recent analysis—created in connection with regulators' investigation of TIAA's
practices—showed that assets invested in a sample employer-sponsored plan and
managed according to free Morningstar advice had superior risk-adjusted net-of-fee
returns (as measured by the Sharpe ratio) at every risk level on both a retrospective
and prospective basis compared to Portfolio Advisor.

70.    The conduct described above continued until recently when TIAA
discontinued it after the government regulators' investigations. TIAA claims to have
eliminated the "hat switch" practice as of June 2020 and revised its compensation
policy as of 2021 to remove differential compensation between managed account
sales and other retirement product sales.

## RELEVANT LEGAL STANDARDS

**I.    ERISA imposes strict standards of conduct on plan fiduciaries and categorically prohibits harmful self-dealing transactions**

**A.    ERISA defines "fiduciary" in functional terms based on plan-related conduct.**

71.    At common law, fiduciary obligations attached only to the entity formally designated in the trust instrument. Under ERISA, Congress used a far more expansive approach. ERISA defines fiduciary not solely in terms of formal trusteeship, but in functional terms. Thus, "an individual or entity can still be found liable as a 'de facto' fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite 'discretionary control' over plan management and administration." *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1101–02 (9th Cir.2004).

72.    ERISA's three-pronged definition of "fiduciary" states that "a person is a fiduciary with respect to a plan to the extent"

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. §1002(21)(A). Courts have an "obligation to liberally construe fiduciary

24

status under ERISA." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 278 (4th Cir. 2019). As discussed *infra*, Part III, TIAA and TIAA Services met this fiduciary definition by rendering investment advice for a fee and otherwise exercising authority and control over plan management and administration.

**B.    ERISA fiduciaries must act prudently and exclusively in the best interests of plan participants.**

73.    To effectuate ERISA's primary purpose of protecting the retirement security of plan participants, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). ERISA's strict fiduciary standards of prudence and loyalty are derived from the common law of trusts and are "*the highest known to the law*." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (emphasis added).

74.    Most fundamentally, ERISA fiduciaries are subject to an unyielding duty of loyalty. *See Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000). The statute states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A). Put simply, the fiduciary must act "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (citing Restatement of Trusts 2d §170 (1959), II Scott on Trusts §170, at 1297–99 (1967),

and Bogert, The Law of Trusts and Trustees §543 (2d ed. 1978)).

75.    A fiduciary also must act prudently—"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). To fulfill this duty, the fiduciary must investigate and evaluate investments and exercise the sound judgment of a knowledgeable and impartial financial expert in making investment decisions or formulating investment advice.

76.    A fiduciary also cannot turn a blind eye to the breach of its co-fiduciary. In addition to any liability a fiduciary may have for its own breach, a fiduciary can also be liable for knowingly participating in, concealing, or failing to remedy a co-fiduciary's breach of duty. *See* 29 U.S.C. §1105(a).

77.    To supplement the general fiduciary duty of loyalty, Congress also prohibited *per se* certain transactions deemed likely to injure a plan, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); 29 U.S.C. §1106(a)–(b); 29 U.S.C. §1002(14).

78.    Although certain otherwise prohibited transactions may be eligible for an exemption, the necessary conditions for relief generally require the fiduciary to show that the transaction serves the participants' interests rather than the fiduciary's self-interest and involves no more than reasonable compensation.

**C.**     **Congress authorized participants to enforce fiduciary obligations through actions to recover losses and ill-gotten profits**

79.     To enforce ERISA's fiduciary obligations, Congress authorized participants to bring a civil action to obtain legal and equitable remedies for their plans, 29 U.S.C. §1132(a)(2). The relief available in a §1132(a)(2) action includes restoration of plan losses caused by the breach or violation as well as restoration to the plan "any profits of such fiduciary" made "through use of assets of the plan by the fiduciary." 29 U.S.C. §1109(a).

80.     ERISA further authorizes participants to bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations [of any provision of this subchapter] or (ii) to enforce any provisions of this subchapter," 29 U.S.C. §1132(a)(3). Appropriate equitable relief includes monetary remedies such as surcharge, disgorgement of profits, and a constructive trust.

81.     Even after a participant's assets are distributed from the plan, the participant retains statutory standing to pursue actions to impose a constructive trust on a fiduciary's ill-gotten profits realized from a breach of the duty of loyalty, and the proceeds of the constructive trust are properly distributed to the participants. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988). To hold otherwise would frustrate the well-established trust principle that a fiduciary may not profit by her breach of the duty of loyalty. If there is no financial incentive to breach, a fiduciary will be less tempted to engage in disloyal transactions. Although class members here

suffered financial damage, a showing of actual harm is immaterial to an action to recover a fiduciary's ill-gotten profits.

## II.     TIAA and TIAA Services acted as ERISA fiduciaries.

### A.     Defendants acted as fiduciaries by issuing self-interested investment advice from which they reaped massive profits.

82.     As noted, the second prong of ERISA's definition of fiduciary provides that "a person is a fiduciary with respect to a plan to the extent he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. §1002(21)(A)(ii).

83.     Under the statute's plain text, TIAA and TIAA Services, acting through the Advisors under their direction and control, rendered investment advice with respect to ERISA plan moneys each time an Advisor executed TIAA's Consultative Sales Process and advised ERISA plan participants how they should invest their plan accounts.

84.     Under the statute's plain text, TIAA and TIAA Services received a fee or other compensation, direct or indirect, for providing advice. Indeed, Advisors admitted that the investment advice provided through the Consultative Sales Process was "included" in the bundle of services for which TIAA was compensated through the administrative fees it collected from each plan. Moreover, each time a participant followed TIAA's investment advice and moved assets to Portfolio Adviser, TIAA and TIAA Services received substantial fees.

85.     The result is the same under applicable regulatory guidance: TIAA and TIAA Services are ERISA fiduciaries to the extent they provided investment advice recommending that ERISA plan participants roll their plan accounts to Portfolio Advisor. *See* 29 C.F.R. §2510.3-21(c)(1).

86.     TIAA and TIAA Services, through the Advisors, rendered advice and made "recommendation as to the advisability of investing in, purchasing, or selling securities or other property." *See* 29 C.F.R. §2510.3-21(c)(1)(i).

87.     The advice was provided on a "regular basis" within the meaning of the regulation, 29 C.F.R. §2510.3-21(c)(1)(ii)(B), because the advice occurred as part of an ongoing relationship between the Advisor and participant through the Consultative Sales Process, and the advice was the beginning of an intended future ongoing relationship between the participant and TIAA Services through Portfolio Advisor, which purports to continually adjust a participant's portfolio as needed.

88.     TIAA and TIAA Services provided "individualized investment advice" within the meaning of the regulation, *id.*, as shown by the fact that TIAA harvested plan recordkeeping data consisting of confidential financial information to identify preselected individuals as the targets of its marketing efforts. Advisors then used those lists of preselected individuals to commence the Consultative Sales Process, culminating in individualized financial plans after detecting each individual's particular "pain points" and financial planning needs. The individualized nature of the advice is further shown by Portfolio Advisor's use of individualized needs and investment preferences to develop a model portfolio recommendation.

89.     Finally, the investment advice was provided pursuant to a mutual understanding that the advice would serve as a primary basis for investment decisions. *See id*. Indeed, TIAA's express goal was to induce plan participants to rely on the advice as the basis for the participant's decision to roll assets to Portfolio Advisor. And once the participant "self-realized" the need for TIAA's help in one of the four financial planning areas, the participant necessarily understood that it would rely on TIAA Services' advice as to how to address that financial planning need.

90.     TIAA cannot avoid liability by arguing that only its wholly owned subsidiary TIAA Services actually provided the advice, not TIAA itself. Fiduciary status attaches if the entity provides investment advice "either directly or indirectly (*e.g.,* through or together with any affiliate)." 29 C.F.R. §2510.3-21(c)(1)(ii).

91.     TIAA Services is an "affiliate" of TIAA within the meaning of the regulation because TIAA has "the power to exercise a controlling influence over [its] management or policies." 29 C.F.R. §2510.3-21(e)(2). TIAA Services' financial statements acknowledge that it is a "wholly owned subsidiary" of TIAA.[5] TIAA in fact exercised a controlling influence over TIAA Services' management or policies, as outlined above, by using TIAA Services as the vehicle to execute TIAA's corporate strategy of combating eroding market share by growing individual

---

[5] TIAA-CREF Individual & Inst'l Svcs., LLC, Notes to Statement of Fin. Condition at 3 (Dec. 31, 2020), https://www.tiaa.org/public/pdf/Statement_of_Financial_Condition.pdf, *archived at* https://perma.cc/XB7G-DZTJ.

advisory and managed account rollover business. *See supra*, Part II.A–E.

**B.     TIAA exercised authority and control over plan management and administration in other ways**

92.     Although the fiduciary investment advice described above alone made TIAA a fiduciary, TIAA also acted as an ERISA fiduciary in other ways.

93.     An entity "is a fiduciary with respect to a plan to the extent" "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. §1002(21)(A).

94.     As noted, TIAA serves as recordkeeper to thousands of ERISA-governed defined contribution plans. Although TIAA's formal recordkeeping role involves certain ministerial tasks such as keeping track of participants' account balances, TIAA abused its position and exceeded the bounds of its formal authority to exercise discretion and control over plans' management, operations, and administration.

95.     Data about a plan's participants is critical to the operation of a retirement plan. To accurately perform its recordkeeping function in a defined contribution plan, TIAA received access to highly sensitive, confidential data about the plan's participants—*e.g.*, age, length of employment, social security number, account balance, contact information, years until retirement age, and investment

selections.

96.     But TIAA did not use these data solely to perform the ministerial tasks formally assigned to it. Instead, TIAA improperly appropriated this confidential information, using its access to this confidential information to aggressively market its high-cost non-plan products, such as Portfolio Advisor, and thereby generate profits for itself at participants' expense.

97.     As noted, the first step of the TIAA's Consultative Sales Process was for Advisors to cold-call *preselected* participants in TIAA-administered plans. In other words, TIAA used its position as the plan's recordkeeper—and its access to confidential data about plan participants—to identify promising high-asset sales targets, coining the term "WHALES" to describe them, and targeting people nearing retirement age who were likely to move assets.

98.     In so doing, TIAA exceeded the bounds of its formal authority and exercised discretion and control over the way the plans were managed and administered—fiduciary conduct. 29 U.S.C. §1002(21)(A)(i), (iii).

99.     Worse still, TIAA exercised such discretion and control for the purpose of profiting at the expense of the plans' participants, including Plaintiffs and class members.

100.    Additionally, TIAA exercised control over the assets of ERISA plans. *See* 29 U.S.C. §1002(21)(A)(i). TIAA has taken the position that under certain annuity contracts, defined contribution plans lack the authority to remove TIAA's affiliated flagship CREF Stock Account as an investment option, even if it is no

longer a prudent option for the plan. According to sworn testimony of TIAA Executive Vice President Douglas Chittenden at a recent trial in this Court, "the plan sponsor [employer] doesn't have the authority to move the assets" in CREF Stock to another plan option. *See* Transcript of Bench Trial, ECF No. 330 at 190–191 (596:11–597:5), *Sacerdote v. New York Univ.*, No. 16-6284 (S.D.N.Y. May 31, 2018).

101.    TIAA's apparent position that the plan sponsor lacks "authority or control respecting management or disposition of [the plan's] assets" results directly from TIAA's refusal to allow the sponsor to move the assets. *See* 29 U.S.C. §1002(21)(A)(i). Thus, if the plan sponsor lacks authority over the disposition of those plan assets, TIAA itself necessarily possesses such "authority or control" over those assets. *Id.* TIAA's status as a fiduciary over plan assets underscores its obligation to act solely in the interest of plan participants when rendering investment advice.

## III.    TIAA and TIAA Services fraudulently concealed their fraudulent conduct

102.    In any ERISA breach of fiduciary duty action involving "fraud or concealment," the action "may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. §1113. Because Plaintiffs' claims sound in fraud, this period automatically applies: TIAA and TIAA Services each "breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment." *Caputo v.*

*Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001).

103.    Plaintiffs did not discover Defendants' fraud, breaches of fiduciary duty, and prohibited transactions until the SEC and New York Attorney General released their findings in July 2021. Accordingly, the proper starting date for the class period is the date that TIAA and TIAA Services commenced their fraudulent course of conduct, January 1, 2012.

104.    Not only do Plaintiffs' underlying claims arise from fraudulent conduct in violation of ERISA, but TIAA and TIAA Services also fraudulently concealed their misconduct.

105.    In ERISA cases, courts often must look to "[t]he common law of trusts, which offers a starting point for analysis." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000); *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). At common law, one who has a duty to disclose "because of a fiduciary or other similar relation of trust and confidence" commits fraud by "fail[ing] to disclose material information" that the beneficiary is entitled to know. *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Lenz v. Assoc. Inns & Restaurants Co of Am.*, 833 F. Supp. 362, 372 (S.D.N.Y. 1993) ("[F]raudulent concealment occurs if the party under the fiduciary duty fails to meet its obligations to inform the other party of facts underlying the claim."); Restatement (Second) of Trusts §173, comment d (1959) (trustee has duty to disclose information the beneficiary needs to know for his protection).

106.    TIAA's and TIAA Services' failures to disclose their conflicts of interest

and use of an undisclosed "hat switch" during the sales process constituted fraudulent concealment.

107.   TIAA and TIAA Services also engaged in acts to hinder the discovery of their breaches of fiduciary duty. *Caputo*, 267 F.3d at 190. Among other things, TIAA Services falsely claimed that it was adhering to its fiduciary obligations to ensure that investment advice was objective and in participants' best interests, when in reality it was doing no such thing. Further, TIAA Services' claims that Advisors were objective and not compensated through commissions were utterly false and served to prevent Plaintiffs and class members from discovering the fraud. TIAA Services' misleading portrayal of Portfolio Advisor and other non-plan products as superior to employer-sponsored plans also prevented class members from discovering the truth.

## CLASS ACTION ALLEGATIONS

108.   Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants of defined contribution plans subject to ERISA who (i) initiated a rollover of assets from the participant's individual plan account to any non-plan product or service affiliated with TIAA or TIAA Services at any time between January 1, 2012 and the date of judgment, (ii) for which a TIAA Services Wealth Management Advisor received credit toward an annual variable bonus under TIAA's incentive compensation plan. Excluded from the class are participants of any plan sponsored by TIAA or its affiliates.

109.   The proposed class meets the requirements of Rule 23(a) for the following reasons:

    a.  The class includes thousands of members and are so large that joinder of all its members is impracticable.

    b.  There are questions of law and fact common to the class including, without limitation: whether TIAA and TIAA Services are fiduciaries with respect to the conduct that is the subject of this complaint; whether TIAA or TIAA Services breached a fiduciary duty; whether TIAA or TIAA Services caused a prohibited transaction; determining the proper remedies for Defendants' violations; and determining the amount of Defendants' unlawful profits.

    c.  Plaintiffs' claims are typical of the claims of the class because each Plaintiff and all class members are pursuing the same legal theories arising from the same course of misconduct instituted on a company-wide basis by TIAA's top executives.

    d.  Plaintiffs are adequate class representatives because they have no interest that conflict with the members of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

110.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties and liability, and (B) adjudications by individual members would, as a practical matter, be dispositive of the interests of the members not

parties to the adjudication or would substantially impair or impede those members' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

111.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable, the losses suffered by individuals may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, the class may be certified under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

112.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the class, has been appointed class counsel by many federal district judges throughout the country to represent individuals in defined contribution retirement plans, and is best able to represent the interests of the class. Fed. R. Civ. P. 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 class actions involving fiduciary misconduct in defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution plan litigation. *See, e.g., Marshall v. Northrop Grumman Corp.*, No. 16-6794 AB (JCX),

2020 WL 5668935, at *4 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]"); *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020) (Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans"); *Bell v. Pension Comm. of ATH Holding Co.,* No. 15-2062, 2019 WL 4193376, at *2 (S.D. Ind. Sept. 4, 2019*)* (the firm are "experts in ERISA litigation"); *Spano v. Boeing Co.*, No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees.").

## CAUSES OF ACTION

### I.    COUNT I: Breach of ERISA Fiduciary Duties

113.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

114.    Based on the facts alleged above, TIAA and TIAA Services acted as fiduciaries when providing investment advice to Plaintiffs and class members. 29 U.S.C. §1002(21)(A)(ii). TIAA also acted as a fiduciary by exercising discretion and control over confidential participant data that was critical to plans' management and administration and using such data for its own marketing purposes. 29 U.S.C. §1002(21)(A)(i), (iii).

115.    When acting as fiduciaries, TIAA and TIAA Services were required to act "*solely* in the interest of the *participants* and beneficiaries and for the *exclusive* purpose of providing benefits to participants and their beneficiaries and defraying *reasonable* expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A) (emphasis added). In other words, TIAA and TIAA Services were obligated to act "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

116.    TIAA and TIAA Services were also required to act with "care, skill, prudence, and diligence" when formulating investment advice, 29 U.S.C. §1104(a)(1)(B), meaning the advice must reflect a thorough and impartial investigation of the participant's options.

117.    The investment advice that TIAA and TIAA Services rendered to

Plaintiffs and class members was neither prudent nor loyal. Based on the facts described above, TIAA and TIAA Services provided advice for the purpose of furthering their own financial interests and preventing the continued erosion of TIAA's shrinking retirement plan business. Thus, TIAA and TIAA Services, improperly using the confidential information it obtained about participants, intentionally steered participants to Portfolio Advisor because that was the more lucrative option for TIAA, without regard for whether rolling assets to Portfolio Advisor was in the participant's best interest or otherwise prudent.

118.   Based on the facts described above, TIAA and TIAA Services fraudulently concealed their breaches of fiduciary duty.

119.   Based on the facts described above, TIAA and TIAA Services each also knowingly participated in, concealed, and failed to remedy each other's breaches of fiduciary's duty, resulting in co-fiduciary liability in addition to the grounds for their own liability. *See* 29 U.S.C. §1105(a).

120.   As a result of these breaches of fiduciary and co-fiduciary duties, TIAA and TIAA Services are liable for all losses suffered by Plaintiffs and class members under 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3). Further, all of TIAA's and TIAA Services' profits made through the use of ERISA plan assets or realized as a result of its breaches of the fiduciary duty are subject to disgorgement or a constructive trust. *Id.*

## II.    COUNT II: ERISA Prohibited Transactions

121.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

122.    Section 1106(b) prohibits self-dealing transactions between a plan and a fiduciary. 29 U.S.C. §1106(b). Based on the facts described above, TIAA and TIAA Services acted as fiduciaries when they rendered investment advice and recommendations that Plaintiffs and class members roll assets from their ERISA plan accounts to Portfolio Advisor, which increased TIAA's and TIAA Services' compensation and profits. In so doing, TIAA and TIAA Services dealt with the assets of the Plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the plans on behalf of a party whose interests were adverse to the interests of the plans, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for their own personal account from parties dealing with the plans in connection with transactions involving the assets of the plans, in violation of 29 U.S.C. §1106(b)(3).

123.    Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. §1106(a)(1). Based on the facts described above, TIAA and TIAA Services are parties in interest because they were plan fiduciaries and entities providing services to the plans. 29 U.S.C. §1002(14)(A) and (B). By rendering investment advice and recommendations that Plaintiffs and class members roll assets from their ERISA plan accounts to Portfolio Advisor, thus increasing TIAA's and TIAA Services' compensation and profits, TIAA and TIAA Services caused

plans to engage in transactions which they knew or should have known constituted an exchange of property between the plans and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in transactions which they knew or should have known constituted the furnishing of services between the plans and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in transactions which they knew or should have known constituted a transfer of plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

124.   Based on the facts described above, no statutory or regulatory exemption is available to relieve TIAA or TIAA Services from liability for these prohibited transactions. Among other reasons, the investment advice that is the subject of this claim was not the result of an impartial recommendation or a prudent investigation of participants' options, and the transactions provided TIAA and TIAA Services with unreasonable compensation.

125.   Based on the facts described above, TIAA and TIAA Services fraudulently concealed these prohibited transactions.

126.   Based on the facts described above, TIAA and TIAA Services each also knowingly participated in, concealed, and failed to remedy the prohibited transactions caused by the other, resulting in co-fiduciary liability in addition to the grounds for their own liability. *See* 29 U.S.C. §1105(a).

127.   As a result of these prohibited transactions, TIAA and TIAA Services are liable for all losses suffered by Plaintiffs, class members, and their respective plans under 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3). Further, all of TIAA's

and TIAA Services' profits made through the use of ERISA plan assets or realized as a result of these self-dealing and otherwise prohibited transactions are subject to disgorgement or a constructive trust. *Id.*

### III.    COUNT III: Non-Fiduciary Recipient of Ill-Gotten Profits

128.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

129.    Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

130.    TIAA and TIAA Services knew that the course of conduct described herein was fraudulent and unlawful.

131.    Accordingly, TIAA and TIAA Services knowingly received improper profits derived from ERISA plan assets. Those profits rightfully belong to Plaintiffs and class members.

132.    Thus, even if TIAA or TIAA Services were not an ERISA fiduciary, each defendant remains subject to restitution, disgorgement, or a constructive trust, which are appropriate equitable remedies under 29 U.S.C. §1132(a)(3).

### JURY TRIAL DEMANDED

133.    Under Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury. In the alternative, Plaintiffs request an advisory

43

jury on all issues not triable of right by a jury.

## PRAYER FOR RELIEF

Plaintiffs seek entry of judgment on each of their claims and request that the Court order the following relief:

- Find and declare that each Defendant breached its fiduciary duties and violated ERISA as described above or is otherwise liable for knowingly participating in its co-defendant's misconduct;

- Grant damages and appropriate equitable relief to remedy for each breach and violation, including recovery of damages or losses, disgorgement of ill-gotten profits, a constructive trust on ill-gotten profits, restitution, and surcharge against Defendants and in favor of Plaintiffs and the class so as to restore Plaintiffs and class members to the position they would have occupied but for Defendants' breaches and violations;

- Order Defendants to provide all accountings necessary to determine the amounts of Defendants' profits and damages to Plaintiffs and class members and their respective plans;

- Order Defendants to stop the practices described above and to notify, in a manner directed by this Court, each class member who transferred assets that this Court has ordered the practices be stopped;

- Certify the proposed class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable relief as the Court deems appropriate.

October 11, 2021                              Respectfully submitted,

                                             /s/ Andrew D. Schlichter
                                             Andrew D. Schlichter, Bar No. 4403267
                                             Jerome J. Schlichter (*pro hac vice* forthcoming)
                                             Sean E. Soyars (*pro hac vice* forthcoming)
                                             SCHLICHTER BOGARD & DENTON, LLP
                                             100 South Fourth Street, Ste. 1200
                                             St. Louis, MO 63102
                                             Phone: (314) 621-6115
                                             Fax: (314) 621-5934
                                             aschlichter@uselaws.com
                                             jschlichter@uselaws.com
                                             ssoyars@uselaws.com

                                             *Counsel for Plaintiffs*