UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN CARFORA, SANDRA PUTNAM, and JUAN
GONZALES *individually and as representatives
of a class of similarly situated individuals*,

Plaintiffs,

-v.-

TEACHERS INSURANCE ANNUITY
ASSOCIATION OF AMERICA and TIAA-CREF
INDIVIDUAL & INSTITUTIONAL SERVICES, LLC,

Defendants.

21 Civ. 8384 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs John Carfora, Sandra Putnam, and Juan Gonzales bring this action against Defendants Teachers Insurance Annuity Association of America and TIAA-CREF Individual & Institutional Services, LLC (collectively, "Defendants" or "TIAA"), asserting a variety of claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191d. Now before the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), which motion is predicated in large measure on the Court finding that Defendants were not ERISA fiduciaries during the relevant timeframe. For the reasons set forth in the remainder of this Opinion, the Court so finds, and grants Defendants' motion to dismiss.

**BACKGROUND**[1]

Like many Americans, Plaintiffs John Carfora, Sandra Putnam, and Juan Gonzales are participants in employer-sponsored defined contribution retirement plans.  Such tax-advantaged plans are integral to funding participants' future retirements.  TIAA provided Plaintiffs' employer-sponsored plans and thousands of others with various administrative and investment-related services.  At the same time, however, TIAA also sought to grow its individual advisory business in its capacity as a broker-dealer and investment advisor.  In furtherance of this goal, TIAA encouraged Plaintiffs and others similarly situated to take distributions from their defined contribution plans and roll that money over into TIAA's "Portfolio Advisor," a managed account service.  Once Plaintiffs and other participants moved assets from their employer-sponsored plans into Portfolio Advisor, TIAA was able to earn higher fees on those assets.  Whether such transfers were in the best interests of the plan participants or of TIAA is at the heart of this lawsuit.

---

[1]     This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  For ease of reference, the Court refers to the Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #36), to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #42), and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #46).

Further, the Court notes that the parties refer in their briefing both to TIAA Services and to Teachers Insurance Annuity Association as "TIAA."  The Complaint, for example, refers to TIAA Services and Teachers Insurance Annuity Association of America somewhat interchangeably.  (*See, e.g.*, Compl. ¶¶ 34-35).  The Court thus adopts the parties' naming convention except where directly quoting from the Complaint, and refers only to "TIAA" throughout this Opinion.

**A.     Factual Background**

**1.     Plaintiffs' Retirement Plans and TIAA's Administration of the Plans**

Plaintiffs are current or former researchers and university professors who are participants in ERISA-governed defined contribution retirement plans. (Compl. ¶¶ 12-14).  Unlike a defined benefit plan, which provides employees with a guaranteed monthly payment and places the risk of loss on the employer to ensure its plan has sufficient assets to pay out, defined contribution plans shift the risk of loss to employees.  (*Id.* at ¶ 18).  As evidence of this shift, these plans are individual-oriented and market-based: participants contribute individual pre-tax earnings into their own accounts, and "direct the contributions into one or more options on the plan's investment menu, which is assembled by the plan's fiduciaries."  (*Id.* at ¶ 19).

Because an employer-sponsored defined contribution plan combines the assets of myriad participants, it exercises more leverage than an individual retail investor and, accordingly, can obtain lower investment fees.  (Compl. ¶ 21).  This is important because, as the Department of Labor ("DOL") has documented, "a 1% difference in fees reduces the average worker's [defined contribution plan] account balance by 28% after 35 years."  (*Id.* at ¶ 20).  In other words, even marginal differences in the fees charged to plans can have significant effects down the line for retirees.

TIAA was founded in 1918 and "historically has heavily marketed to the higher education market."  (Compl. ¶ 22).  For years, TIAA has provided recordkeeping functions for over 15,000 institutional clients, which clients'

plans count over 5 million participants.  (*Id.*).  Alongside its recordkeeping services, TIAA also provides "TIAA-affiliated investment options in which participants can invest, including fixed and variable annuities and mutual funds." (*Id.*).  Additionally, TIAA operates an individual advisory business.  (*Id.* at ¶ 27).

### 2.   The Pitch to Join Portfolio Advisor

#### a.   TIAA's Declining Retirement Business

Beginning in 2011, TIAA became aware of the fact that its institutional retirement plan business faced two potentially existential threats.  (Compl. ¶ 26).  *First*, the business was suffering declining market share due to "aggressive competition from industry giants such as Vanguard and Fidelity." (*Id.*).  In just one year, for example, TIAA lost $6.4 billion in client assets to competitors.  (*Id.*).  *Second*, TIAA's institutional business appeared to be losing favor with the baby-boomer generation, which continued to move its retirement assets to other providers.  (*Id.*).  TIAA projected that it would have negative asset flows by 2018 if it did not take action.  (*Id.*).

Faced with this stark realization, TIAA sought to expand its individual advisory business, which commanded higher fees — and thus higher revenues — and could potentially attract new assets.  (Compl. ¶¶ 27-30).  "The centerpiece of TIAA's new strategy was to aggressively market Portfolio Advisor, a managed account program." (*Id.* at ¶ 29).  As a managed account program, Portfolio Advisor places investors in a model portfolio of securities, and rebalances the assets in the account if they deviate too far from the model.  (*Id.*

4

at ¶¶ 29-30).  Investors are required to pay various fees to TIAA for use of the

program.  (*Id.* at ¶ 31).  Between 2011 and 2017, as part of its efforts to expand

the individual advisory side of the business, TIAA tripled the number of "wealth

management advisors" who were responsible for selling Portfolio Advisor

services ("Advisors"), from 300 to 900.  (*Id.* at ¶ 32).

### b.   The Consultative Sales Process

TIAA's Advisors utilized a multi-step pitch to attract customers to

Portfolio Advisor known as the "Consultative Sales Process."  (Compl. ¶ 33).  To

begin, Advisors cold-called participants in TIAA-administered employer-

sponsored plans "to offer free financial planning services, often describing the

service as an included benefit of the plan."  (*Id.*).  In order to prioritize which

participants to target, TIAA allegedly utilized information to which it had access

through its provision of employer-sponsored retirement plan services.  (*Id.* at

¶¶ 53-54, 88).  Participants with the largest retirement plan accounts,

colloquially called "WHALES," were high-priority sales targets.  (*Id.* at ¶ 54).

Next, Advisors conducted a "discovery" meeting with the participant, in

order to learn more about the participant's financial circumstances and needs.

(Compl. ¶ 34).  Unbeknownst to participants, Advisors were trained to uncover

"pain points" during this process — essentially, circumstances or uncertainties

that participants feared and that could be used later to up-sell them on

Portfolio Advisor.  (*Id.* at ¶¶ 34-36).  TIAA's training materials encouraged

Advisors to "Mak[e] the Client 'Feel the Pain'" so as to convince the client that

he or she needed the high-touch services offered by Portfolio Advisor.  (*Id.* at

¶¶ 35-36).  After the discovery meeting, TIAA created a curated financial plan responsive to the information collected.  (*Id.* at ¶ 37).  Finally, Advisors scheduled a follow-up meeting with the participant, through which the financial plan was presented, and at which the Advisor ultimately pitched Portfolio Advisor.  (*Id.*).

       **c.**    **TIAA's Representations Regarding Its Non-Plan Products, Including Portfolio Advisors, and TIAA's Incentive Structure**

Beyond merely pitching plan participants to roll over assets from their employer-sponsored plans into Portfolio Advisor, Plaintiffs also allege that TIAA held itself out to participants and the broader public as acting solely on behalf of their interests.  (*See, e.g.*, Compl. ¶ 38).  On this point, Plaintiffs offer several exemplary representations.  For example, a 2012 TIAA brochure stated that TIAA and its Advisors provided "objective advice," and that the company was "a trusted partner providing … specific investment recommendations" and "working in your best interest."  (*Id.*).  More explicitly, this same brochure referred to "trusted advice and guidance you'll receive — meeting a fiduciary standard requiring us to ensure that our recommendations are always in your best interest."  (*Id.* at ¶ 41).  TIAA also trained its Advisors to tout the company's "non-profit heritage," and to describe themselves as "objective, [and] non-commissioned."  (*Id.* at ¶ 39).

Alongside such representations, TIAA instructed Advisors to employ a "hat-switching" strategy during the Consultative Sales Process that Plaintiffs allege was inherently misleading.  (Compl. ¶ 59).  Advisors were told to wear a

6

"fiduciary hat when acting as an investment adviser representative and a non-fiduciary hat when acting as a registered broker-dealer representative." (*Id.*). This instruction was confusing to Advisors, who "did not understand how one hat fell off and another superseded it while in the middle of advising a participant to remove assets from a retirement plan[.]" (*Id.* at ¶ 60). And it was similarly confusing to plan participants, who were unable to differentiate the standard of advice they were receiving from Advisors from one moment to the next. (*Id.* at ¶ 63).

Plaintiffs assert that TIAA's incentive structure for its Advisors was "fraught with conflicts of interest." (Compl. ¶ 45). Instead of being non-commissioned, Advisors received a variety of bonuses based on asset growth and meeting sales goals. (*Id.*). As one example, an Advisor meeting her assets target would receive a 0.10% commission for all assets rolled over from an employer-sponsored plan to Portfolio Advisor. (*Id.* at ¶ 47). Advisors could also earn longer-term incentives, including a "recurring cumulative growth award for all client assets that remained under TIAA management." (*Id.* at ¶ 48). Conversely, TIAA Advisors did *not* receive bonuses for keeping participants invested in their employer-sponsored plans, or for moving assets to self-directed IRAs. (*Id.* at ¶ 47). Plaintiffs allege that "[t]hese conflicts of interest were either undisclosed or disclosed in an insufficient or misleading manner." (*Id.* at ¶ 52).

In addition to these carrots, TIAA also employed sticks to encourage Advisors to sell Portfolio Advisor. TIAA publicly ranked Advisors' performance

7

through the use of scorecards that were visible to peers and supervisors.
(Compl. ¶ 56).  The company also put Advisors who failed to meet their sales
goals on improvement plans.  (*Id.* at ¶ 57).  Because of this pressure, Plaintiffs
allege that "many Advisors … resign[ed] to avoid potential termination."  (*Id.*).

### 3.     Portfolio Advisor's Lackluster Performance

According to Plaintiffs, "Advisors used an incomplete and misleading
comparison of the pros and cons of rolling assets to Portfolio Advisor compared
to remaining in employer-sponsored plans." (Compl. ¶ 64).  TIAA discouraged
open discussion of fees between Advisors and prospective clients, even though
the company did disclose this information in writing.  (*Id.* at ¶ 65).  As a result,
some plan participants who ultimately rolled assets over to Portfolio Advisor
were dismayed to learn that Portfolio Advisor did *not* consistently perform
better than employer-sponsored plans, even though it cost participants
significantly more in fees.  (*Id.* at ¶¶ 64-69).  Further, Advisors "misleadingly
inform[ed] participants that if they did not roll over assets … their only other
option was to manage their employer-sponsored plan accounts entirely by
themselves[.]"  (*Id.* at ¶ 66).  In point of fact, many of the purported benefits of
Portfolio Advisor were available free of charge through a host of other services
plans purchased.  (*Id.* at ¶ 67).  According to Plaintiffs, TIAA had no reason to
think that Portfolio Advisor would better serve plan participants; indeed,
Morningstar, a third-party investment research firm, projected in 2018 that
Portfolio Advisor assets would perform worse than assets in employer-
sponsored plans.  (*Id.* at ¶ 69).

**B.**     **Procedural Background**

Plaintiffs initiated this lawsuit by filing a complaint against Defendants on October 11, 2021.  (Dkt. #1).  The matter was originally assigned to the Honorable John G. Koeltl.  (Case Opening Initial Assignment Notice).  On October 13, 2021, the case was reassigned to the Honorable P. Kevin Castel. (Notice of Case Reassignment).  Defendants first indicated that they intended to move to dismiss the complaint on October 28, 2021, when they requested an extension of time to submit a pre-motion letter discussing their contemplated motion to dismiss.  (Dkt. #16; *see also* Dkt. #23-24 (pre-motion letters)).

On December 14, 2021, Judge Castel held the initial pre-trial conference in this case and set out a briefing schedule for Defendants' anticipated motion to dismiss.  (Dkt. #26).  On January 5, 2022, the case was again reassigned to the Honorable Lewis J. Liman.  (Notice of Case Reassignment).  In line with the previously-set briefing schedule, Defendants filed their motion to dismiss and supporting papers on January 10, 2022.  (Dkt. #35, 36).  The case was then reassigned to the Honorable Andrew L. Carter, Jr., on January 13, 2022. (Notice of Case Reassignment).  The matter was reassigned for a final time to this Court on January 18, 2022.  (Notice of Case Reassignment).  Plaintiffs filed their opposition on February 4, 2022.  (Dkt. #42).  Defendants filed their reply on February 15, 2022.  (Dkt. #46).  Accordingly, Defendants' motion is fully briefed and ripe for this Court's consideration.

## DISCUSSION

**A.    Motions to Dismiss Under Rule 12(b)(6)**

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure

to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).

When considering a motion to dismiss under Rule 12(b)(6), a court should

"draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded

factual allegations to be true, and determine whether they plausibly give rise to

an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.

2011) (internal quotation marks and citation omitted).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570

(2007)).  While the plausibility requirement "is not akin to a 'probability

requirement,' ... it asks for more than a sheer possibility that a defendant has

acted unlawfully."  *Id.*  (citation omitted).  Toward that end, a plaintiff must

provide more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation."  *Id.*  Moreover, "[w]here a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief."  *Id.* (internal quotation

marks omitted) (quoting *Twombly*, 550 U.S. at 557).

**B.    Plaintiffs Fail to Allege That TIAA Was an ERISA Fiduciary During
          the Relevant Timeframe**

Plaintiffs' three claims are brought under ERISA, and proceed from the

premise that Defendants acted as ERISA fiduciaries towards Plaintiffs in

10

connection with their solicitation of Plaintiffs into the Portfolio Advisor program.  TIAA counters that Plaintiffs' claims must be dismissed for the simple reason that TIAA was not an ERISA fiduciary during the relevant timeframe of Plaintiffs' allegations.  (Def. Br. 11).  Because TIAA was not an ERISA fiduciary, it follows that it could not have breached any fiduciary duties allegedly owed to Plaintiffs.  (*Id.*).  Plaintiffs do not seriously dispute that their claims depend on whether TIAA is deemed a fiduciary.  (*See, e.g.*, Pl. Opp. 1 ("TIAA does not contest that the complaint spells out egregious violations of ERISA's exacting duties to act prudently and 'with an eye single to the interests of the participants and beneficiaries,' it merely disputes that those duties applied." (internal citation omitted)).  Accordingly, before addressing the remaining elements of Plaintiffs' claims, the Court considers the antecedent issue of whether TIAA was an ERISA fiduciary.

### 1.  Applicable Law

By statute, ERISA imposes a number of duties on plan fiduciaries.  *See* ERISA § 404, 29 U.S.C. § 1104.[2]  Principal among these duties are the obligations to act "solely in the interest of the participants" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  *Id.* § 1104(a)(1).  This Circuit has referred to ERISA's fiduciary duties as "the highest known to the law."  *Donovan* v. *Bierwirth*, 680 F.2d 263, 272 n.8

---

[2]     The section numbers assigned to the provisions of ERISA in Title 29 do not line up with the section numbering in the original Act.

(2d Cir. 1982); *see also John Hancock Mut. Life Ins. Co.* v. *Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993) ("Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive.").

ERISA contains several provisions meant to enforce these duties of prudence and loyalty.  For example, Section 409(a) makes plan fiduciaries liable for breaches of these statutory duties:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).  And Section 406, among other prophylactic measures, prohibits a fiduciary from engaging in self-dealing transactions with a plan.  *Id.* § 1106(b)(1) ("A fiduciary with respect to a plan shall not ... deal with the assets of the plan in his own interest or for his own account[.]").

To round out this robust scheme, Congress empowered both plan participants and DOL to sue for violations.  Plan participants can sue to recover losses caused by breaches of fiduciary duties and to obtain other equitable remedies.  *See* 29 U.S.C. § 1132(a)(2)-(3).  The Secretary of Labor can also institute civil proceedings under the same provisions, as well as collect civil penalties for a variety of other violations.  *See generally id.* § 1132.  This is

12

in addition to the Secretary's authority to "prescribe such regulations as he finds necessary or appropriate to carry out" ERISA's many provisions. *Id.* § 1135.

Logically, for claims premised on a defendant acting in a fiduciary capacity, "the threshold question is ... whether that [defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Coulter* v. *Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (quoting *Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000)) (citing 29 U.S.C. §§ 1002(21)(A), 1109). "This rule emerges from the principle that 'trustee[s] under ERISA ... wear different hats,' but ERISA requires 'that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions.'" *Massaro* v. *Palladino*, 19 F.4th 197, 211-12 (2d Cir. 2021) (quoting *Pegram*, 530 U.S. at 225). Thus, "'[t]o state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege facts which, if true, would show that the defendant acted as a fiduciary, breached its fiduciary duty, and thereby caused a loss to the plan at issue.'" *Tr. of Upstate N.Y. Eng'rs Pension Fund* v. *Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 121 (S.D.N.Y. 2015) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 730 (2d Cir. 2013) (Straub, J., dissenting in part)), *aff'd,* 843 F.3d 561 (2d Cir. 2016)

ERISA and its implementing regulations lay out two avenues through which one can become a plan fiduciary subject to these statutory duties. *First* and foremost, ERISA requires that "[e]very employee benefit plan ... be

13

established and maintained pursuant to a written instrument[,]" and that

"[s]uch instrument shall provide for one or more named fiduciaries who jointly

or severally shall have authority to control and manage the operation and

administration of the plan." 29 U.S.C. § 1102(a)(1); *see also Coulter*, 753 F.3d

at 366 (first examining whether defendants were named fiduciaries under the

ERISA plans in breach case). *Second*, ERISA provides that one may become a

*de facto* or "functional" fiduciary

> to the extent [i] he exercises any discretionary authority
> or discretionary control respecting management of such
> plan or exercises any authority or control respecting
> management or disposition of its assets, [ii] he renders
> investment advice for a fee or other compensation,
> direct or indirect, with respect to any moneys or other
> property of such plan, or has any authority or
> responsibility to do so, or [iii] he has any discretionary
> authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A); *see also Mertens* v. *Hewitt Assocs.*, 508 U.S. 248, 251

(1993); *Coulter*, 753 F.3d at 366.

## 2. Analysis

Plaintiffs acknowledge that TIAA is not a named fiduciary under their

plans, and accordingly look to the functional fiduciary provisions of ERISA to

satisfy their threshold showing in this case. (*See* Compl. ¶¶ 71, 82-101 (citing

and applying the functional fiduciary provisions to TIAA's alleged conduct)). In

broad summary, Plaintiffs offer three reasons why TIAA should be considered a

functional fiduciary during the relevant timeframe: (i) TIAA made various

representations that it was a fiduciary, such that it should now be equitably

estopped from denying fiduciary status (*see, e.g.*, Compl. ¶¶ 28, 38-41, 89);

14

(ii) TIAA "render[ed] investment advice for a fee" as described in 29 U.S.C. § 1002(21)(A)(ii) by encouraging plan participants to roll over assets to Portfolio Advisor (*see, e.g.*, Compl. at ¶ 114); and (iii) TIAA exercised discretionary authority or control over the plans' management or administration as described in 29 U.S.C. § 1002(21)(A)(i) & (iii), through its use of confidential participant information and through various product design decisions (*see, e.g.*, *id.*). The Court addresses each of these arguments in turn.

> ### a.   TIAA Is Not Equitably Estopped From Arguing That It Was Not an ERISA Fiduciary

Before Plaintiffs engage with ERISA's statutory language or implementing regulations, they first argue that TIAA is equitably estopped from denying its status as an ERISA fiduciary. (Pl. Opp. 9-13). The crux of Plaintiffs' contention is that during the relevant timeframe, TIAA held itself out to the public as acting in the best interests of plan participants, and that it made similar representations during individual pitches to roll over plan assets to Portfolio Advisor. (*See, e.g.*, *id.* at 9 ("The Consultative Sales Process touted TIAA's non-profit heritage because TIAA knew that focusing on its trusted reputation would induce rollovers. TIAA trained advisors to inform participants that TIAA was providing objective advice untainted by commissions and acting solely in the participants' best interests." (citing Compl. ¶¶ 28, 38-41, 89))).

In this regard, Plaintiffs seize on a 2012 marketing brochure that explicitly referred to TIAA "meeting a *fiduciary standard*" when providing investment recommendations. (Pl. Opp. 10; *see also* Compl. ¶ 41). TIAA rejoins that Plaintiffs' equitable estoppel argument ascribes undue influence to

the brochure, and that Plaintiffs have otherwise failed to make out a claim for equitable estoppel.  (Def. Br. 25).  Further, it points out that Plaintiffs have not cited to any precedent — nor is TIAA aware of any — in which a defendant was deemed to be an ERISA fiduciary solely on a theory of equitable estoppel.  (Def. Reply 9).

Generally speaking, "[t]he doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  *Babitt* v. *Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 93 (2d Cir. 2003) (quoting *Kosakow* v. *New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001)).  "Under federal law, a party may be estopped from pursuing a claim or defense where: [i] the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; [ii] and the other party reasonably relies upon it; [iii] to her detriment."  *Kosakow*, 274 F.3d at 725 (citing *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59 (1984); RESTATEMENT (SECOND) OF TORTS § 894 (1979)); *see also Buttry* v. *Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)).  Plaintiffs in ERISA cases must further show "extraordinary circumstances" in order for the doctrine to apply. *Paneccasio* v. *Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008) (citation omitted).

The Court concludes that Plaintiffs fail to state a claim for equitable estoppel because (i) Plaintiffs have failed to demonstrate that *they*, rather than

unknown members of the general public, relied upon TIAA's statements and representations; (ii) many of the statements and representations cited by Plaintiffs are too general to engender justifiable reliance; and (iii) Plaintiffs have failed to demonstrate the "extraordinary circumstances" necessary for equitable estoppel to apply.  *First*, Plaintiffs fail to allege that they in fact relied on TIAA's representations or that TIAA disseminated misleading statements *to them*, rather than to the broader public.  This is particularly true as it relates to the 2012 marketing brochure.  Reasonable reliance is a necessary element of equitable estoppel and analogous claims for equitable relief, and courts in this District routinely find the doctrine inapplicable where plaintiffs fail to plead facts showing *personal* reliance on the conduct at issue.  *See, e.g.*, *Jacubovich* v. *Israel*, 397 F. Supp. 3d 388, 393 (S.D.N.Y. 2019) (finding equitable estoppel inapplicable because "plaintiffs have not even alleged that their grandfather (or anyone else acting on behalf of the estate) actually saw — much less relied on — the" document at issue), *aff'd sub nom. Jacubovich* v. *State of Israel*, 816 F. App'x 505 (2d Cir. 2020) (summary order); *Doe* v. *Kolko*, No. 06 Civ. 2215 (SLT) (MDG), 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) ("Equitable estoppel is appropriate [for a claim based on] defendants' misconduct toward the potential plaintiff, not a community at large … plaintiffs' allegations establish that defendants targeted 'victims,' not John Doe No. 2 or John Doe No. 3."); *see also Roeder* v. *J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 620 (S.D.N.Y. 2021) ("The equitable estoppel claim is personal.  A lie to Person A cannot support a claim of equitable estoppel by Person B absent some showing

that the misrepresentation affected the ability of Person B to bring a timely claim."), *aff'd*, No. 21-552, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order).

No doubt, many of TIAA's representations in the 2012 brochure were imprudent, particularly now as the company vigorously disputes that it was a fiduciary for ERISA purposes.  But in the absence of Plaintiffs pleading facts to show that this brochure in fact caused the alleged harm here, the Court is unwilling to impose the heightened fiduciary duties embodied in ERISA on TIAA based on a single 10-year-old marketing document or general allegations premised on vague statements.[3]  Equitable principles like estoppel are "properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  *Veltri* v. *Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) (internal quotation marks and citation omitted). In other words, equitable estoppel is designed to place the aggrieved party on the same footing as it should have been but for their opponent's conduct. Absent a showing that Plaintiffs here relied on TIAA's alleged

---

[3]     Plaintiffs protest that the brochure was simply one example, and that the Court may also consider an Assurance of Discontinuance issued by the New York Attorney General in resolving an investigation into sales practices at TIAA.  (Pl. Opp. 11 & n.7 (citing *In re TIAA-CREF Individ. & Instl. Svcs. LLC*, Assurance of Discontinuance (July 9, 2021), https://ag.ny.gov/sites/default/files/tiaa_aod_-_2021.07.13_-_fully_executed.pdf (last accessed Sept. 27, 2022)).  However, the Court will not permit Plaintiffs to amend their pleadings in their opposition submission.  *See generally Shah* v. *Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint"). Even if the Court were to consider this document, it would not remedy the other deficiencies discussed in the text.

misrepresentations, application of estoppel here would give them an undue windfall.

*Second*, many of statements and representations Plaintiffs submit toward their estoppel claim are simply too general to engender justifiable reliance. *See Herter* v. *Dick's Clothing & Sporting Goods, Inc.*, 58 F. Supp. 2d 306, 312 (S.D.N.Y. 1999) (finding "reliance on … general statement was not reasonable" and that "words were too non-specific for [p]laintiff to have based his actions on them."); *Pronti* v. *CNA Fin. Corp.*, No. 03 Civ. 1518 (GTE) (DRH), 2007 WL 4246339, at *6 (N.D.N.Y. Nov. 28, 2007) ("No reasonable person could construe the general language in the e-mail as sufficient to make specific promises about the manner in which [plaintiff's] pension benefit would be calculated."); *King* v. *C.A.C. Indus., Inc.*, No. 00 Civ. 449 (MDG), 2018 WL 5084818, at *4 (E.D.N.Y. Oct. 17, 2018) (rejecting equitable estoppel claim where party relied on "misunderstanding" rather than "affirmative misrepresentation").  Beyond the 2012 brochure, Plaintiffs argue that TIAA's representations that it provided "objective advice" or its emphasis on its "non-profit heritage" form the basis for an estoppel claim.  (Compl. ¶¶ 38-40).  Again, Plaintiffs do not allege reliance on these types of representations.  But even if Plaintiffs did, taking these statements to mean that TIAA held itself out as an *ERISA fiduciary* as opposed to a generally reliable and trusted company would not be justified, without more.

*Third* and finally, equitable estoppel is a "drastic remedy."  *Mason* v. *Jamie Music Pub. Co.*, 658 F. Supp. 2d 571, 586 (S.D.N.Y. 2009).  This is

particularly so in the context of ERISA, which requires a showing of
"extraordinary circumstances" for the doctrine to apply.  *Sullivan-Mestecky* v.
*Verizon Commc'ns Inc.*, 961 F.3d 91, 101-02 (2d Cir. 2020) (finding
extraordinary circumstances given the "persistence and size of [the ERISA
fiduciary's] error, notwithstanding the ample inquiry notice provided by
[plaintiff's] calls" alerting the fiduciary to the issue).  Once again, Plaintiffs have
pleaded no extraordinary circumstances relating to them.  And the Court finds
unavailing Plaintiffs' citation to cases in which fiduciary status is not in
dispute, and ERISA fiduciaries have been estopped from asserting various legal
arguments.  (Pl. Opp. 10-13).  For example, Plaintiffs cite to *CIGNA Corp.* v.
*Amara*, 563 U.S. 421 (2011), a case in which the Supreme Court found
equitable estoppel to be an appropriate remedy in a "suit by a beneficiary
against a plan fiduciary … about the terms of a plan."  *Id.* at 439; *see also*
*Sullivan-Mestecky*, 961 F.3d at 99-102 (discussing estoppel where fiduciary
status of defendants was not in contention); *Devlin* v. *Empire Blue Cross & Blue
Shield*, 274 F.3d 76, 85-87 (2d Cir. 2001) (same).  Here, whether TIAA is
estopped from arguing that it was a plan fiduciary is precisely what is at issue
on this motion to dismiss, and Plaintiffs' citations to these cases effectively put
the cart before the horse.  Likewise, the fact that "the burden under ERISA
shifts to the defendants to disprove any portion of potential damages by
showing that the loss was not caused by the breach of fiduciary duty," as held
by the Second Circuit in *Sacerdote* v. *New York University*, does nothing to
impute fiduciary status in the first instance to TIAA.  9 F.4th 95, 113 (2d Cir.

2021), *cert. denied*, 142 S. Ct. 1112 (2022).  Instead, this goes to *breach*, which TIAA does not directly put at issue on this motion to dismiss.  In short, Plaintiffs' cited cases are inapposite and, indeed, confirm that no court has ever found that an otherwise non-fiduciary defendant is estopped from denying fiduciary status.  This Court will not be the first.

### b. Plaintiffs Have Not Adequately Pleaded Facts Showing That TIAA Was an Investment Advice Fiduciary

Plaintiffs next turn to the functional fiduciary provisions of ERISA and its implementing regulations to argue that TIAA assumed fiduciary status vis-à-vis the plans.  In the Complaint, Plaintiffs lead with the investment advice provisions of ERISA (*see* Compl. ¶¶ 82-89), and allege that "TIAA and TIAA Services, acting through the Advisors under their direction and control, rendered investment advice with respect to ERISA plan moneys each time an Advisor executed TIAA's Consultative Sales Process and advised ERISA plan participants how they should invest their plan accounts." (*Id.* at ¶ 83).  TIAA proffers two main arguments for dismissal: (i) per DOL guidance during the relevant timeframe, rollover recommendations did not constitute investment advice (Def. Br. 12-16), and (ii) independent of the DOL interpretations, Plaintiffs fail to plead facts showing that the rollover recommendations here constituted investment advice (*id.* at 16-20).

As noted above, "a person is a fiduciary with respect to a plan to the extent he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii).  In 1975, DOL

promulgated a foundational test for determining who qualifies as an "investment advice" fiduciary under this prong of the functional fiduciary statutory provision. *See* 29 C.F.R. § 2510.3-21. DOL then promulgated amendments to the 1975 test in 2016, but the amendments were struck down, and the 1975 test was reinstated and remains in place today. "[T]o plead that a defendant is a fiduciary because it provided investment advice for a fee [in satisfaction of 29 U.S.C. § 1002(21)(A)(ii)], a plaintiff must plead that [i] the defendant provided individualized investment advice; [ii] on a regular basis; [iii] pursuant to a mutual agreement, arrangement, or understanding that [iv] the advice would serve as a primary basis for the plan's investment decisions; and [v] the advice was rendered for a fee." *Bekker* v. *Neuberger Berman Grp. LLC*, No. 16 Civ. 6123 (LTS) (BCM), 2018 WL 4636841, at *10 (S.D.N.Y. Sept. 27, 2018) (citing 29 C.F.R. § 2510.3-21) (internal quotation marks omitted); *see also F.W. Webb Co.* v. *State St. Bank & Tr. Co.*, No. 09 Civ. 1241 (RJH), 2010 WL 3219284, at *8 (S.D.N.Y. Aug. 12, 2010) (laying out the same elements under the regulation); *Chamber of Com. of United States of Am.* v. *United States Dep't of Lab.*, 885 F.3d 360, 364 (5th Cir. 2018) (citing same test in striking down amended regulation) ("*Chamber of Commerce*").

### i.      The Evolving DOL Guidance

The Court digresses from its analysis to acknowledge that this is not a run-of-the-mill statutory or regulatory interpretation case, given DOL's shifting perspective over the last two decades regarding what qualifies as "investment advice." In 2005, DOL issued Advisory Opinion 2005-23A (the "Deseret

Letter"), which appears to fully address the implications on fiduciary status of

TIAA's conduct in the instant case.[4]  The Deseret Letter reads in relevant part:

> It is the view of the Department that merely advising a plan participant to take an otherwise permissible plan distribution, even when that advice is combined with a recommendation as to how the distribution should be invested, does not constitute "investment advice" within the meaning of the regulation (29 CFR § 2510-3.21(c)). The investment advice regulation defines when a person is a fiduciary by virtue of providing investment advice with respect to the assets of an employee benefit plan. The Department does not view a recommendation to take a distribution as advice or a recommendation concerning a particular investment (*i.e.*, purchasing or selling securities or other property) as contemplated by regulation § 2510.3-21(c)(1)(i). Any investment recommendation regarding the proceeds of a distribution would be advice with respect to funds that are no longer assets of the plan.

U.S. Dep't of Labor, Advisory Opinion 2005-23A (December 7, 2005) (footnotes

omitted).  Because the Deseret Letter explains that funds taken out of a plan

for rollover purposes are "no longer assets of the plan," under this

interpretation of "investment advice," TIAA's pitch to plan members to roll

assets out of their plans and into Portfolio Advisor necessarily did not create a

fiduciary relationship.

But this is not the end of the story.  In 2020, DOL changed course and

withdrew the Deseret Letter.  (Def. Br. 18; Pl. Opp. 20).  In conjunction with

this withdrawal, the agency, following a notice and comment period,

promulgated a new interpretation and acknowledged that the absolute edict

---

[4]     The Deseret Letter is available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/2005-23a (last accessed Sept. 27, 2022).

contained in the Deseret Letter — that assets rolled over from employer-
sponsored plans could never be considered "assets of the plan" — was
misguided:

> The Department believes that the analysis in the
> Deseret Letter was incorrect when it stated that advice
> to take a distribution of assets from a Title I Plan is not
> advice to sell, withdraw, or transfer investment assets
> currently held in the plan. A recommendation to roll
> assets out of a Title I Plan is necessarily a
> recommendation to liquidate or transfer the plan's
> property interest in the affected assets and the
> participant's associated property interest in plan
> investments.

Prohibited Transaction Exemption 2020-02, Improving Investment Advice for
Workers & Retirees, 85 Fed. Reg. 82798-01, at 82803. Significantly, however,
this "assets of the plan" interpretation is the explicit reversal only of the
Deseret Letter, and not of the five-part test that the Deseret Letter interpreted.
*See id.* at 82804 ("[T]he Department now is only changing its view on the
Deseret Letter (and specifically, one aspect of it). The five-part test still applies
without the Deseret Letter, as it did for decades before the letter.").

Accordingly, DOL's new interpretation is, in some respects, a return to
the past. It does not suggest, for example, that one-time sales advisements are
*always* investment advice. Instead, it notes that advice to roll over plan assets
should be analyzed under the 1975 five-part facts and circumstances analysis
discussed above. 85 Fed. Reg. 82798-01, at 82804. As an example of how this
analysis might apply to rollover advice, DOL notes that, as to the "regular
basis" prong:

> [A]dvice to roll over plan assets can also occur as part of an ongoing relationship or an intended ongoing relationship that an individual enjoys with his or her investment advice provider. In circumstances in which the investment advice provider has been giving advice to the individual about investing in, purchasing, or selling securities or other financial instruments through tax-advantaged retirement vehicles subject to Title I or the Code, the advice to roll assets out of a Title I Plan is part of an ongoing advice relationship that satisfies the regular basis prong. Similarly, advice to roll assets out of a Title I Plan into an IRA where the investment advice provider has not previously provided advice but will be regularly giving advice regarding the IRA in the course of a more lengthy financial relationship would be the start of an advice relationship that satisfies the regular basis prong. It is clear under Title I and the Code that advice to a Title I Plan includes advice to participants and beneficiaries in participant-directed individual account pension plans, so in these scenarios, there is advice to the Title I Plan — meaning the Plan participant or beneficiary — on a regular basis.

*Id.* at 82805.

DOL recognized, and accounted for the possibility, that this new opinion would likely create new legal exposure for industry participants:

> [I]n response to commenters expressing concern about the possibility of being held liable for past transactions that would not have been treated as fiduciary under the Deseret analysis, the Department will not pursue claims for breach of fiduciary duty or prohibited transactions against any party, or treat any party as violating the applicable prohibited transaction rules, for the period between 2005, when the Deseret Letter was issued, and February 16, 2021, based on a rollover recommendation that would have been considered non-fiduciary conduct under the reasoning in the Deseret Letter.

85 Fed. Reg. 82798-01, at 82804. This decision to not pursue such claims is also informed by the "reliance interests of those who looked to the Deseret

Letter for guidance," *id.*, given that such advisory opinions constitute "'a body of experience and informed judgment to which the courts and litigants may properly resort for guidance,'" *id.* (quoting *Raymond B. Yates, M.D., P.C. Profit Sharing Plan* v. *Hendon*, 541 U.S. 1, 18 (2004); *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944))).

The Court is faced, then, with a letter providing guidance to TIAA during the relevant timeframe; and a contrary after-the-fact interpretation that was promulgated following more formal notice and comment procedures.  Two findings are clear from caselaw.  *First*, the new interpretation need not be applied in full force retroactively.  *See, e.g.*, *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *see also* 85 Fed. Reg. 82798-01 at 82804 ("[B]ecause the Department does not wish to disturb the reliance interests of those who looked to the Deseret Letter for guidance, the Department also does not expect or intend a private right of action to be viable for a transaction conducted in reliance on the Deseret Letter prior to that date.").  *Second*, as Plaintiffs note, advisory opinions necessarily "lack the force of law," and their interpretations are "entitled to respect … only to the extent that those interpretations have the power to persuade." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (internal quotation marks and citation omitted).  Plaintiffs are correct that the

26

fact that TIAA would not be a fiduciary under the Deseret Letter's interpretation does not compel the Court to dismiss this case.[5]

Turning first to the import of the new interpretation, the Court agrees with TIAA that it should not be applied reflexively to conduct that predated its issuance. "Retroactivity is not favored in the law," and as noted above, courts are hesitant to apply administrative rules retroactively, applying them only when "their language requires this result." *Bowen*, 488 U.S. at 208; *see also N-N* v. *Mayorkas*,, 540 F. Supp. 3d 240, 266 (E.D.N.Y. 2021) (applying *Bowen* in the administrative law setting); *Blanca Tel. Co.* v. *Fed. Commc'ns Comm'n*, 991 F.3d 1097, 1116-17 (10th Cir.) ("It would be inappropriate for an agency, having long acquiesced in practice to one interpretation, to manufacture liability by retroactively applying a new interpretation."), *cert. denied*, 142 S. Ct. 486 (2021), *reh'g denied*, 142 S. Ct. 850 (2022). The new interpretation explicitly states that it should not be applied retroactively, 85 Fed. Reg. 82798-01 at 82804, which weighs heavily against applying the new interpretation

---

[5]     TIAA reads too much into *Acosta* v. *Target Corp.*, 745 F.3d 853 (7th Cir. 2014). In *Acosta*, the Seventh Circuit found that it was proper to look back to the relevant statute and regulations as they existed at the time of the conduct at issue, rather than new agency regulations and commentary promulgated under an amended statute, when determining the defendant's liability. *See id.* at 859-60. In so doing, the court accepted defendant's argument that, under the statute and regulations "as they existed in 2004-2007," the time period when defendant engaged in the at-issue conduct, defendant's "interpretation was reasonable" such that the court should not hold defendant "liable for a change it could not predict." *Id.* at 860. Undercutting TIAA's arguments in the instant case, however, the Seventh Circuit did not mechanically rule in favor of the defendant. Instead, it declined to apply the new regulations and commentary retroactively, and then determined whether the defendant's interpretation of the statute and regulations during the relevant timeframe was reasonable. *Id.* at 859-60. Moreover, while the Deseret Letter was only persuasive, the regulations at issue in *Acosta* were binding. The Deseret Letter's power to persuade this Court today is undisputedly undermined by the DOL's change in interpretation.

retroactively here.  Indeed, as the Supreme Court has explained, the hesitation surrounding retroactivity

> is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.

*Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 265 (1994) (internal quotation marks and footnotes omitted).

In the administrative law context, new interpretations of administrative rules can be a particular source of mischief where "the agency's interpretation conflicts with a prior interpretation," which therefore creates "the kind of 'unfair surprise' against which our cases have long warned."  *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012) (quoting *Long Island Care at Home, Ltd.* v. *Coke*, 551 U.S. 158, 170-71 (2007), and citing *Thomas Jefferson Univ.* v. *Shalala*, 512 U.S. 504, 515 (1994)); *cf. Marsh* v. *J. Alexander's LLC*, 905 F.3d 610, 632 (9th Cir. 2018) ("Because the interpretation that the DOL advances in its Guidance and amicus brief is 'entirely consistent with its past views,' *Auer* deference is warranted.").  This is especially so where new interpretations would "impose potentially massive liability on [a] respondent for conduct that occurred well before that interpretation was announced."  *SmithKline Beecham Corp.*, 567 U.S. at 155-

56. Accordingly, the Supreme Court has cautioned against affording heightened deference to new agency interpretations where these factors are present. *Id.*

The concerns with retroactivity are particularly acute here. The Deseret Letter was DOL's clearest statement on this issue for 15 years. DOL itself has recognized that the Deseret Letter engendered substantial reliance interests, and that industry participants should not be subject to new liability based on its new regulations regarding investment advice. 85 Fed. Reg. 82798-01 at 82804. These concerns, then, bolster the Court's decision not to apply the new interpretation retroactively or to afford it heightened deference in the circumstances of this case.[6]

How, then, should the Court interpret the investment advice fiduciary provisions in light of DOL's shifting interpretations? There is no DOL interpretation binding the Court. To the extent the Deseret Letter had the power to persuade prior to 2020, such power is undermined by the change in interpretation by DOL. The soundest approach — one that neither creates unfair surprise nor places undue weight on DOL's now-rescinded advisory opinion — is to analyze the facts under the time-tested five-part test, using the

---

[6]    Neither party suggests that, even if not applied retroactively, the new interpretation is nonetheless entitled to *Skidmore* or other deference. *Skidmore* v. *Swift & Co.* says that certain agency actions are given the power to persuade based on the "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. 134, 140 (1944). Even taking those factors into account, the Court is not persuaded that the new interpretation is entitled to such deference in this case, given, among other things, its inconsistency with prior interpretations.

"'traditional tools of construction'" and applying deference only "after having exhausted all of" them. *Aleutian Cap. Partners, LLC* v. *Scalia*, 975 F.3d 220, 232 (2d Cir. 2020) (quoting *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2416 (2019)).

The Court will therefore engage in its own interpretation of ERISA's statutory provisions and the regulations promulgated thereunder, taking into account, when appropriate, the reasoning of either the Deseret Letter or the Rule. *See, e.g.*, *Bey* v. *City of New York*, 999 F.3d 157, 166-67 (2d Cir. 2021) (finding "regulation to be unambiguous" and thus not applying *Auer* deference, but observing that agency's "guidance only further supports our reading of the regulation"). In this respect, it agrees with the Plaintiffs, who argue that "[i]f deference is not warranted [under the new DOL interpretation], the rule is not that the defendant wins or the prior interpretation controls.... Instead, the court simply proceeds to interpret the statute and regulation *de novo* instead of giving binding effect to the new interpretation." (Pl. Opp. 16 (internal quotation marks and emphasis omitted)). *See also SmithKline Beecham Corp.*, 567 U.S. at 161 ("In light of our conclusion that the DOL's interpretation is neither entitled to *Auer* deference nor persuasive in its own right, we must employ traditional tools of interpretation to determine" the issue.). The Court will thus consider the relevant statutory and regulatory provisions, including the five-part investment advice test — as well as interpretations from other courts that have considered the relevant statutory and regulatory language and DOL guidance over the years — to determine whether TIAA was an investment advice fiduciary during the relevant time period.

30

   **ii.**  **Plaintiffs Fail to Plead Facts Demonstrating That TIAA Rendered Investment Advice on a Regular Basis to the Plans**

  The Court begins by considering whether TIAA provided "investment advice" on a "regular basis."  29 C.F.R. § 2510.3-21(c).  For the reasons that follow, the Court concludes that it did not.

  *First*, for TIAA to have provided advice on a "regular basis," there must have been some number of instances in which advice was provided.  The Court need not decide what, exactly, that number is, because Plaintiffs' allegations of two to three interactions are clearly insufficient.  (*See* Compl. ¶¶ 33-37 (discussing an initial phone call, meeting, then recommendation to roll over assets)).  *See also Schloegel* v. *Boswell*, 994 F.2d 266, 273 (5th Cir. 1993) ("providing invest-type advice" over the course of "a few instances" did not constitute a regular basis); *Fuller* v. *SunTrust Banks, Inc.*, No. 11 Civ. 784 (ODE), 2019 WL 1996693, at *14 (N.D. Ga. Mar. 29, 2019) (finding that representatives of registered investment advisor were not ERISA fiduciaries because, among other facts, provision of advice was delivered too sporadically over the course of years); *Del Castillo* v. *Cmty. Child Care Council of Santa Clara Cnty., Inc.*, No. 17 Civ. 7243 (SVK), 2018 WL 11361335, at *13 (N.D. Cal. Nov. 19, 2018) (concluding that allegations regarding provision of advice at "multiple meetings of the [] Board" were not "sufficient to support an inference of regular advice"); *Nat'l Ass'n for Fixed Annuities* v. *Perez*, 217 F. Supp. 3d 1, 12 (D.D.C. 2016) (finding "occasional or intermittent" advice did not constitute advice "on a regular basis" under the 1975 regulations); *cf. Chamber of*

31

*Commerce*, 885 F.3d at 375 ("The contemporary case law similarly demonstrates that when investment advice was procured 'on a fee basis,' it entailed a substantial, ongoing relationship between adviser and client." (collecting cases)).  The Consultative Sales Process does not constitute advice on a "regular basis" in a strictly numerical sense, given the limited number of actual interactions with plan participants prior to the rollover decision.

Further to this point, "regular basis" is meant to be understood in the context of the *plan's* investment decisions.  The investment advice provision of ERISA states that "a person is a fiduciary *with respect to a plan* to the extent … he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property *of such plan*, or has any authority or responsibility to do so[.]"  29 U.S.C. § 1002(21)(A)(ii) (emphasis added).  The 1975 regulations reiterate this focus on plan-level advising.  In order to fall within the regulation's definition, one must provide investment advice on "a regular basis to *the plan* pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and *the plan* or a fiduciary with respect to *the plan*[.]"  29 C.F.R. § 2510.3-21(c)(1)(ii)(B) (emphases added); *see also Walker* v. *Merrill Lynch & Co. Inc.*, 181 F. Supp. 3d 223, 234 (S.D.N.Y. 2016) ("Plaintiff has not pled facts demonstrating that Merrill Lynch provided 'individualized investment advice' *to the Plan*; that it did so 'on a regular basis'; that it provided that advice pursuant to a 'mutual agreement, arrangement, or understanding'"; or that the parties understood that the advice provided by Merrill Lynch 'would serve as a primary basis for

32

the plan's investment decisions.'" (emphasis added) (quoting *F.W. Webb Co.*, 2010 WL 3219284, at *8)); *Advanced Salon Visions Inc.* v. *Lincoln Benefit Life Co.*, No. 08 Civ. 2346 (LAB) (WMC), 2010 WL 3341803, at *6 (S.D. Cal. Aug. 25, 2010) ("[I]t doesn't make a meaningful difference that Plaintiffs adopted multiple plans on the advice of the Defendants, and over the course of several years.  This is because an ERISA fiduciary is a fiduciary of *a plan*." (emphasis in original) (citing 29 U.S.C. § 1109(a))); *see generally Farm King Supply, Inc. Integrated Profit Sharing Plan & Tr.* v. *Edward D. Jones & Co.*, 884 F.2d 288, 293 (7th Cir. 1989) (applying ERISA's statutory text and 1975 regulations and noting that "[t]he starting point of the analysis is whether under the regulation there existed a mutual agreement or understanding between the parties that [the brokerage firm's] advice would be the primary basis for the Plan's investment decisions").

Plaintiffs contend that TIAA's actions constituted regular investment advising on the theory that it is appropriate to aggregate all of TIAA's interactions with various plan participants.  (Pl. Opp. 18).  But this argument is not supported in the caselaw, and indeed is contradicted by the statutory text and prevailing regulations.  Plaintiffs' citation to a Supreme Court concurrence joined by only two Justices in *LaRue* v. *DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008) (Thomas, J., concurring), only underscores this point.  Further, in the cases Plaintiffs cited throughout their opposition, whether the defendant-respondent was a fiduciary in the first instance was not at issue.  *See, e.g., id.* at 252-53.  *LaRue* says nothing about the functional fiduciary

provisions, let alone what it means to provide investment advice on a regular basis to an ERISA plan.

*Second*, this limited number of actual interactions was related only to one investment decision: that of rolling assets over from the employer-sponsored plan to Portfolio Advisor. This is relevant to the understanding of "regular basis," as that phrase need not distill down into a mere quantitative inquiry, but also may be understood in the context of routinely providing plans with investment advice on a variety of decisions.

The Court notes that DOL has provided guidance on whether rollover recommendations — the activity at issue here (*see* Pl. Opp. 19) — are given on a "regular basis," given their nature as one-off recommendations. As an initial matter, and contrary to TIAA's argument, the Deseret Letter is *not* an example of such guidance, because it did not directly speak to the regular basis inquiry. (*See* Def. Br. 19-20). Instead, it focused on how, if at all, rollover recommendations could constitute "investment advice," concluding that they did not because "[a]ny investment recommendation regarding the proceeds of a distribution would be advice with respect to funds that are no longer assets of the plan." (Deseret Letter). But other prior DOL interpretive guidance accords with the Court's understanding that, under a plain reading of the 1975 regulations, rollover recommendations do not constitute advice "on a regular basis" because they are "one-time" recommendations. *See* Definition of the Term "Fiduciary"; Conflict of Interest Rule — Retirement Investment Advice, 80 Fed. Reg. 21928-01, 21951. For example, in a 2015 notice of proposed

34

rulemaking designed to dispense with the five-part test in favor of new regulations with more expansive fiduciary provisions, DOL opined that rollovers could not constitute advice on a regular basis because they are "one-time" decisions.  *Id.* ("These rollovers, which will be one-time and not 'on a regular basis' and thus not covered by the 1975 standard[.]"); *see also id.* at 21952 ("Too much has changed since 1975, and too many investment decisions are made as one-time decisions and *not advice on a regular basis* for the five-part test to be a meaningful safeguard any longer." (emphasis added)).  When DOL eventually promulgated these more expansive fiduciary rules and dispensed with the 1975 five-part test,[7] the Fifth Circuit Court of Appeals struck them down as exceeding the authority delegated to DOL by Congress in ERISA and as running afoul of the statute's plain text.  *Chamber of Commerce*, 885 F.3d at 369, 388.  In so doing, the Fifth Circuit noted that "by requiring that the advice be given to the customer on a 'regular basis' and that it must also be the 'primary basis' for investment decisions, the definition [of investment advice fiduciary under the 1975 regulations] excluded one-time transactions like IRA rollovers." *Id.* at 365; *see also id.* at 380 (finding "DOL's 1975 regulations only covered 'investment advice fiduciaries' who rendered advice regularly and as the primary basis for clients' investment decisions," and thus did not "include[] one-time IRA rollover or annuity transactions").

---

[7]     *See* Definition of the Term "Fiduciary"; Conflict of Interest Rule — Retirement Investment Advice, 81 Fed. Reg. 20946-01, 20946 ("The 1975 regulation was adopted prior to … the now commonplace rollover of plan assets from ERISA-protected plans to IRAs.  Today, as a result of the five-part test, many investment professionals … have no obligation to adhere to ERISA's fiduciary standards[.]").

As discussed, DOL's recently-promulgated 2020 final interpretation and accompanying preamble, 85 Fed. Reg. 82798-01, reflects the agency's amended interpretation, which brings rollovers within the purview of ERISA and its investment advice provisions in certain circumstances.  It adopts a different tack than the agency adopted in 2016: instead of looking to *replace* the five-part investment advice test, it builds on it.  *Id.* at 82799 ("This document also sets forth the Department's final interpretation of the five-part test of investment advice fiduciary status for purposes of this exemption, and provides the Department's views on when advice to roll over Title I Plan assets to an IRA will be considered fiduciary investment advice under Title I and the Code.").  Once again, however, DOL explained that the new interpretation was necessary to cover rollovers, because they are one-time occurrences historically understood not to constitute advice on a regular basis:

> The Department has carefully considered these comments in clarifying its interpretation of the "regular basis" prong of the five-part test.  The Department does not believe that the regular basis prong has effectively been eliminated by stating that this prong may be satisfied, in some cases, with the occurrence of first-time advice on rollovers that is intended to be the beginning of a long-term relationship.  The regulation still requires, in all cases, that advice will be provided on a regular basis.  The Department's interpretation merely recognizes that the rollover recommendation can be the beginning of an ongoing advice relationship.  It is important that fiduciary status extend to the entire advisory relationship.

*Id.* at 82806.

As discussed above, this 2020 guidance was not in place at the time of the conduct implicated in this case.  (*See* Compl. ¶¶ 12 (Plaintiff John Carfora

opened a Portfolio Advisor account in September 2015), 13 (Plaintiff Sandra
Putnam opened a Portfolio Advisor account in July 2018), 14 (Plaintiff Juan
Gonzales opened a Portfolio Advisor account in December 2013)).  Nonetheless,
Plaintiffs ask the Court to make TIAA retroactively liable under this new
interpretation because Plaintiffs have Portfolio Advisor accounts, and thus are
engaged in an "ongoing advice relationship" with TIAA.  But, as noted, the
Court need not give this new interpretation much, if any, deference, as applied
to this case.  *See, e.g.*, *SmithKline Beecham Corp.*, 567 U.S. at 156
("[D]efer[ring] to the agency's [new] interpretation in this circumstance would
seriously undermine the principle that agencies should provide regulated
parties 'fair warning of the conduct [a regulation] prohibits or requires.'"
(quoting *Gates & Fox Co.* v. *Occupational Safety & Health Rev. Comm'n*, 790
F.2d 154, 156 (D.C. Cir. 1986))).  Thus, even if the Court did conclude that
TIAA was a fiduciary based on the rollover recommendation, it would be based
on the Court's own interpretation and not the 2020 guidance.

In point of fact, the Court, engaging in its own interpretation aided by
caselaw and DOL's guidance over the years, does not find that TIAA's limited
recommendations to Plaintiffs to engage in a one-time transaction constitutes
advice on a "regular basis" under "the language of the *statute and regulation*
which have been in effect since 1975[.]"  (Pl. Opp. 23 (emphasis in original)).
The plain meaning of "regular" runs counter to advisement related to a one-
time decision, even if this decision is a consequential one.  *See Kisor*, 139 S. Ct.
at 2415 (holding that a court must "exhaust all the 'traditional tools' of

construction" before "wav[ing] the ambiguity flag," and that if the court finds "uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means — and the court must give it effect, as the court would any law."). Again, it bears repeating that the Supreme Court has cautioned against "defer[ring] to an interpretation that would ... impos[e] retroactive liability on parties for longstanding conduct that the agency had never before addressed." *Id.* at 2418. The Court's outcome would be the same had the Deseret Letter never been issued,[8] as DOL has indicated time and time again in its various notices of proposed rulemaking and rules to address this very issue. To the extent that Plaintiffs have Portfolio Advisor accounts today, they essentially ask the Court to find that they have an ongoing investment advice relationship with TIAA — one that dates back years — despite the fact that a plain reading of the 1975 regulations did not constitute investment advice on a regular basis as to the rollovers in the first instance.

*Third*, Plaintiffs' claims are not bolstered by actions taken *after* the rollover took place. The 2020 guidance notes that the analysis under 29 U.S.C. § 1002(21)(A)(ii) and the 1975 regulations may take into account the nature of

---

[8]     The Court notes that despite not being bound by the Deseret Letter, its decision is in line with the general avoidance of retroactivity of new rules and with DOL's command during rulemaking, where it recognized that "being held liable for past transactions that would not have been treated as fiduciary" conduct would be problematic, and that "the Department ... does not expect or intend a private right of action to be viable for a transaction conducted" in reliance on prior interpretations of the investment advice fiduciary rule. Prohibited Transaction Exemption 2020-02, Improving Investment Advice for Workers & Retirees, 85 Fed. Reg. 82798-01, at 82804.

the relationship after assets have been rolled out of the plan and into an IRA. *Contra* Deseret Letter ("Any investment recommendation regarding the proceeds of a distribution would be advice with respect to funds that are no longer assets of the plan.").  The Court's own analysis would not arrive at the same conclusion.[9]  The 1975 test was promulgated in reference to Section 1002(21)(A)(ii), which says that a "person is a fiduciary with respect to a plan to the extent . . . he renders investment advice . . . *with respect to any moneys or other property of such plan.*"  (emphasis added).  Plaintiffs do not offer an explanation as to why assets, having left the plan, are still "moneys or property of such plan" as relevant to the regular basis inquiry, and the Court reads this statutory text as inconsistent with such argument.  Instead, plaintiffs simply rely on the 2020 interpretive guidance that states: "[A]dvice to roll assets out of a Title I Plan into an IRA where the investment advice provider has not previously provided advice but will be regularly giving advice regarding the IRA in the course of a more lengthy financial relationship would be the start of an advice relationship that satisfies the regular basis prong."  *See* 85 Fed. Reg. 82798-01, at 82805.

        Putting aside the fact that the Court need not defer to that interpretation, the Court finds that the better reading of the statute and regulations takes into account only advice given while the assets are, in fact, plan assets when deciding whether TIAA rendered "investment advice" on a

---

[9]     The Court offers no opinion as to whether, taking into account the deference it may afford the DOL's interpretation when analyzing post-2020 guidance conduct, it would reach the same conclusion.

"regular basis."  *See* 29 C.F.R. § 2510.3-21(c)(1)(ii)(B) ("A person shall be deemed to be rendering investment advice to an employee benefit plan … only if … [the person] [r]enders any advice … on a regular basis to the plan … [and] that such services will serve as a primary basis for investment decisions *with respect to plan assets*[.]" (emphasis added)).  Focusing the analysis on only the timeframe when the assets in question were plan assets, all that TIAA could possibly have provided was a promise of future investment advice, which is not, itself, an additional instance of advice-giving relevant to the regular basis inquiry.  *Cf. Coleman* v. *Nationwide Life Ins. Co.*, 969 F.2d 54, 61 (4th Cir. 1992), *as amended* (July 17, 1992) (noting that "a court must ask whether a person is a fiduciary with respect to the particular activity at issue"); *Massaro*, 19 F.4th at 211 ("[A] plaintiff must also show that the [defendant] was *acting in a fiduciary capacity* when he or she took the challenged action." (emphasis in original)).  Thus, any actions taken as part of TIAA's Portfolio Advisor management following the rollover are outside the scope of the analysis, and do not support Plaintiffs' "regular basis" arguments.

Even if the Court were to consider the 2020 interpretation and look beyond the fact that the rollover itself is a "one-time" occurrence — despite prior DOL guidance and despite the Court's own reading of the statute and the five-part test — and to what happens following the rollover, Plaintiffs do not sufficiently allege that TIAA's actions constituted advice on a "regular basis" once assets were in Portfolio Advisor.  The 2020 guidance is clear that not all one-time rollover recommendations constitute "investment advice."  *See, e.g.*,

40

85 Fed. Reg. 82798-01 at 82806 ("The regulation still requires, in all cases, that advice will be provided on a regular basis.").  The 2020 guidance provides examples to help identify circumstances where a rollover recommendation may constitute "investment advice."  For example, the guidance notes that when the discussions about a rollover include "the parties agreeing to check-in periodically on the performance of the customer's post-rollover financial products," that is evidence of an ongoing investment advice relationship.  *Id.*

Plaintiffs allege that as part of its services, Portfolio Advisor "rebalances the assets if the account deviates from the model portfolio allocation by a certain amount."  (Compl. ¶ 30).  Certainly, this indicates that Portfolio Advisor renders services once assets are moved into the managed accounts.  But Plaintiffs have not alleged facts that would bring the Portfolio Advisor under such definition of "advice."  Looking to the 2020 guidance, Plaintiffs do not allege, for example, initial promises of periodic "check-ins" or their analogues, nor do they even allege that such check-ins happen under the program.  Put simply, Plaintiffs allege no facts as to their relationship with TIAA following the rollover that sound in "recommendations" or individualized discussions.  *Cf. Chamber of Commerce*, 885 F.3d at 374 ("DOL's 1975 regulation flowed directly from contemporary understanding of 'investment advice for a fee,'" which aligned with the position of the Securities and Exchange Commission (the "SEC") that "'[t]he very function of furnishing [investment advice for compensation]'" was "learning the personal and intimate details of the financial affairs of clients and making recommendations as to purchases and sales of

41

securities" (alteration in original) (citation omitted)).  Even if the Court

considered itself bound by the 2020 interpretation, then, it would not find that

Plaintiffs have adequately alleged that TIAA is a fiduciary.[10]

### c.  Plaintiffs Fail to Establish That TIAA Exercised Control over Plan Assets or Had Control over Plan Administration

As a third line of attack, Plaintiffs argue that TIAA acted as a fiduciary

because it "exercise[d] any discretionary authority or discretionary control

respecting management of such plan or exercise[d] any authority or control

respecting management or disposition of its assets," or "ha[d] any discretionary

authority or discretionary responsibility in the administration of such plan."

(Compl. ¶¶ 92-101 (citing 29 U.S.C. § 1002(21)(A))).  Plaintiffs argue in

particular that TIAA qualified as a fiduciary under these statutory provisions

because it "abused its position and exceeded the bounds of its formal authority

to exercise discretion and control over plans' management, operations, and

administration."  (*Id.* at ¶ 94).  It did this, Plaintiffs claim, by leveraging "its

position as the plan's recordkeeper" to "identify promising high-asset sales

targets" (*id.* at ¶ 97), and by refusing to allow plan administrators to "remove

TIAA's affiliated flagship CREF Stock Account as an investment option" for

certain annuity contracts (*id.* at ¶ 100).  TIAA challenges both claims.

---

[10]     The parties disagree as to whether Plaintiffs' claims satisfy any of the other prongs of the 1975 investment advice rule.  (*See* Def. Br. 16-20; Pl. Opp. 16-22; Def. Reply 5-8). The Court has focused its attention on the parties' dispute regarding the provision of investment advice on a regular basis to the plans.  Because the Court has found that Plaintiffs have not pleaded that TIAA provided investment advice to the plans on a regular basis, it need not address Defendants' arguments that Plaintiffs similarly fail to plead facts regarding the requirements of advice made pursuant to a mutual agreement.

> ### i. TIAA's Use of or Access to Participant Information Did Not Create a Fiduciary Relationship

Plaintiffs' first theory as to why TIAA was a fiduciary vis-à-vis the plans under the additional functional fiduciary provisions of ERISA relates to the company's use of participants' personal information.  (*See, e.g.*, Compl. ¶ 95 ("Data about a plan's participants is critical to the operation of a retirement plan.  To accurately perform its recordkeeping function in a defined contribution plan, TIAA received access to highly sensitive, confidential data about the plan's participants[.]")).  Plaintiffs contend that this use of participant information constituted control over both plan assets and the "way the plans were managed and administered[.]"  (*Id.* at ¶ 98).

Section 3 of ERISA provides that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary may prescribe."  29 U.S.C. § 1002(42).  Two regulatory provisions, in turn, define "plan assets."  Section 2510.3-101 states that "[g]enerally, when a plan invests in another entity, the plan's assets include its investment[.]"  29 C.F.R. § 2510.3-101(a)(2).  Separately, Section 2510.3-102 states that

> the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, as of the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets.

29 C.F.R. § 2510.3-102 (a)(1).

Construing these provisions, multiple courts have found that participant information and the like does not fall under the definition of "plan assets." *See, e.g.*, *Harmon* v. *Shell Oil Co.*, No. 20 Civ. 21 (VB), 2021 WL 1232694, at *3 (S.D. Tex. Mar. 30, 2021) ("Neither of the promulgated regulations either expressly or by any plain-language interpretation includes participant data as plan assets under ERISA."); *Divane* v. *Nw. Univ.*, No. 16 Civ. 8157 (JLA), 2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018) ("The Court has no doubt that a compilation of the information TIAA has on participants has some value (to TIAA, at least), but the Court cannot conclude that it is a plan asset under ordinary notions of property rights."), *aff'd*, 953 F.3d 980 (7th Cir. 2020), *vacated and remanded on other grounds sub nom. Hughes* v. *Nw. Univ.*, 142 S. Ct. 737 (2022).  This Court agrees with these courts that the term "plan assets" plainly extends to money or invested capital, but does not extend to encompass any information that may potentially benefit a servicer of the plan.  To the extent that Plaintiffs argue that these courts' interpretations run contrary to the statute (Pl. Opp. 25), which refers to "moneys" in the second prong of the fiduciary definition, 29 U.S.C. § 1002(21)(A)(ii), the above-referenced regulations promulgated by DOL squarely contradict their theory.

Plaintiffs seek to avoid these authorities by arguing that this issue does not turn on whether participant information fits the narrow definition of "assets," but instead on "the way TIAA *used* the data," which "was an exercise of fiduciary control and authority over the plans' *operations*."  (Pl. Opp. 25). Unsurprisingly, Plaintiffs cite no cases in support of this theory, nor do they

fully explain how this distinction would make a difference.  Their theory is instead logically foreclosed by the analyses of courts that have considered this issue before.  For example, the plaintiffs in *Harmon* argued unsuccessfully that the participant information available to the plan's recordkeeper allowed the defendant to profit through "peddling [financial] products to Plan participants." *Harmon*, 2021 WL 1232694, at *1.  Plaintiffs here appear to advance an argument similar to the one that was rejected in *Harmon*: that use of participant information can be leveraged to induce plan participants to engage in transactions and to exercise control over participants.  The Court likewise rejects this argument.

Further, and importantly, this theory runs counter to the statutory language.  Because Plaintiffs' argument as to "assets" is unavailing, presumably they contend that TIAA's "exercis[ing] of fiduciary control and authority over the plans' operations" constitutes "exercis[ing] any discretionary authority or discretionary control respecting management of such plan" or "administration of such plan."  29 U.S.C. § 1002(21)(A)(i), (iii).  The word "operations" is not mentioned in the statute, which instead focuses on "*management*" and "*administration*."  *Id.* (emphases added).  But Plaintiffs' theory says nothing about the management or administration of the plans; instead, they argue that because TIAA assists with the plans' operations, TIAA is a fiduciary.  (Compl. ¶ 95).  If accepted, this argument would effectively turn every recordkeeper that provides services integral to the day-to-day operation of a plan into an ERISA fiduciary.

Such a result is not contemplated by the statutory language, which evinces a concern with more consequential, plan-level decision-making through use of the term "management," or through requiring a fiduciary to have "authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii); *see Bouboulis* v. *Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006) ("[Section] 1002(21)(A) creates a bifurcated test: 'Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted. Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.'" (quoting *Olson* v. *E.F. Hutton & Co., Inc.*, 957 F.2d 622, 625 (8th Cir. 1992))). The few cases cited by either side suggest the same. *See, e.g.*, *Walsh* v. *Principal Life Ins. Co.*, 266 F.R.D. 232, 242 (S.D. Iowa 2010) ("Plaintiff's construction contravenes what is the clear meaning of the statute and the regulation — that a person does not become a fiduciary with respect to an ERISA plan unless he or she exercises discretionary authority or discretionary control with respect to the management of an ERISA plan." (citing *Pegram*, 530 U.S. at 223)); *see also* 29 C.F.R. § 2509.75-8 at D-2 (DOL interpretive bulletin) ("[o]nly persons who perform one or more of the functions described in [§ 1002(21)(A)] *with respect to an employee benefit plan* are fiduciaries" (emphasis added)).

### ii.   TIAA's Product Design Decisions Did Not Create a Fiduciary Relationship

Plaintiffs also theorize that TIAA's decision that "under certain annuity contracts, defined contribution plans lack the authority to remove [it]s flagship

46

CREF Stock Account as an investment option" means that the company exercises "authority or control" over the plans or their assets. (Compl. ¶¶ 100-101). TIAA rejoins that it was within its rights to include "bundling requirements" in its contracts with plans, and that "[p]lan sponsors are responsible for choosing products to be offered to their participants[.]" (Def. Br. 23-24).

"A party 'only falls within sub[divisions] (i) and (iii) [of 29 U.S.C. § 1002(21)(A)] if they possess final authority to make decisions for the plan or if they have control over plan assets.'" *Bekker*, 2018 WL 4636841, at *9 (quoting *Apogee Enterprises, Inc.* v. *State St. Bank & Tr. Co.*, No. 09 Civ. 1899 (RJH), 2010 WL 3632697, at *2 (S.D.N.Y. Sept. 17, 2010)). Even where a defendant provides services to a plan, its choices to limit the investment options available to the plan or to exercise control over such options ordinarily do not suffice to create fiduciary status without more. *See, e.g.*, *Zang* v. *Paychex, Inc.*, 728 F. Supp. 2d 261, 270-71 (W.D.N.Y. 2010) ("Plaintiff's allegation that [the defendant] controlled which mutual funds to make available to the Plan does not support its claim that [the defendant] is a fiduciary. Ultimately, it remained up to plaintiff to decide which funds to invest in[.]"); *Hecker* v. *Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) ("[A] service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms."); *see also In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 58 (1st Cir. 2021) ("As we have noted, case law almost directly on point flatly rejects plaintiffs' notion

47

that Fidelity acts as a fiduciary in selecting funds for its FundsNetwork."); *cf.*
*Harris Tr. & Sav. Bank* v. *John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29 (2d
Cir. 2002) (finding that insurer's adherence to plan documents negotiated at
arms-length "was not an exercise of 'discretionary authority' over the Plan and
therefore did not implicate its fiduciary duties under ERISA").

So too here.  TIAA was a recordkeeper to Plaintiffs' plans, and also
provided a menu of investment options to participants as a service to the plans.
(*See* Compl. ¶ 22 ("TIAA serves as the plans' recordkeeper and provides TIAA-
affiliated investment options in which participants can invest, including fixed
and variable annuities and mutual funds.")).  Even though TIAA may have
exercised discretion as to how to bundle the investment options available to the
plans (*see* Def. Br. 24 (noting that TIAA "engage[d] in 'product design'"); Pl.
Opp. 25 ("TIAA also exercised control over plans' investment options and
recordkeepers[.]")), this does not mean that TIAA exercised discretion *as to the
plans.*  Plan sponsors were free to refuse to use TIAA's services if the
contracted-for terms were unappealing.  Plaintiffs may not transform a
grievance they might have against their plans for utilizing TIAA into a claim
that TIAA was itself a plan fiduciary.  It is their plan sponsors who exercised
discretion and control in the relevant sense, not TIAA.  To hold otherwise would
render every company that provides basic services, including menus of
investment options or recordkeeping, an ERISA fiduciary.  Once again,
Plaintiffs cite no cases purporting to support their theory on this point, and the
Court's holding thus aligns with the clear and growing weight of the caselaw.

48

**C.**     **Plaintiffs Fail to State a Claim Under Section 502(a)(3)**

Count III of Plaintiffs' Complaint is brought under ERISA § 502(a)(3),

29 U.S.C. § 1132(a)(3), which Plaintiffs claim allows a court to "award 'other

appropriate equitable relief' to redress 'any act or practice' that violates

ERISA[,]" such that "[f]iduciary status is not a prerequisite to liability."  (Compl.

¶ 129).  TIAA acknowledges that an action may lie against a non-fiduciary, but

points out that in order to succeed, Plaintiffs must show that a fiduciary

breached a duty owed to them and that TIAA knowingly participated in the

breach.  (Def. Br. 26 (listing elements of such a claim)).  As Plaintiffs ultimately

concede, this claim also rises or falls with a finding of fiduciary status as to

TIAA.  (*See* Pl. Opp. 27 ("Plaintiffs have plausibly alleged the fiduciary status of

the TIAA entities[.]  And TIAA does not dispute that the underlying conduct

violated fiduciary duties.  Plaintiffs have alleged TIAA's knowing participation in

the misconduct because TIAA implemented the scheme at the highest level of

the organization as a company-wide policy." (internal quotation marks

omitted))).

"'The well-settled elements of a cause of action for participation in a

breach of fiduciary duty are [i] breach by a fiduciary of a duty owed to plaintiff,

[ii] defendant's knowing participation in the breach, and [iii] damages.'"  *Tr. of

Upstate N.Y. Eng'rs Pension Fund* v. *Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d

Cir. 2016) (quoting *Diduck* v. *Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270,

281-82 (2d Cir. 1992), *abrogated on other grounds by Gerosa* v. *Savasta & Co.,

Inc.*, 329 F.3d 317 (2d Cir. 2003)).  For the reasons noted above, Plaintiffs have

only identified TIAA as a putative fiduciary and, ultimately, have failed to allege that TIAA owed any fiduciary duties to them; *a fortiori*, Plaintiffs' claim that TIAA might otherwise be liable under a theory that requires a breach by a fiduciary and TIAA's knowing participation in said breach fails as a matter of law.

## D.   Carfora's and Gonzales's Claims Are Time-Barred Under ERISA's Statute of Repose

Separate and apart from the merits, TIAA argues that the claims of Plaintiffs Carfora and Gonzales for breach of fiduciary duty are time-barred, because their rollovers took place more than six years ago.  The parties do not dispute that the conduct relevant to assessing when the statute of repose began to run is the rollover and opening of Portfolio Advisor accounts.  (*See* Def. Br. 27; Pl. Opp. 27).  Because Carfora and Gonzales took these actions more than six years ago, ordinarily their claims would be barred.  However, Plaintiffs argue that the limitations period should be tolled, because they adequately allege fraud or concealment with the requisite particularity in the Complaint.  (*See* Pl. Opp. 28-29).

Under ERISA, a plaintiff may not bring a claim for breach of a fiduciary duty

> after the earlier of ... six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation ... except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

50

29 U.S.C. § 1113.  As the Second Circuit has explained, ERISA provides two limitations periods possibly applicable here: one period "applicable in the absence of any special circumstances, is six years from the date of the last action that was part of the breach[,]" and another six-year period, where "a complaint alleges fraud or concealment with the requisite particularity." *Janese* v. *Fay*, 692 F.3d 221, 227-28 (2d Cir. 2012).  Importantly, this latter six-year period "is tolled until the plaintiff discovers, or should with reasonable diligence have discovered, the breach."  *Id.* at 228 (citing *Caputo* v. *Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001)).  "To successfully plead this 'fraud or concealment exception,' a complaint must allege that a fiduciary either '[i] breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; or [ii] engaged in acts to hinder the discovery of a breach of fiduciary duty.'"  *Id.* (quoting *Caputo*, 267 F.3d at 190).  "Moreover, these allegations must be stated 'with particularity[' under Federal Rule of Civil Procedure 9(b)], requiring a plaintiff to 'specify the time, place, speaker, and content of the alleged misrepresentations,' as well as 'how the misrepresentations were fraudulent' and 'those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'"  *Id.* (quoting *Caputo*, 267 F.3d at 191).

Plaintiffs argue that they satisfy this fraud or concealment exception because of TIAA's misleading "company-wide policy" of recommending Portfolio Advisor to prospective clients.  (Pl. Opp. 27 (citing Compl. ¶¶ 2, 26-27, 38-39

(discussing, *inter alia,* TIAA's Consultative Sales Process, representations that TIAA provided objective advice, the 2012 marketing brochure, and TIAA's representations about its non-profit heritage)); *see also id.* at 28-29 (further discussing these similar representations in the context of Rule 9(b)).  Plaintiffs aver that they "did not discover" TIAA's fraud or concealment until the SEC and the New York Attorney General released certain findings in July 2021 (Compl. ¶ 103), because TIAA "fraudulently concealed" its misconduct (*id.* at ¶ 104).

Plaintiffs' argument fails.  As the Court discussed in analyzing their equitable estoppel claims, Plaintiffs have not "'alleged with particularity that [they] actually relied on the supposed misstatements.'"  *Fir Tree Cap. Opportunity Master Fund, L.P.* v. *Am. Realty Cap. Properties, Inc.*, No. 17 Civ. 4975 (AKH), 2017 WL 10808809, at *5 (S.D.N.Y. Dec. 14, 2017) (quoting *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 312 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship* v. *Bear Stearns Companies L.L.C.*, 829 F.3d 173 (2d Cir. 2016)); *see also Tropical Sails Corp.* v. *Yext, Inc.*, No. 14 Civ. 7582 (JFK), 2015 WL 2359098, at *5 (S.D.N.Y. May 18, 2015) ("Because reliance is an essential element of fraud, it must also be pled with particularity under Rule 9(b).")).  Plaintiffs have not pleaded any facts about what TIAA represented *to them* when recommending Portfolio Advisor, which is necessary to plead a claim for fraud with particularity.

Further, Plaintiffs' barebones allegation that Carfora and Gonzales opened Portfolio Advisor accounts "as a result of Defendants' breaches of

fiduciary duty" does not meet other pleading requirements of Rule 9(b). (Compl. ¶¶ 12, 14). Plaintiffs have not alleged the requisite "time, place, [or] speaker" of the alleged misrepresentations, other than broadly alleging that representations during the Consultative Sales Process and about Portfolio Advisor should be attributed to TIAA as a whole and its team of Advisors. (*See* Pl. Opp. 28). This is not sufficient under Rule 9(b). *See, e.g.*, *Deejayzoo, LLC* v. *Kaz Konsulting, LLC*, No. 19 Civ. 8688 (PKC), 2020 WL 6781999, at *2 (S.D.N.Y. Nov. 17, 2020) (finding plaintiff did not adequately plead fraud under Rule 9(b) where plaintiff "merely alleges in conclusory fashion that [defendant-company] made an oral promise … but fails to identify who made the statement and to whom and where it was made"). As with the deficient allegations of reliance, Plaintiffs have only pleaded facts regarding TIAA's general practices and representations, but have not explained who made the representations, when they were made, and whether or not such representations were even made to Plaintiffs Carfora and Gonzales.

Contrary to Plaintiffs' contention, claims for fraudulent concealment do not avoid the requirements of Rule 9(b). *See, e.g.*, *Janese*, 692 F.3d at 228 ("To successfully plead this fraud *or* concealment exception … [the] allegations must be stated with particularity." (internal citations and quotation marks omitted) (emphasis added)); *N.Y. Dist. Council of Carpenters Pension Fund* v. *Forde*, 939 F. Supp. 2d 268, 281 (S.D.N.Y. 2013) (finding that plaintiffs adequately pleaded "omissions that both constituted a beach of [] fiduciary duty and delayed the

[p]laintiffs' discovery of the breach … with particularity as required under" Federal Rule of Civil Procedure 9(b) (citing *Caputo*, 267 F.3d at 191)).

And because the Court does not know what representations or omissions were made as to Carfora and Gonzales, these Plaintiffs similarly fail to plead concealment under Rule 9(b), which involves a similar analysis. *See, e.g.*, *Montero* v. *Teva Pharms. USA Inc.*, No. 19 Civ. 9304 (AKH), 2020 WL 1862593, at *4 (S.D.N.Y. Apr. 14, 2020) ("The Complaint alleges misrepresentation, omission, and concealment only in conclusory terms, failing to identify any particular misleading statement or act of concealment.  These claims also do not differentiate between Defendants, much less identify a particular speaker or the person responsible for the failure to disclose."), *appeal dismissed*, No. 20-1566, 2020 WL 6587526 (2d Cir. June 19, 2020); *Innovation Ventures, LLC* v. *Ultimate One Distrib. Corp.*, No. 12 Civ. 5354 (KAM) (RLM), 2014 WL 1311979, at *10 (E.D.N.Y. Mar. 28, 2014) ("Here, the [counter-plaintiffs] have not alleged any facts pertaining to what omissions [individual third-party defendant] allegedly made, the context of any omissions and how they misled [them], and what [he] obtained through the fraudulent omissions.").  Simply put, Plaintiffs have not alleged details regarding the substance, speaker, context, or time of any representations to them, or omissions from them, by TIAA.  Accordingly, they fail to plead with the requisite particularity that TIAA concealed information from them that would toll ERISA's statute of repose.

Accordingly, Plaintiffs Carfora and Gonzales's claims against TIAA are time-barred.[11]

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      September 27, 2022
            New York, New York

                                                                _____
                                                                 KATHERINE POLK FAILLA
                                               United States District Judge

---

[11]    Despite Plaintiffs' request for leave to amend regarding the limitations issue (Pl. Opp. 30), the Court finds that amendment would be futile, inasmuch as Plaintiffs cannot adequately state a claim for breach of a fiduciary duty.  *See, e.g.*, *Bellocchio* v. *Garland*, No. 21 Civ. 3280 (KPF), 2022 WL 2702445, at *6 (S.D.N.Y. July 12, 2022) ("Amendment is futile if the 'amended portion of the complaint would fail to state a cause of action.'" (collecting cases)).

Finally, the Court notes that given its resolution of the motion to dismiss, it does not address Defendants' arguments regarding class standing.  (*See* Def. Br. 29-30).