**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN CARFORA, SANDRA PUTNAM, and JUAN GONZALES (aka Gonzalez), individually and as representatives of a class of similarly situated individuals, | No. 1:21-cv-08384-KPF |
| *Plaintiffs,* | |
| v. | CLASS ACTION |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, and TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC, | JURY TRIAL DEMANDED |
| *Defendants.* | |

**SECOND AMENDED COMPLAINT**

1.      This action arises from a fraudulent scheme to enhance corporate profits commenced in 2012 by Defendant TIAA-CREF Individual & Institutional Services, LLC ("TIAA Services") and its corporate parent, Defendant Teachers Insurance and Annuity Association of America (together with TIAA Services, "TIAA").

2.      Upon realizing that its share of the market for retirement plan services was eroding and that demographic trends would soon lead to a steep drop in revenues, TIAA instituted a corporate policy requiring the use of fraudulent sales tactics to induce individuals to transfer assets from their low-fee employer-sponsored retirement plans to TIAA's high-fee "Portfolio Advisor" program and other lucrative non-plan products.

3.     A critical component of the scheme was for TIAA to abuse its position as a recordkeeper to employer-sponsored plans to harvest highly confidential and personal financial data regarding plan participants. Armed with this sensitive information, TIAA used it to identify individuals with large account balances nearing retirement as targets for TIAA's sales representatives, who then used manipulative "fear selling" tactics and falsely portrayed TIAA's high-cost non-plan products as the superior solution for participants' financial planning needs without regard to whether the recommendation was in the participants' best interests.

4.     TIAA also concealed sales representatives' conflict of interest, requiring sales representatives to falsely claim that their recommendations were objective and non-commissioned when in fact TIAA's bonus structure created financial incentives to recommend Portfolio Advisor and similar high-cost non-plan products.

5.     As a result of this scheme, TIAA reaped massive and unlawful profits at the expense of employees and retirees who were charged higher fees for products and services that underperformed those available through their employers' tax-favored plans.

6.     TIAA's dishonest actions to benefit itself at participants' expense violated its fiduciary duties under the Employee Retirement Income Security Act (ERISA) as well as ERISA's prohibited transaction rules—duties which are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Even if Defendants were not fiduciaries within the meaning of ERISA, TIAA

and TIAA Services are nonetheless subject to liability due to their knowing participation in ERISA violations by the sponsors of the plans in which Plaintiffs and class members participated (the "Plan Sponsors").

7.     TIAA also fraudulently concealed its breaches of fiduciary duty and prohibited transactions, as the facts were only recently revealed following the public release of investigative findings of the U.S. Securities and Exchange Commission and New York State Office of the Attorney General.

8.     To obtain redress for TIAA's misconduct, Plaintiffs bring this action on behalf of a proposed class of similarly situated individuals. Plaintiffs and the class seek an order requiring TIAA to make good all losses sustained by class members and for appropriate equitable relief to disgorge TIAA's ill-gotten profits. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3).

## JURISDICTION AND VENUE

9.     **Subject-matter jurisdiction.** This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law and is brought under 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

10.    **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where at least one of the alleged breaches or violations took place, and where at least one defendant resides or may be found.

11.    **Standing.** Plaintiffs and class members were defrauded and sustained damages and financial losses that are fairly traceable to Defendants' breaches of

fiduciary duty and other violations of ERISA, and those injuries may be redressed by a judgment of this Court. But for Defendants' misconduct, the assets in Plaintiffs' and class members' retirement plan accounts would have had an opportunity for continued appreciation within their plans and would not have been subject to the excessive and unreasonable fees or inferior investment performance of TIAA Services' Portfolio Advisor and other TIAA-affiliated non-plan products. But for Defendants' misconduct, TIAA and TIAA Services would not have been unjustly enriched through fees and expenses assessed against Plaintiffs' and class members' Portfolio Advisor accounts, TIAA's wealth management, and other TIAA-affiliated non-plan products. Plaintiffs and all class members have standing to pursue remedies to prevent Defendants from retaining the benefit of their fraud, which is one proper measure of injury or damages. Plaintiffs and all class members also have standing to seek disgorgement or a constructive trust on TIAA's and TIAA Services' ill-gotten profits realized as a result of their breaches of the duty of loyalty and prohibited transactions. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988).

**PARTIES**

## I.    Plaintiffs

12.    Plaintiff John Carfora is a retired professor and a participant in the ERISA-governed Dartmouth College 401(a) Defined Contribution Retirement Plan

and Loyola Marymount University Defined Contribution Plan.[1] He opened a TIAA Portfolio Advisor account in September 2015 as a result of Defendants' conduct described below. After establishing the account in September 2015, Plaintiff also made additional rollovers from ERISA-governed plans to Portfolio Advisor after October 11, 2015, as a result of Defendants' conduct described below. For example, Plaintiff executed a rollover to Portfolio Advisor from the Loyola Marymount plan on October 20, 2015, in reliance on investment advice from a wealth management advisor employed by Defendants.

13.    Plaintiff Sandra Putnam is a retired senior research scientist and a participant in the ERISA-governed Pacific Institute for Research and Evaluation 401(a) Defined Contribution Plan and the Pacific Institute for Research and Evaluation 403(b) Tax-Deferred Annuity Plan. She opened a TIAA Portfolio Advisor account in July 2018 as a result of Defendants' conduct described below.

14.    Plaintiff Juan Gonzales (aka Gonzalez) is a university professor and a participant in the ERISA-governed Georgetown University Defined Contribution Retirement Plan and Georgetown University Voluntary Contribution Retirement Plan. He opened a TIAA Portfolio Advisor account in December 2013 as a result of Defendants' conduct described below.

---

[1] ERISA defines "participant" as "any employee or former employee … who is or may become eligible to receive a benefit of any type from an employee benefit plan … or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

## II.  Defendants

15.    Teachers Insurance and Annuity Association of America is a legal reserve life insurance company established under the insurance laws of the State of New York in 1918. Its headquarters and principal place of business is in New York, NY. TIAA's clients include thousands of defined contribution plans which utilize TIAA's investment options (annuities and mutual funds) and administrative services such as recordkeeping of participants' accounts.

16.    TIAA-CREF Individual & Institutional Services, LLC is a wholly owned subsidiary of Teachers Insurance and Annuity Association of America. TIAA Services is a Delaware limited liability company; its headquarters and principal place of business is in New York, NY. TIAA Services is a registered broker-dealer under the Securities Exchange Act of 1934 and an investment advisor under the Investment Advisers Act of 1940 and provides investment advisory services to individuals.

17.    As explained below, by making rollover recommendations which benefited TIAA and TIAA Services at class members' expense, TIAA and TIAA Services acted as fiduciaries as defined by ERISA, breached their fiduciary duty of loyalty, and engaged in transactions categorically prohibited by ERISA. To the extent they were not ERISA fiduciaries, TIAA and TIAA Services nevertheless knowingly participated in the Plan Sponsors' ERISA violations.

6

## FACTS APPLICABLE TO ALL COUNTS

**I.    Defined contribution plans are institutional investors with the ability to obtain low fees compared to the retail market.**

18.    An employer-sponsored retirement plan may be classified as a defined benefit plan or a defined contribution plan. A defined benefit plan is a traditional pension; the employee is guaranteed a specified monthly payment and the risk of loss falls on the employer who is responsible for ensuring that the plan has sufficient assets to meet its obligations for benefit payments. In contrast, a defined contribution plan shifts the risk of loss to the employees. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Plaintiffs and the class members are participants in defined contribution plans.

19.    In a defined contribution plan, participants contribute pre-tax earnings (often matched by the employer up to a certain percentage) into an individual account and direct the contributions into one or more options on the plan's investment menu, which is assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

20.    "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* The Department of Labor has illustrated that a 1% difference in fees reduces the

average worker's account balance by 28% after 35 years.[2] In dollar terms, this fee differential adds up to nearly $500,000 after 40 years.[3]



21.    Defined contribution plans are institutional investors. In contrast to an individual seeking to make a small investment in the retail market at retail prices, a defined contribution plan pools the purchasing power of the combined assets of all of the plan's participants—often thousands of individuals. Thus, employer-sponsored defined contribution plans have the leverage to obtain much lower fees than an individual would be able to obtain in the retail market. As illustrated above, those lower fees produce enhanced retirement savings compared to what an

---

[2] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

individual could achieve investing outside of a plan.

## II. TIAA adopted a company-wide policy of providing fraudulent investment advice for the purpose of enhancing TIAA's revenues and profits at the expense of retirement plan participants.

### A. To combat eroding market share and the imminent decline of its retirement business, TIAA implemented a corporate strategy designed to induce participants to roll assets out of their retirement plans and into TIAA's high-cost non-plan products.

22.     Founded in 1918, TIAA historically has heavily marketed to the higher education market. As a result, TIAA has dominated the market for services to retirement plans sponsored by educational institutions and other nonprofit employers. Currently TIAA has over 15,000 institutional clients, whose plans have more than five million individual participants. TIAA serves as the plans' recordkeeper and provides TIAA-affiliated investment options in which participants can invest, including fixed and variable annuities and mutual funds. As of 2018, TIAA administered nearly $1 trillion in client assets, including $235 billion in its flagship Traditional annuity and $122 billion in the CREF Stock variable annuity.

23.     Although TIAA has publicly proclaimed in marketing materials and elsewhere that it "has operated without profit over the past 100 years," that is misleading at best. *See, e.g.*, Br. for TIAA as Amicus Curiae at 5, *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019) (No. 17-3244). In 1998, Congress revoked the tax-deductible 501(c)(3) charitable organization status of TIAA because it "competed

directly with for-profit insurance companies and mutual fund groups."[4]

24.    In fact, TIAA is organized as a *for-profit* stock life insurance company. TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion.

25.    Consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest-paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. During 2016—in the midst of the fraudulent scheme at issue herein—TIAA's executive compensation disclosures reported that TIAA's CEO received $18.5 million in compensation, $5.1 million more than the CEO of Citigroup. In 2015, TIAA's CEO received $18 million, more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and comparable to the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive officers" earned a combined total of well over $40 million in compensation in 2015. As a percentage of assets under management, TIAA's CEO had the very highest compensation rate among peers.

---

[4] Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007), http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.





**TIAA CEO Compensation**
**Highest Among Reporting Investment Fund Families**
**as a Percentage of Assets under Mgmt (AUM)**

Legend:
- TIAA-CREF ($834B AUM)
- Invesco ($784.5B AUM)
- JP Morgan ($1676B AUM)
- Bank of New York Mellon (Dreyfus) ($1700B AUM)
- Deutsche Bank AG ($842B AUM)
- Prudential ($1220B AUM)
- Black Rock ($4890B AUM)
- State Street ($2300B AUM)
- Natixis SA ($884.9B AUM)

26.     As of 2011, TIAA recognized that two factors threatened its institutional retirement plan business. First, TIAA's share of the non-profit plan market faced aggressive competition from industry giants such as Vanguard and Fidelity, which had begun to erode TIAA's assets under management. For example, Notre Dame recently moved $1.3 billion from TIAA to Fidelity, during a year in which a total of $6.4 billion in client assets left TIAA in favor of competitors. Second, demographic trends showed a large segment of participants in TIAA-administered plans—the baby-boomer generation—were nearing retirement. These new retirees were increasingly likely to move their retirement assets to other providers. Based on these threats, TIAA projected in 2011 that its net asset flows would become negative as of 2018 unless it developed a new strategy.

11

27.     TIAA then created a plan to expand its individual advisory business in the hopes of preventing further losses to competitors and attracting new assets.

28.     A critical component of the new strategy was for TIAA to tout its non-profit heritage. TIAA recognized that its trusted reputation provided a competitive advantage that TIAA relied on in growing its individual business.

29.     The centerpiece of TIAA's new strategy was to aggressively market Portfolio Advisor, a managed account program. Portfolio Advisor places the investor in a model portfolio which often includes TIAA-affiliated funds. The model portfolios invest in securities such as mutual funds and exchange-traded funds.

30.     Portfolio Advisor is not merely a one-time recommendation, but rather an ongoing investment advice program that rebalances the assets if the account deviates from the model portfolio allocation by a certain amount.

31.     Investors pay multiple layers of fees in Portfolio Advisor, in an amount much higher than they would typically pay by retaining assets in an employer-sponsored retirement plan. First, the underlying funds in the portfolio charge a percentage fee or "expense ratio" on all assets under management. On top of that, TIAA Services charges a variable asset-based management fee of up to 1.15%—fees on fees. As noted, a 1% increase in fees equates to a 28% loss for a typical investor.

32.     To implement its strategy of pushing Portfolio Advisor, TIAA Services more than *tripled* the size of its sales force from fewer than 300 "wealth management advisors" ("Advisors") in 2011 to nearly 900 Advisors by 2017.

33.     TIAA Services required Advisors to follow a highly structured pitch

called the Consultative Sales Process. At step one, Advisors cold-call preselected participants in TIAA-administered employer-sponsored plans to offer free financial planning services, often describing the service as an included benefit of the plan.

34.    Step two was a "discovery" meeting to gather additional information about the participant's financial circumstances. TIAA Services trained Advisors to use this meeting to discover "pain points"—a form of "fear selling" used to push the participant to change her or his investments. TIAA had an internal mantra about using fear to generate sales: "If they cry, they buy."

35.    Official sales training material spelled out TIAA's explicit goal of "Making the Client 'Feel the Pain'":



36.    Advisors' goal in uncovering pain points was to cause the participant to

"self-realize" a need for help addressing one or more of four financial planning challenges: asset management and allocation, income distribution, incapacity, and estate planning.

37.    At step three, TIAA Services used the individualized financial information collected in the discovery meeting to prepare a financial plan that incorporated projections and asset allocation recommendations. Advisors then used the financial plan in a follow-up meeting to recommend Portfolio Advisor as a solution to each financial planning challenge.

**B.    TIAA used fraudulent tactics to induce retirement plan participants to move their assets to TIAA's non-plan products and wealth management.**

38.    TIAA Services, acting through its Advisors, carried out its program established at the corporate level to repeatedly misrepresent and omit material facts in advising retirement plan participants to invest in Portfolio Advisor. Pursuant to this corporate policy, TIAA Services and its Advisors falsely stated that they provided objective advice and acted solely in the participant's best interests. For example, a 2012 TIAA Services' marketing brochure repeatedly stated that TIAA Services and its Advisors provided "objective advice," and described TIAA Services' advisory team as "a trusted partner providing … specific investment recommendations" and "working in your best interest."

39.    Based on corporate policy, TIAA Services similarly trained Advisors to emphasize TIAA's "non-profit heritage" and "culture of objectivity and acting solely in the best interest of our clients," and to describe themselves as "objective, [and]

non-commissioned."

40.    Advisors, in accordance with TIAA Services' corporate training materials, repeated these talking points in initial meetings and other communications to participants, emphasizing the "salaried, non-commissioned" and "objective advice" provided by TIAA Services.

41.    TIAA Services' 2012 marketing brochure admitted that it was acting as a fiduciary in providing investment advice to participants. The brochure referred to the "*trusted advice and guidance you'll receive—meeting a fiduciary standard requiring us to ensure that our recommendations are always in your best interest.*" ERISA's fiduciary standard imposes a duty of loyalty—to act solely in the interest of plan participants and for the exclusive purpose of providing benefits to participants.

42.    In accordance with this corporate policy of training Advisors to inform plan participants that the investment advice given was "objective" and "solely in the best interest of" the client, an Advisor's standard outreach email for new clients stated that *all* TIAA Services Advisors "*are held to the fiduciary standard,*" claiming that TIAA's advice was unaffected by conflicts of interest and thus superior to non-fiduciary competitors.

43.    Those statements were false and misleading. Although TIAA Services was in fact acting as a plan fiduciary, the assertion that its advice *complied* with its fiduciary obligations could not be further from the truth.

44.    Rather than serving participants' best interests exclusively, the recommendations to move assets to Portfolio Advisor and other lucrative non-plan

products further the financial interests of TIAA and TIAA Services at the expense of participants. When reviewing Advisors' recommendations, TIAA Services did not even attempt to determine whether those recommendations were actually in participants' best interests.

45.    Contrary to TIAA's false and misleading representations to participants, the Advisors were neither objective nor disinterested. The Advisors had profound conflicts of interest and significant financial incentives to recommend that participants roll over assets into Portfolio Advisor even though participants' interests would have been better served by remaining invested in their employer-sponsored plans.

**C.    TIAA created powerful incentives for Advisors to steer participants to Portfolio Advisor and other non-plan products, thereby enriching TIAA at participants' expense.**

46.    TIAA's "incentive compensation plan" for Advisors was fraught with conflicts of interest. TIAA paid Advisors a base salary plus a performance-based bonus, referred to as variable compensation or annual variable bonus. Contrary to TIAA's express corporate policy to represent that Advisors were "non-commissioned," the bonus was based on an Advisor's annual and cumulative asset growth, as well as achievement of sales goals, graded under a "scorecard" system. Under this incentive compensation plan, Advisors received larger bonuses for convincing participants in low-cost employer-sponsored plans to roll over assets to Portfolio Advisor, which charged higher fees and was much more profitable to TIAA and TIAA Services.

47. Carol Deckbar, TIAA's head of institutional investment and endowment products and services and formerly executive vice president and chief operating officer, pointedly reminded Advisors at a 2014 convention that their compensation depended on pushing participants into high-cost TIAA proprietary investments: "Where do you think you get your bonuses?"

48. If an Advisor met certain asset growth targets under TIAA's policy, the Advisor received a bonus of 10 basis points (0.10%) for all assets rolled over from employer-sponsored plan accounts into Portfolio Advisor. Thus, a $500,000 rollover added $500 to the Advisor's bonus. In contrast, Advisors *received no credit for recommending* that a participant remain invested in the employer-sponsored plan or make a transfer to another option such as a self-directed IRA on which TIAA earned no management fees.

49. In addition to those bonuses, a larger long-term incentive was in place from 2013 to 2018 based on the total assets under TIAA management during the Advisor's tenure. Advisors received a recurring cumulative growth award for all client assets that remained under TIAA management. Until 2016, the credit for Portfolio Advisor assets was *eight to sixteen times higher* than the credit for assets in employer-sponsored plans. From 2017 to 2018, the multiplier was three. Thus, until 2016, $500,000 invested in an employer-sponsored plan added only $12.50 to the cumulative growth award annually. But if the same $500,000 were rolled over to Portfolio Advisor, that would generate *$100–$200* for the Advisor's cumulative growth award each year that the account remained open.

50.     In short, TIAA's compensation structure made Portfolio Advisor assets much more valuable to an Advisor than assets in an employer-sponsored plan. As of 2013, an Advisor would anticipate that $500,000 invested in an employer-sponsored plan would add only $62.50 to the Advisor's compensation over the next five years, but would be worth $1,500 in bonuses if the Advisor's "fear selling" caused the participant to move $500,000 to Portfolio Advisor. Thus, over a five-year period, assets invested in Portfolio Advisor were worth *twenty-four times more* than assets invested in employer-sponsored plans.

51.     Portfolio Advisor assets also enhanced the Advisor's "relationship complexity" score until 2017, which was based on the proportion of new assets enrolled in complex products such as Portfolio Advisor, and thus increased the Advisor's scorecard-based bonus.

52.     The variable compensation or bonus represented a substantial portion, and sometimes most, of an Advisor's total compensation. For the typical Advisor, the annual variable bonus was 60% of the base salary. The highest-paid Advisors received an annual variable bonus up to *seven times higher* than their base salaries. These financial incentives caused Advisors to make more recommendations to participants to roll their assets from employer-sponsored plan to Portfolio Advisor and other TIAA non-plan products.

53.     These conflicts of interests were either undisclosed or disclosed in an insufficient or misleading manner. TIAA Services' Forms ADV stated that Advisors could earn additional compensation for "complex" product sales based on the

"degree of effort generally required" for those accounts. In fact, managed accounts like Portfolio Advisor did not involve materially greater effort from the Advisor's perspective than TIAA's non-complex or "core" products in employer-sponsored plans.

54.    TIAA Services' supervisors also pressured Advisors to sell Portfolio Advisor. One supervisor instructed his team that managed accounts "should be presented to 100%" of retirement plan participants and that they were "the right fit for most if not all" participants. Advisors who questioned management's directives were "processed out" of TIAA.

55.    TIAA intentionally targeted the participants with the largest retirement plan accounts and labeled them "WHALES." Supervisors required Advisors to participate in "WHALE calls"—designed to devise strategies to get the participant to move to Portfolio Advisor or other TIAA products. Advisors had to report back to their supervisors about the outcome of sales opportunities from WHALE calls.

56.    Supervisors discouraged sales of self-directed options—which produced either no, or much less revenue, to TIAA—and pushed Advisors to identify "pain points" to make participants "uncomfortable" and motivated to change their investments and to a managed-account option.

57.    TIAA ranked Advisors based on performance and made Advisors' scorecards and progress toward sales goals visible to other Advisors and supervisors at all times. Many supervisors regularly circulated sales rankings to their teams.

Supervisors congratulated Advisors who sold new Portfolio Advisor accounts and exhorted Advisors who failed to do so to improve.

58.    TIAA Services placed Advisors who failed to meet sales goals on performance improvement plans, causing many Advisors to resign to avoid potential termination. Yet when Advisors met their annual goals, TIAA Services increased the next year's target, resulting in constant pressure to achieve increased asset growth.

59.    As a result of the Consultative Sales Process, incentive compensation plan, and negative pressures on Advisors, annual revenues generated from assets rolled over to Portfolio Advisor increased from $2.6 million to $54 million—over 2,000%—from 2013 to 2018.

**D.    TIAA fraudulently led participants to believe that it was acting solely in their interests when in reality its investment advice was designed to benefit TIAA at participants' expense.**

60.    TIAA Services' training materials instructed Advisors that they wore more than one "hat," depending on the situation: a fiduciary hat when acting as an investment adviser representative and a non-fiduciary hat when acting as a registered broker-dealer representative. TIAA Services sought to use an investment adviser fiduciary standard through all the preliminary stages of the Consultative Sales Process right up to but not including the moment when an Advisor provided an investment recommendation. At that point, TIAA's position was that the implementation of the advice somehow changed the duty to a lesser one.

61.    TIAA's attempt to draw a distinction between these roles was

inherently misleading, both to participants and to the Advisors themselves. Even Advisors were confused about this dual-hat system and did not understand how one hat fell off and another superseded it while in the middle of advising a participant to remove assets from a retirement plan and implementing that recommendation.

62.    TIAA Services' training was also internally inconsistent. The compliance training materials warned that terms like "objective" and "non-commissioned" "*may be misleading*" because the result of the Consultative Sales Process was driven by Advisor financial incentives and not an objective recommendation. But TIAA Services' Consultative Sales Process training required Advisors to use those precise terms in scripted talking points.

63.    TIAA Services' written disclosures were also misleading because they suggested that the financial planning process was subject to a fiduciary duty yet failed to disclose that TIAA Services treated the ultimate investment recommendation as somehow excluded from the financial planning process.

64.    Advisors also did not inform participants when the "hat switch" occurred. The switch occurred during a single meeting, yet Advisors improperly and misleadingly failed to mention when they were taking off one hat and putting on the other. The Consultative Sales Process follow-up meeting usually involved fiduciary investment advice based on the participant's personal financial circumstances and goals immediately followed by a recommendation to roll assets from the employer-sponsored plan account to Portfolio Advisor (which TIAA wrongly claimed was non-fiduciary advice). Yet TIAA Services did not require real-time disclosure of the "hat

21

switch."

**E.    TIAA fraudulently portrayed the merits of Portfolio Advisor, which charged much higher fees than employer-sponsored plans for worse performance.**

65.    Advisors used an incomplete and misleading comparison of the pros and cons of rolling assets to Portfolio Advisor compared to remaining in employer-sponsored plans.

66.    Regarding fees and expenses, Advisors generally failed to inform participants of the fees and expenses of moving assets to Portfolio Advisor compared to remaining in the employer-sponsored plan. TIAA Services supervisors and trainers discouraged discussing the fees of Portfolio Advisor. Although TIAA Services disclosed the Portfolio Advisor management fee in writing, Advisors were not required to provide comparative fee information for the participant's plan until mid-2017. Employer-sponsored plans, by virtue of their size and pooled bargaining power, can command much lower fees than TIAA's Portfolio Advisor and other non-plan products. Not until late 2018 did TIAA Services provide Advisors with a tool to calculate the fee differential between Portfolio Advisor and the individual's plan, which could be a large amount.

67.    As to services, TIAA Services supervisors and trainers encouraged Advisors to misleadingly inform participants that if they did not roll over assets to Portfolio Advisor, their only other option was to manage their employer-sponsored plan accounts entirely by themselves, while contrasting the difficulties of self-directed investment with the benefits of a managed account like Portfolio Advisor.

68.    This was misleading because managed account services like Portfolio Advisor were available for free in most participants employer-sponsored plans through Morningstar, a neutral third-party investment research firm. Other advertised features of Portfolio Advisor were also available through employer-sponsored plans at a much lower cost than the management fee charged on Portfolio Advisor accounts. Advisors failed to consistently and meaningfully disclose these plan-based options.

69.    Advisors also failed to consistently disclose other advantages of employer-sponsored plans compared to Portfolio Advisor, such as greater protections from creditors and more flexible withdrawal options.

70.    TIAA Services also had no basis to conclude that Portfolio Advisor would serve participants' best interests from a performance perspective. From 2012 through 2017, TIAA Services had no comparative data showing that assets invested in Portfolio Advisor outperformed similarly allocated investments in employer-sponsored plans on either an absolute, net-of-fees, or risk-adjusted basis. In fact, TIAA Services became aware of complaints in February 2018 that individuals had learned from Morningstar advice that projected performance in Portfolio Advisor was worse than the projected performance of assets in employer-sponsored plans. A more recent analysis—created in connection with regulators' investigation of TIAA's practices—showed that assets invested in a sample employer-sponsored plan and managed according to free Morningstar advice had superior risk-adjusted net-of-fee returns (as measured by the Sharpe ratio) at every risk level on both a retrospective

and prospective basis compared to Portfolio Advisor.

71.    The conduct described above continued until recently when TIAA discontinued it after the government regulators' investigations. TIAA claims to have eliminated the "hat switch" practice as of June 2020 and revised its compensation policy as of 2021 to remove differential compensation between managed account sales and other retirement product sales.

**RELEVANT LEGAL STANDARDS**

**I.    ERISA imposes strict standards of conduct on plan fiduciaries and categorically prohibits harmful self-dealing transactions.**

    **A.    ERISA defines "fiduciary" in functional terms based on plan-related conduct.**

72.    At common law, fiduciary obligations attached only to the entity formally designated in the trust instrument. ERISA similarly requires a written plan document which identifies one or more "named fiduciaries" with authority to control and manage the operation and administration of the plan, which is usually the employer who sponsors the plan. But ERISA takes a far more expansive approach than the common law, extending fiduciary status to those who undertake certain plan-related functions.  Thus, "an individual or entity can still be found liable as a 'de facto' fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite 'discretionary control' over plan management and administration." *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1101–02 (9th Cir. 2004).

73.    ERISA's three-pronged functional "fiduciary" definition states that "a

person is a fiduciary with respect to a plan to the extent"

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Courts have an "obligation to liberally construe fiduciary status under ERISA." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 278 (4th Cir. 2019). As discussed *infra*, Part III, TIAA and TIAA Services met this fiduciary definition by rendering investment advice for a fee and otherwise exercising authority and control over plan management and administration.

74.    The Plan Sponsors of the plans at issue are either named fiduciaries, functional fiduciaries (by virtue of conduct such as hiring TIAA as a plan service provider), or both.

**B.    ERISA fiduciaries must act prudently and exclusively in the best interests of plan participants.**

75.    To effectuate ERISA's primary purpose of protecting the retirement security of plan participants, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S.

25

86, 96 (1993). ERISA's strict fiduciary standards of prudence and loyalty are derived from the common law of trusts and are "*the highest known to the law*." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (emphasis added).

76.    Most fundamentally, ERISA fiduciaries are subject to an unyielding duty of loyalty. *See Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000). The statute states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Put simply, the fiduciary must act "with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts § 170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)).

77.    A fiduciary also must act prudently—"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). To fulfill this duty, the fiduciary must investigate and evaluate investments and exercise the sound judgment of a knowledgeable and impartial financial expert in making investment decisions or formulating investment advice.

78.    The duty of prudence extends to the selection of service providers, such as recordkeepers. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741 (2022).

79.     Because the content of the duty of prudence depends on the surrounding circumstances, the requisite level of care may vary based on the circumstances facing the fiduciary. The personal data of a plan's participants is highly sensitive and confidential. Because fiduciaries are entrusted with sensitive participant data, they must exercise the highest care to ensure its safety and security.

80.     The Department of Labor advises that "[p]lan sponsors should use service providers that follow strong cybersecurity practices." U.S. Dep't of Labor, *Tips for Hiring a Service Provider with Strong Cybersecurity Practices* 1 ("*DOL Tips*"), https://www.dol.gov/sites/dolgov/files/ebsa/key-topics/retirement-benefits/cybersecurity/tips-for-hiring-a-service-provider-with-strong-security-practices.pdf (Apr. 14, 2021). It further advises that doing so "help[s] business owners and fiduciaries meet their responsibilities under ERISA to prudently select and monitor such service providers." *Id.*

81.     Objectively prudent fiduciaries as a factual matter would select service providers who safeguard the personal data of plan participants, and take steps to ensure that recordkeepers maintain the integrity of participants' data, do not allow it to fall into the wrong hands or, worse, misuse it themselves. Thus, plan sponsors who fail to take steps to ensure that service providers protect participants' data and use such data only for proper purposes breach their fiduciary duties.

82.     By way of example, it is indisputable that fiduciaries could not, consistent with ERISA's strict duties of prudence and loyalty, sell participants'

Social Security numbers to the highest bidder, nor auction off information about participants' retirement accounts. It follows that they may not allow third-party service providers to abuse their access to such sensitive data to enrich themselves through misleading or predatory sales tactics.

83.    A fiduciary also cannot turn a blind eye to the breach of its co-fiduciary. In addition to any liability a fiduciary may have for its own breach, a fiduciary can also be liable for knowingly participating in, concealing, or failing to remedy a co-fiduciary's breach of duty. *See* 29 U.S.C. § 1105(a).

84.    To supplement the general fiduciary duty of loyalty, Congress also prohibited *per se* certain transactions deemed likely to injure a plan, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); 29 U.S.C. § 1106(a)–(b). An entity providing services to a plan is a party in interest. 29 U.S.C. § 1002(9), (14)(B).

85.    Although certain otherwise prohibited transactions may be eligible for an exemption, the necessary conditions for relief generally require the fiduciary to show that the transaction serves the participants' interests rather than the fiduciary's or service provider's interests and involves no more than reasonable compensation.

C.    **Congress authorized participants to enforce fiduciary obligations through actions to recover losses and ill-gotten profits.**

86.    To enforce ERISA's fiduciary obligations, Congress authorized participants to bring a civil action to obtain legal and equitable remedies for their plans, 29 U.S.C. § 1132(a)(2). The relief available in a § 1132(a)(2) action includes restoration of plan losses caused by the breach or violation as well as restoration to the plan "any profits of such fiduciary" made "through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

87.    ERISA further authorizes participants to bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations [of any provision of this subchapter] or (ii) to enforce any provisions of this subchapter," 29 U.S.C. § 1132(a)(3). Appropriate equitable relief includes monetary remedies such as surcharge, disgorgement of profits, and a constructive trust.

88.    Even after a participant's assets are distributed from the plan, the participant retains statutory standing to pursue actions to impose a constructive trust on ill-gotten profits realized from a breach of the duty of loyalty, and the proceeds of the constructive trust are properly distributed to the participants. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988).

II.    **TIAA and TIAA Services acted as ERISA fiduciaries.**

A.    **Defendants acted as fiduciaries by issuing self-interested investment advice from which they reaped massive profits.**

89.    As noted, the second prong of ERISA's definition of fiduciary provides

29

that "a person is a fiduciary with respect to a plan to the extent he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii).

90.    Under the statute's plain text, TIAA and TIAA Services, acting through the Advisors under their direction and control, rendered investment advice with respect to ERISA plan moneys each time an Advisor executed TIAA's Consultative Sales Process and advised ERISA plan participants how they should invest their plan accounts.

91.    Under the statute's plain text, TIAA and TIAA Services received a fee or other compensation, direct or indirect, for providing advice. Indeed, Advisors admitted that the investment advice provided through the Consultative Sales Process was "included" in the bundle of services for which TIAA was compensated through the administrative fees it collected from each plan. Moreover, each time a participant followed TIAA's investment advice and moved assets to Portfolio Adviser, TIAA and TIAA Services received substantial fees. Under the plain meaning of the statute, nothing more is required to establish fiduciary status.

92.    The result is the same under applicable regulatory guidance, to the extent the plain meaning of the statute does not control: TIAA and TIAA Services are ERISA fiduciaries to the extent they provided investment advice recommending that ERISA plan participants roll their plan accounts to Portfolio Advisor. *See* 29 C.F.R. § 2510.3-21(c)(1).

93.     TIAA and TIAA Services, through the Advisors, rendered advice and made "recommendation as to the advisability of investing in, purchasing, or selling securities or other property." *See* 29 C.F.R. § 2510.3-21(c)(1)(i).

94.     The advice was provided on a "regular basis" within the meaning of the regulation, 29 C.F.R. § 2510.3-21(c)(1)(ii)(B), because the advice occurred as part of an ongoing relationship between the Advisor and participant through the Consultative Sales Process, and the advice was the beginning of an intended future ongoing relationship between the participant and TIAA Services through Portfolio Advisor, which purports to continually adjust a participant's portfolio as needed.

95.     As part of the Consultative Sales Process, Advisors informed participants that the advice relationship would continue after the rollover, and that TIAA would continue to be a trusted partner thereafter by providing updated, individualized advice tailored to the participant's needs in the years to come. Advisors promised periodic check ins under the Portfolio Advisor program, which the Advisors referred to as a "Yearly Review." In addition to these annual check ins, Advisors also informed participants that there was an "open door" and participants should feel free to call at "any time" for advice. For example, after opening his Portfolio Advisor account, Plaintiff Carfora had regular investment advice discussions over a period of years with Advisors employed by TIAA, including Erin Gavin, DeeAnn Kinney, and Mike Hitch.

96.     In addition to providing investment advice on a regular basis to individual participants, TIAA also provided investment advice on a regular basis to

each ERISA-governed plan in which class members participated. TIAA admits that when a plan hires TIAA for a fee, the standard package of services that TIAA provides to the plan includes "fund-level allocation advice" to the plan's participants, "personalized to each participant's career stage and retirement income goals" through "one-on-one in person meetings." Br. for TIAA as Amicus Curiae 9, *Hughes v. Nw Univ.*, 595 U.S. 170 (2022) (No. 19-1401) ("TIAA *Hughes* Br.").[5] This investment advice provided to each plan was not an isolated occurrence, but rather was a service provided continuously throughout the class period and available to all participants in each plan.

97.    Throughout the class period, TIAA systematically created lists of pre-selected participants in thousands of client plans, which TIAA would then regularly distribute to its 900 advisors to initiate the Consultative Sales Process. Thus, TIAA's advisors cold-called many preselected participants in each client plan and rendered investment advice to each participant to move his or her plan assets to Portfolio Advisor.

98.    TIAA and TIAA Services provided "individualized investment advice" within the meaning of the regulation, *id.*, as shown by the fact that TIAA harvested plan recordkeeping data consisting of confidential financial information to identify preselected individuals as the targets of its marketing efforts. Advisors then used those lists of preselected individuals to commence the Consultative Sales Process,

---

[5] http://www.supremecourt.gov/DocketPDF/19/19-1401/198019/20211028141124721_19-1401%20bsacTIAA.pdf

culminating in individualized financial plans after detecting each individual's particular "pain points" and financial planning needs. The individualized nature of the advice is further shown by Portfolio Advisor's use of individualized needs and investment preferences to develop a model portfolio recommendation.

99. Finally, the investment advice was provided pursuant to a mutual understanding that the advice would serve as a primary basis for investment decisions. *See* 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). Indeed, TIAA's express goal was to induce plan participants to rely on the advice as the basis for the participant's decision to roll assets to Portfolio Advisor. And once the participant "self-realized" the need for TIAA's help in one of the four financial planning areas, the participant necessarily understood that it would rely on TIAA Services' advice as to how to address that financial planning need.

100. TIAA has admitted the existence of a "mutual agreement, arrangement, or understanding between" TIAA or TIAA Services "and the plan or a fiduciary with respect to the plan," that TIAA's investment advice services "will serve as primary basis for investment decisions with respect to plan assets." *See* TIAA *Hughes* Br. 9. In a defined contribution plan, all or virtually all plan assets are allocated to the accounts of individual participants. In its *amicus* filing in the Supreme Court, TIAA admitted that its bundle of services includes providing "fund-level allocation advice" to plan participants, and that this investment advice is "personalized to each participant's career stage and retirement income goals." *Id*. Thus, TIAA's contracts with plan fiduciaries are based on the mutual

understanding that TIAA's services will include providing investment advice to all plan participants, whose accounts hold the assets of the entire plan; that such advice will serve as the primary basis for participants, who lack the expertise of a sophisticated financial expert like TIAA, to make decisions on how the plan's assets will be invested; and that such advice will be individualized based on the particular needs of each participant and his or her investment strategy or goals. Thus, TIAA's conduct satisfies 29 C.F.R. § 2510.3-21(c)(1)(ii)(B).

101.    TIAA cannot avoid liability by arguing that only its wholly owned subsidiary TIAA Services actually provided the advice, not TIAA itself. Fiduciary status attaches if the entity provides investment advice "either directly or indirectly (*e.g.,* through or together with any affiliate)." 29 C.F.R. § 2510.3-21(c)(1)(ii).

102.    TIAA Services is an "affiliate" of TIAA within the meaning of the regulation because TIAA has "the power to exercise a controlling influence over [its] management or policies." 29 C.F.R. § 2510.3-21(e)(2). TIAA Services' financial statements acknowledge that it is a "wholly owned subsidiary" of TIAA.[6] TIAA in fact exercised a controlling influence over TIAA Services' management or policies, as outlined above, by using TIAA Services as the vehicle to execute TIAA's corporate strategy of combating eroding market share by growing individual advisory and managed account rollover business. *See supra*, Part II.A–E.

---

[6] TIAA-CREF Individual & Inst'l Svcs., LLC, Notes to Statement of Fin. Condition at 3 (Dec. 31, 2020), https://www.tiaa.org/public/pdf/Statement_of_Financial_Condition.pdf, *archived at* https://perma.cc/XB7G-DZTJ.

**B.    TIAA exercised authority and control over plan management and administration in other ways.**

103.    Although the fiduciary investment advice described above alone made TIAA a fiduciary, TIAA also acted as an ERISA fiduciary in other ways.

104.    An entity "is a fiduciary with respect to a plan to the extent" "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

105.    As noted, TIAA serves as recordkeeper to thousands of ERISA-governed defined contribution plans. Although TIAA's formal recordkeeping role involves certain ministerial tasks such as keeping track of participants' account balances, TIAA abused its position and exceeded the bounds of its formal authority to exercise discretion and control over plans' management, operations, and administration.

106.    Data about a plan's participants is critical to the operation of a retirement plan. To accurately perform its recordkeeping function in a defined contribution plan, TIAA received access to highly sensitive, confidential data about the plan's participants—*e.g.*, age, length of employment, social security number, account balance, contact information, years until retirement age, and investment selections.

107.    But TIAA did not use these data solely to perform the ministerial tasks formally assigned to it. Instead, TIAA improperly appropriated this confidential information, using its access to this confidential information to aggressively market its high-cost non-plan products, such as Portfolio Advisor, and thereby generate profits for itself at participants' expense.

108.    As noted, the first step of the TIAA's Consultative Sales Process was for Advisors to cold-call *preselected* participants in TIAA-administered plans. In other words, TIAA used its position as the plan's recordkeeper—and its access to confidential data about plan participants—to identify promising high-asset sales targets, coining the term "WHALES" to describe them, and targeting people nearing retirement age who were likely to move assets.

109.    In so doing, TIAA exceeded the bounds of its formal authority and exercised discretion and control over the way the plans were managed and administered—fiduciary conduct. 29 U.S.C. § 1002(21)(A)(i), (iii).

110.    Worse still, TIAA exercised such discretion and control for the purpose of profiting at the expense of the plans' participants, including Plaintiffs and class members.

111.    Additionally, TIAA exercised control over the assets of ERISA plans. *See* 29 U.S.C. § 1002(21)(A)(i). TIAA has taken the position that under certain annuity contracts, defined contribution plans lack the authority to remove TIAA's affiliated flagship CREF Stock Account as an investment option, even if it is no longer a prudent option for the plan. According to sworn testimony of TIAA

Executive Vice President Douglas Chittenden at a recent trial in this Court, "the plan sponsor [employer] doesn't have the authority to move the assets" in CREF Stock to another plan option. *See* Transcript of Bench Trial, ECF No. 330 at 190–191 (596:11–597:5), *Sacerdote v. New York Univ.*, No. 16-6284 (S.D.N.Y. May 31, 2018).

112.    TIAA's apparent position that the plan sponsor lacks "authority or control respecting management or disposition of [the plan's] assets" results directly from TIAA's refusal to allow the sponsor to move the assets. *See* 29 U.S.C. § 1002(21)(A)(i). Thus, if the plan sponsor lacks authority over the disposition of those plan assets, TIAA itself necessarily possesses such "authority or control" over those assets. *Id.* TIAA's status as a fiduciary over plan assets underscores its obligation to act solely in the interest of plan participants when rendering investment advice.

## III.    TIAA and TIAA Services knowingly received ill-gotten profits produced by Plan Sponsors' ERISA violations.

113.    As noted, TIAA's standard package of services to its client plans includes personalized investment advice provided in "one-on-one meetings" with plan participants. *See supra*, ¶ 96; TIAA *Hughes* Br. 9. Even if such advice did not create fiduciary relationships of trust and confidence, TIAA remains subject to liability under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). While ERISA §§ 409(a) and 502(a)(2) impose liability only on plan fiduciaries, § 502(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Tr. & Sav. Bank v. Salomon*

*Smith Barney, Inc.*, 530 U.S. 238, 246 (2000). Thus, a defendant may be held liable under § 502(a)(3) even if it is not an ERISA fiduciary, if the defendant "knowingly participates" in an ERISA fiduciary's violation.

114.    Under ERISA's trust law roots, "it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Id*. at 250 (citing Restatement (Second) of Trusts §§ 284, 291, 294, 295, 297 (1959)).

115.    A transferee with actual or constructive knowledge of the circumstances constituting the breach of duty or rendering the transaction unlawful may be held liable for restitution.

116.    The Plan Sponsors of the plans in which Plaintiffs and proposed class members participated are ERISA fiduciaries because they are named as fiduciaries under the plan documents or exercised fiduciary discretion by hiring TIAA as a plan service provider.

117.    As such, the Plan Sponsors were subject to ERISA's duties of loyalty and prudence and were bound by ERISA's prohibited transactions provisions. However, the Plan Sponsors—including the fiduciaries of the plans in which Plaintiffs and class members participated—failed to monitor and investigate TIAA's

conduct and compensation and to implement restrictions to protect participants from being duped into high-cost rollovers that would deplete their hard-earned retirement savings. The Plan Sponsors thus failed to act as a prudent fiduciary would have under the circumstances and caused prohibited transactions.

### A. A prudent fiduciary would have restricted TIAA's cross-selling activities and monitored TIAA's cross-selling revenues.

118. ERISA's duty of prudence is an objective standard derived from the common law of trusts. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). Because fiduciaries are held "to the standards of others 'acting in a like capacity and *familiar with such matters*,'" a lack of knowledge or expertise is not a defense. *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)) (emphasis added). Thus, an ERISA "fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019). "[A] pure heart and an empty head are not enough." *Id.* Determining what a hypothetical prudent fiduciary would have known, and how such a fiduciary would have acted under the circumstances, involves questions of fact. Here, a prudent fiduciary acting in the best interests of plan participants would have (1) implemented measures to protect participants against TIAA's conflict of interest, and (2) monitored TIAA's cross-selling revenues.

#### 1. Cross-selling restrictions

119. As a factual matter, a prudent expert in the field would have been aware of the issue of cross-selling in defined-contribution plans by the start of the class period. In January 2011, the Government Accountability Office issued a report

finding that "industry experts" at the time were aware of the "conflicts of interest" that arise when a recordkeeper markets its non-plan products to a plan's participants.[7] As the GAO described the problem:

> Cross-selling products outside of a plan to participants can substantially increase a service provider's compensation, which creates an incentive for the service provider to steer participants toward the purchase of these products even though such purchases may not serve the participants' best interest. For example, products offered outside a plan may not be well suited to participants' needs or participants may be able to secure lower fees by choosing investment funds within their plans comparable with products offered outside their plan.

*Id.*

120. A second report, issued in March 2013, found that service provider representatives had encouraged rollovers from employer-sponsored plans to an IRA "even with only minimal knowledge of a caller's financial situations."[8]

121. The 2011 GAO Study (at 36) explicitly noted that "Plan sponsors can take steps to preclude service providers from cross-selling non-plan products and services to plan participants," such as requiring the service provider to sign a non-solicitation agreement.

---

[7] United States Gov't Accountability Office, Report to Congressional Requesters, 401(k) Plans, *Improved Regulation Could Better Protect Participants from Conflicts of Interest*, at 36 ("2011 GAO Study"), https://www.gao.gov/products/gao-11-119.

[8] United States Gov't Accountability Office, Report to Congressional Requesters, 401(k) Plans, *Labor and IRS Could Improve the Rollover Process for Participants* (March 2013), https://www.gao.gov/assets/660/652881.pdf.

122.    In fact, sponsors of numerous defined-contribution plans outside of the proposed class[9] have prevented recordkeepers from cross-selling investment products and services outside of their plans through contract terms that prohibit cross-selling and the use of participants' data for marketing or purposes other than administrative and recordkeeping functions.

123.    To be clear, Plaintiffs are not asserting that every failure to categorically prohibit cross-selling is a *per se* breach of fiduciary duty. But given the 2011 GAO Study's findings that conflicts of interest can result in rollover advice that is contrary to the interests of plan participants, prudent fiduciaries at the start of the class period, at a minimum, would have realized that cross-selling was a significant issue in defined-contribution plans and thus would have monitored their recordkeepers' cross-selling activities while implementing measures to mitigate conflicts of interest. At a minimum, a prudent fiduciary, if not prohibiting cross-sales outright, would have required the recordkeeper and its representatives to fully and adequately disclose its financial incentives and all information material to the rollover decision. Information material to the rollover decision would include, without limitation, comparisons of the fees that the participant would incur by executing the rollover versus remaining invested in the employer-sponsored plan;

---

[9] TIAA's clients represent a small fraction of the more than 600,000 ERISA-governed defined-contribution plans in the United States. *See* U.S. Dep't of Labor, *Private Pension Historical Tables and Graphs 1975–2020*, Table E1 (Oct. 2022), https://www.dol.gov/sites/dolgov/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletin-historical-tables-and-graphs.pdf

comparative performance information; whether managed account services were available through the employer-sponsored plan; and the cost of such plan-based services compared to the cost of the service outside of the plan. *See supra*, ¶¶ 65–70.

124.    As a factual matter, a prudent fiduciary acting in the participants' interest would understand that the need to monitor service providers' conduct is particularly acute when the service provider is entrusted with sensitive data about the plan's participants. The DOL has recognized the duty to ensure that participants' data is protected by advising that the duty to prudently select and monitor service providers includes ensuring that service providers have "strong cybersecurity practices." *DOL Tips* 1. Thus, an objectively prudent fiduciary would take steps to ensure that participants' sensitive data is not exposed to an unnecessary risk that it could be misused by third parties. A prudent fiduciary who discovers that the service provider itself *in fact* is misusing the data to enrich itself at participants' expense would not allow the practice to continue unabated for years, but instead would take steps to immediately restrict further misuse of participant data.

### 2.    Monitoring all sources of revenue

125.    ERISA explicitly requires that administrative expenses and service provider compensation be "reasonable" for the services provided. *See* 29 U.S.C. §§ 1104(a)(1)(A)(ii), 1108(b)(2)(A). Thus, allowing a service provider to receive more than reasonable compensation constitutes both a fiduciary breach and a non-exempt prohibited transaction. 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1106(a)(1)(C), 1108(b)(2)(A).

126.    To fulfill the obligation to ensure that a service provider receives no more than reasonable compensation, the fiduciary must account for all sources of compensation received by the service provider in connection with its services to the plan, including "indirect" compensation from sources "other than the covered plan[.]" *See* 29 CFR § 2550.408b-2(c)(viii)(B)(2) (defining "indirect compensation").

127.    If the fiduciary fails to quantify all sources of a service provider's compensation, it becomes impossible for the fiduciary to make a reasoned assessment of whether the provider's total compensation is reasonable for its services to the plan, because the fiduciary does not know the total compensation.

128.    As a factual matter, a prudent expert in the field would have known by the start of the class period that cross-selling could provide a substantial source of revenue to defined-contribution plan recordkeepers, often representing multiples of actual recordkeeping fees. As the GAO concluded in 2011, cross-selling "can substantially increase a service provider's compensation" and "cross-selling IRA rollovers to participants, in particular, is an important source of income for service providers." 2011 GAO Study at 36. For example, "a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with $50 to $100 in fees if the same participant were to invest in a fund within a plan." *Id.*

129.    The illustration below shows the effect of non-plan product sales on a recordkeeper's total compensation:



130. A fiduciary who fails to understand the significance of cross-selling revenues to a recordkeeper and to quantify such revenue loses the ability to use that information in negotiating the service provider's compensation. Conversely, a fiduciary who determines the amount of the recordkeeper's cross-selling revenues can use that information to negotiate a more favorable deal for the plan, reducing the costs paid by plan participants. Accordingly, the fiduciary who fails to account for cross-selling revenues necessarily causes its plan to incur unreasonable fees, because the same services could have been obtained at a lower cost if the fiduciary had diligently investigated the provider's cross-selling revenues and used that information for the plan's benefit.

**B.**   **The Plan Sponsors failed to implement restrictions on TIAA's cross-selling activities.**

131.   As noted, TIAA's conduct described *supra*, ¶¶ 22–71, resulted in TIAA paying $97 million to settle federal and state charges following investigations into its practices by the SEC and New York State Office of Attorney General. TIAA's corporate strategy to grow its rollover business to combat eroding market share—accomplished through its Advisors' false representations of objectivity, "fear selling," misleading portrayals of Portfolio Advisor's merits relative to employer-sponsored plans, and other conduct described above—resulted in a 20-fold increase in TIAA's annual revenues generated from assets rolled over to Portfolio Advisor. From 2013 to 2018, such revenues increased from $2.6 million to $54 million.

132.   The steadily increasing revenues that TIAA achieved due to its Advisors' misleading practices raise a strong inference that the Plan Sponsors failed to implement the measures described above, which a prudent fiduciary would have adopted. *See supra*, ¶¶ 119–24. As discussed, TIAA's Advisors failed to inform Plaintiffs and class members that investors typically incur far higher fees by investing in Portfolio Advisor than by remaining invested in their employer-sponsored plans, which frequently offer similar managed account services free of charge. *See supra*, ¶¶ 66–68. Nor was there any basis for TIAA's Advisors to state that Portfolio Advisor's high fees were justified by an expectation of superior performance relative to an employer-sponsored plan. *Id*. ¶ 70.

133.   Accordingly, if the Plan Sponsors had implemented the measures of a

prudent fiduciary by requiring TIAA to fully and accurately disclose its conflict of interest and the relative merits of Portfolio Advisor compared to employer-sponsored plans, *see supra*, ¶ 123, TIAA's Portfolio Advisor revenues would not have increased by 2,000% during the class period. If the Plan Sponsors had acted prudently by mandating that TIAA make full and accurate disclosures of material information (if not prohibiting cross-selling outright), TIAA's Portfolio Advisor revenues likely would have *decreased*, or at least experienced a much lower growth rate. That is because no rational investor fully informed of the facts would knowingly agree to squander hard-earned retirement assets by paying a much higher fee unaccompanied by an expectation of enhanced performance, particularly if substantially identical managed account services were available for free in the employer-sponsored plan, as was often the case.

134. By way of specific example, Plaintiff Carfora executed a rollover to Portfolio Advisor from the Loyola Marymount University Defined Contribution Retirement Plan in reliance on investment advice from an Advisor employed by TIAA. As discussed in further detail below, Plaintiff had numerous interactions with this Advisor. *See infra*, ¶ 155. Throughout the course of these interactions, TIAA's representative disavowed any conflict of interest, representing that her compensation was not commission-based and that TIAA was acting in Plaintiff's best interest. Moreover, TIAA's representative informed Plaintiff that he would earn more money through Portfolio Advisor (evidently without any comparative information supporting such a belief), while failing to inform Plaintiff that the fees

and expenses of moving assets to Portfolio Advisor were higher than remaining in his employer-sponsored plan. Accordingly, it is apparent that the fiduciaries of Loyola Marymount's plan failed to implement the restrictions on TIAA's cross-selling activities that a prudent fiduciary would have under the circumstances. *See supra*, ¶ 123.

135.    Plaintiffs Putnam and Gonzales had similar experiences in their interactions with TIAA's representatives in advance of executing Portfolio Advisor rollovers from their employer-sponsored plans. TIAA's advisors minimized or denied any conflict of interest and did not present Plaintiffs with comparative information material to the rollover decision. Thus, the fiduciaries of their plans also evidently failed to implement the restrictions on TIAA's cross-selling activities that a prudent fiduciary would have under the circumstances. *See supra*, ¶¶ 13–14, 123.

## C.    The Plan Sponsors failed to prudently investigate TIAA's cross-selling revenues.

136.    Separate from the breaches of duty described in the preceding section, the Plan Sponsors also failed to properly account for TIAA's cross-selling revenues, resulting in additional fiduciary breaches and prohibited transactions.

137.    As discussed, based on repeated guidance from the DOL (and common sense), a fiduciary cannot assess whether a service provider's total compensation is reasonable unless the fiduciary knows the *amount* of the compensation. On information and belief, the vast majority, if not all, of the Plan Sponsors failed to determine the amount of TIAA's cross-selling revenues, thereby preventing them

from making an informed assessment of whether the total sum of TIAA's plan-related compensation was reasonable for the services provided. Based on counsel's knowledge and investigation of industry practices, this contention will likely have evidentiary support after a reasonable opportunity for discovery. The fact that TIAA's Portfolio Advisor revenues sharply and continuously escalated during the class period, see supra, ¶ 59, further strengthens the inference that the Plan Sponsors failed to inquire, monitor, or assess the reasonableness of TIAA's cross-selling revenues.

138.    The precise set of services that TIAA provided to each plan encompassed by the class is immaterial. For any given set of services, each Plan Sponsor negotiated an administrative and recordkeeping fee with TIAA that the Plan Sponsor believed to be reasonable for the included services.[10] The fact that TIAA was actually receiving substantial additional plan-related revenues of which the Plan Sponsor was unaware and failed to take into account—for the exact same services to the plan—necessarily means that TIAA was receiving more compensation than what the Plan Sponsor had determined to be the reasonable fee for the contracted services. This violated ERISA's explicit reasonableness requirement, breached the duty of prudence due to a lack of investigation into all of TIAA's revenue sources, and caused non-exempt prohibited transactions. 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1106(a)(1)(C), 1108(b)(2)(A) (prohibited transaction for services

---

[10] Whether a particular plan's negotiated fees were in fact reasonable is a separate question.

qualifies for exemption "if no more than reasonable compensation is paid therefor").

139.   To use the following graphic for illustrative purposes, the sponsor of the example plan depicted by the left column would have negotiated a $30,000 annual administrative fee, which is the amount the sponsor determined to be reasonable for TIAA's package of services to the plan (including investment advice). In reality, TIAA received an additional $138,000 in revenue from cross-selling non-plan products to the plan's participants, but provided *no additional services* to the plan beyond those specified in the contract. As a result, TIAA's *actual* plan-related compensation was several times higher than the amount that the fiduciary had determined to be reasonable for TIAA's services to the Plan.





140.    Further, by causing their plans to hire and retain TIAA as a service provider and to engage in unchecked cross-selling resulting in transfers of plan assets to TIAA for TIAA's own benefit, the sponsors caused their plans to engage in prohibited transactions with a party in interest. 29 U.S.C. § 1106(a)(1)(D).

141.    TIAA's cross-selling and self-interested investment advice to participants was not a service necessary for the operation of the plans.

**D.    TIAA knew that Plan Sponsors failed to implement restrictions and failed to inquire into TIAA's cross-selling revenues.**

142.    Because each of the ERISA violations described above involved an interaction between TIAA and a Plan Sponsor (or the lack of an interaction), TIAA necessarily knew of the circumstances that rendered the conduct a breach of fiduciary duties and the circumstances that rendered the transactions involving TIAA's services and transfers and use of plan assets unlawful.

143.    TIAA knew that the Plan Sponsors failed to monitor TIAA's cross-selling activities and the manner in which it was using participant data; failed to implement restrictions on TIAA's cross-selling practices; failed to mandate full and adequate disclosures of TIAA's financial incentives to recommend rollovers to TIAA's proprietary products; and failed to mandate full disclosure of all information material to the rollover decision, such as comparative fee and performance information.

144.    TIAA necessarily knew of any failures of Plan Sponsors to inquire into the amount of TIAA's cross-selling revenues related to each plan. Thus, TIAA also

necessarily knew that Plan Sponsors who failed to inquire into TIAA's revenues also were not accounting for TIAA's cross-selling revenues when assessing the reasonableness of TIAA's compensation for its services to each plan.

145.   TIAA thus knew of Plan Sponsors' conduct in causing plans to hire and retain TIAA as a service provider receiving unreasonable compensation and allowing TIAA to engage in unchecked cross-selling resulting in transfers of plan assets to TIAA for TIAA's own benefit.

146.   TIAA directly participated in and enabled the Plan Sponsors' fiduciary breaches by engaging in unchecked cross-selling, knowingly receiving transfers of plan assets and unreasonable compensation, and by failing to disclose to Plan Sponsors the extent of its cross-selling revenues and that its Advisors were engaging in false and misleading practices.

## IV.   TIAA and TIAA Services engaged in fraud and concealed their fraudulent conduct.

147.   In any ERISA breach of fiduciary duty action involving "fraud or concealment," the action "may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. Because Plaintiffs' claims sound in fraud, this period automatically applies: TIAA and TIAA Services each "breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001).

148.   Plaintiffs did not discover Defendants' fraud, breaches of fiduciary

duty, and prohibited transactions until the SEC and New York Attorney General released their findings in July 2021. Accordingly, the proper starting date for the class period is the date that TIAA and TIAA Services commenced their fraudulent course of conduct, January 1, 2012.

149.    Not only do Plaintiffs' underlying claims arise from fraudulent conduct in violation of ERISA, but TIAA and TIAA Services also fraudulently concealed their misconduct.

150.    In ERISA cases, courts often must look to "[t]he common law of trusts, which offers a starting point for analysis." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000); *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). At common law, one who has a duty to disclose "because of a fiduciary or other similar relation of trust and confidence" commits fraud by "fail[ing] to disclose material information" that the beneficiary is entitled to know. *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Lenz v. Assoc. Inns & Restaurants Co of Am.*, 833 F. Supp. 362, 372 (S.D.N.Y. 1993) ("[F]raudulent concealment occurs if the party under the fiduciary duty fails to meet its obligations to inform the other party of facts underlying the claim."); Restatement (Second) of Trusts § 173, comment d (1959) (trustee has duty to disclose information the beneficiary needs to know for his protection).

151.    TIAA's and TIAA Services' failures to disclose their conflicts of interest and use of an undisclosed "hat switch" during the sales process constituted fraudulent concealment.

152.    TIAA and TIAA Services also engaged in acts to hinder the discovery of their breaches of fiduciary duty. *Caputo*, 267 F.3d at 190. Among other things, TIAA Services falsely claimed that it was adhering to its fiduciary obligations to ensure that investment advice was objective and in participants' best interests, when in reality it was doing no such thing. Further, TIAA Services' claims that Advisors were objective and not compensated through commissions were utterly false and served to prevent Plaintiffs and class members from discovering the fraud. TIAA Services' misleading portrayal of Portfolio Advisor and other non-plan products as superior to employer-sponsored plans also prevented class members from discovering the truth.

153.    Plaintiffs Carfora and Gonzales relied on Defendants' fraudulent representations in deciding to roll assets from their employer-sponsored plans to Portfolio Advisor. The fraudulent nature of Defendants' conduct was concealed from them until the recent public release of investigative findings of the U.S. Securities and Exchange Commission and New York State Office of the Attorney General.

154.    The substance, speaker, context, and time of the misrepresentations to, and omissions from, Plaintiffs Carfora and Gonzales are as follows.

155.    Plaintiff Carfora was induced to open a Portfolio Advisor account by Erin Gavin, an advisor employed by Defendants. Plaintiff Carfora and his spouse spoke with Gavin on numerous telephone calls beginning in July 2015. Gavin aggressively pitched Portfolio Advisor. Gavin led Plaintiff Carfora to believe that TIAA was a fiduciary acting in his best interests, based on statements such as "our

best interests are your best interests." Gavin made statements to the effect that she and other advisors "don't make a commission" and get paid "no matter what." Gavin emphasized that TIAA could be trusted to act in Plaintiff's best interest because TIAA and Plaintiff Carfora had a long-term relationship dating back to the 1980's. Gavin made statements to Plaintiff Carfora to the effect that TIAA had "been acting as your financial advisor and has made you a lot of money" over the years and that this "new product," Portfolio Advisor, would "earn you more money" than remaining in the employer-sponsored plan, and, therefore, "we want you to allow us to make the necessary transfers" to establish the Portfolio Advisor account. Gavin failed to inform Plaintiff Carfora that the fees and expenses of moving assets to Portfolio Advisor were higher than remaining in his employer-sponsored plan, or explain how paying higher fees would reduce the value of the portfolio over time. Gavin failed to disclose data showing the projected performance of Portfolio Advisor compared to remaining in the employer-sponsored plan. Gavin emphasized the difficulty of self-directed investing through an employer-sponsored plan and failed to inform Plaintiff Carfora of managed account services available through his employer-sponsored plan or elsewhere at a much lower cost or no cost.

156.    Plaintiff Gonzales was induced to open a Portfolio Advisor account after meeting with Dawn Edwards, an advisor employed by Defendants. Plaintiff Gonzales and his spouse met with Edwards in December 2013 at TIAA-CREF offices in Austin, Texas. Plaintiff believed TIAA was acting in his best interest due to having held long-term investments with TIAA and positive results working with

a previous advisor. Ms. Edwards' supervisor came into the meeting and assured

Plaintiff and his spouse that TIAA was acting "on their behalf," by "taking actions

to help them with their long-term plans." Edwards and the supervisor represented

that Portfolio Advisor was superior to remaining invested in the employer-

sponsored plan because TIAA would engage in "active monitoring" of the Portfolio

Advisor funds "continuously, all the time," whereas the assets in the employer-

sponsored plan would not be actively monitored. Based on these representations,

Plaintiff decided to put his "full trust and faith in TIAA" and decided to proceed

with the Portfolio Advisor rollover. In touting the benefits of "active monitoring"

and the lack of active monitoring in the employer-sponsored plan, neither Edwards

nor her supervisor informed Plaintiff of other managed account services in the

market, through his employer-sponsored plan or elsewhere, that were available at a

much lower cost or no cost. Neither Edwards nor her supervisor informed Plaintiff

Gonzales that the fees and expenses charged to assets in Portfolio Advisor would be

higher than those charged to assets in the employer-sponsored plan or how that fee

differential would significantly reduce the overall portfolio over time. They failed to

disclose data showing the projected performance of Portfolio Advisor compared to

remaining in the employer-sponsored plan.

## CLASS ACTION ALLEGATIONS

157.    Plaintiffs seek to certify, and to be appointed as representatives of, the

following class:

> All participants of defined contribution plans subject to ERISA who (i) initiated a rollover of assets from the participant's individual plan account to any non-plan product or service affiliated with TIAA or TIAA Services at any time between January 1, 2012 and the date of judgment, (ii) for which a TIAA Services Wealth Management Advisor received credit toward an annual variable bonus under TIAA's incentive compensation plan. Excluded from the class are participants of any plan sponsored by TIAA or its affiliates.

158. The proposed class meets the requirements of Rule 23(a) for the following reasons:

a. The class includes thousands of members and are so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to the class including, without limitation: whether TIAA and TIAA Services are fiduciaries with respect to the conduct that is the subject of this complaint; whether TIAA or TIAA Services breached a fiduciary duty; whether TIAA or TIAA Services caused a prohibited transaction; whether TIAA or TIAA Services knowingly participated in ERISA violations by other fiduciaries; determining the proper remedies for Defendants' violations; and determining the amount of Defendants' unlawful profits.

c. Plaintiffs' claims are typical of the claims of the class because each Plaintiff and all class members are pursuing the same legal theories arising from the same course of misconduct instituted on a company-wide basis by TIAA's top executives.

d. Plaintiffs are adequate class representatives because they have no interest that conflict with the members of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

159. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties and liability, and (B) adjudications by individual members would, as a practical matter, be dispositive of the interests of the members not parties to the adjudication or would substantially impair or impede those members' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

160. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable, the losses suffered by individuals may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, the class may be certified under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

161.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class, has been appointed class counsel by many federal district judges throughout the country to represent individuals in defined contribution retirement plans, and is best able to represent the interests of the class. Fed. R. Civ. P. 23(g). Schlichter Bogard has been appointed as class counsel in over 30 class actions involving fiduciary misconduct in defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution plan litigation. *See, e.g., Marshall v. Northrop Grumman Corp.*, No. 16-6794 AB (JCX), 2020 WL 5668935, at *4 (C.D. Cal. Sept. 18, 2020) ("The Court finds that Schlichter, Bogard & Denton is exceptionally skilled having achieved unparalleled success in actually pioneering complex ERISA 401(k) excessive fee litigation[.]"); *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020) (Schlichter Bogard "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans"); *Bell v. Pension Comm. of ATH Holding Co.,* No. 15-2062, 2019 WL 4193376, at *2 (S.D. Ind. Sept. 4, 2019*)* (the firm are "experts in ERISA litigation"); *Spano v. Boeing Co.*, No. 06-743, Doc. 587, at 5–6 (S.D. Ill. Mar. 31, 2016) ("The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one[.]") (internal quotations omitted); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination."); *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487, at *2 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees.").

## CAUSES OF ACTION[11]

### COUNT III: Non-Fiduciary Recipient of Ill-Gotten Profits

162.    Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

163.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

164.    The Plan Sponsors of the plans in which the named Plaintiffs and proposed class members participate are named fiduciaries or functional fiduciaries

---

[11] Plaintiffs have deleted Counts I and II to comply with the Court's instruction that "Plaintiffs may submit an amended complaint as to Count III only." ECF 63 at 29. Plaintiffs reserve all rights to appeal the dismissal of those claims as asserted in the initial complaint (ECF 1) and the proposed amended complaint (ECF 53-1).

under ERISA based on, among other things, hiring TIAA as their plans' recordkeeper. As such, the Plan Sponsors owed duties of loyalty and prudence to the plans and plan participants and were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between their plans and party-in-interest service providers like Defendants.

165. Based on the facts described above, *see supra*, ¶¶ 118–41, the Plan Sponsors breached their fiduciary duties in at least the following respects:

- failing to protect Plaintiffs and class members' interests and those of their plans by allowing or failing to monitor Defendants' cross-selling efforts and to discover Defendants' fraudulent sales tactics;

- failing to take steps to protect Plaintiffs and class members by preventing Defendants' fraudulent sales tactics and misuse of confidential participant data to benefit themselves;

- failing to protect the interests of Plaintiffs and class members by mandating that TIAA fully disclose conflicts of interest and other information material to the rollover decision;

- failing to inquire into Defendants' revenues derived from cross-selling; and

- failing to monitor and account for the amount of Defendants' revenues derived from cross-selling to evaluate whether Defendants' compensation was reasonable for the services provided to the plans.

166. Had the Plan Sponsors discharged their ERISA obligations,

Defendants either would have been prevented from engaging in the conduct described herein, or the harmful effects of that conduct would have been mitigated.

167.    In addition, based on the conduct described herein, the Plan Sponsors caused their plans to engage in non-exempt prohibited transactions which the sponsors knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest or transfer to, or use by or for the benefit of a party in interest, of any assets of their plans.

168.    TIAA and TIAA Services knew that their own course of conduct described herein was fraudulent and unlawful. TIAA and TIAA Services also knew of the circumstances that rendered the Plan Sponsors' conduct a breach of fiduciary duties and the circumstances that rendered the transactions involving their services and transfers and use of plan assets unlawful. Defendants knew that the Plan Sponsors were not monitoring or restricting Defendants' cross-selling activities, requiring full disclosure of material information including conflicts of interest, inquiring into the amount of Defendants' cross-selling revenues derived from their plans, or implementing other measures to protect the plans' participants from misuse of their confidential information and predatory and fraudulent sales tactics.

169.    As a result of their own misconduct and the Plan Sponsors' ERISA violations, TIAA and TIAA Services knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

170.    Thus, even if TIAA or TIAA Services were not an ERISA fiduciary,

each defendant remains subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or constructive trust.

## JURY TRIAL DEMANDED

171.    Under Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury. In the alternative, Plaintiffs request an advisory jury on all issues not triable of right by a jury.

## PRAYER FOR RELIEF

Plaintiffs seek entry of judgment on each of their claims and request that the Court order the following relief:

- Find and declare that each Defendant is liable for knowingly participating in the Plan Sponsors' ERISA violations;

- Grant appropriate equitable relief, including without limitation disgorgement or a constructive trust on ill-gotten profits, restitution, and surcharge against Defendants and in favor of Plaintiffs and the class so as to restore Plaintiffs and class members to the position they would have occupied but for the Plan Sponsors' ERISA violations and Defendants' knowing participation in same;

- Order Defendants to provide all accountings necessary to determine the amounts of Defendants' profits and the amounts that must be restored to Plaintiffs and class members and their respective plans;

- Order Defendants to stop the practices described above and to notify, in a manner directed by this Court, each class member who transferred assets that this Court has so ordered;

- Certify the proposed class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable relief as the Court deems appropriate.

November 3, 2023                    Respectfully submitted,

                                   /s/ Sean E. Soyars
                                   Andrew D. Schlichter, Bar No. 4403267
                                   Jerome J. Schlichter (admitted *pro hac vice*)
                                   Sean E. Soyars (admitted *pro hac vice*)
                                   SCHLICHTER BOGARD LLP
                                   100 South Fourth Street, Ste. 1200
                                   St. Louis, MO 63102
                                   (314) 621-6115
                                   Fax: (314) 621-5934
                                   aschlichter@uselaws.com
                                   jschlichter@uselaws.com
                                   ssoyars@uselaws.com

                                   *Counsel for Plaintiffs*