UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CARFORA, SANDRA PUTNAM, and JUAN GONZALES, *individually and as representatives of a class of similarly situated individuals,*<br><br>        Plaintiffs,<br><br>       -v.-<br><br>TEACHERS INSURANCE ANNUITY ASSOCIATION OF AMERICA and TIAA-CREF INDIVIDUAL & INSTITUTIONAL SERVICES, LLC,<br><br>        Defendants. | 21 Civ. 8384 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs John Carfora, Sandra Putnam, and Juan Gonzales (together, "Plaintiffs") brought this putative class action against Defendants TIAA-CREF Individual & Institutional Services, LLC, and Teachers Insurance Annuity Association of America (together, "Defendants" or "TIAA") in connection with Defendants' provision of various administrative and investment-related services to Plaintiffs' employer-sponsored retirement plans, which are covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 26 U.S.C. §§ 401-420, 29 U.S.C. §§ 1001-1191d.

The Court has issued three opinions resolving earlier motions in this action. In *Carfora I,* the Court dismissed Plaintiffs' original complaint, which sought to impute fiduciary duties to TIAA itself. *See Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.,* 631 F. Supp. 3d 125, 135, 140-54, 156 (S.D.N.Y. 2022) ("*Carfora I*"), *reconsideration granted in part,* No. 21 Civ. 8384 (KPF), 2023 WL 5352402 (S.D.N.Y. Aug. 21, 2023). In *Carfora II,* the Court granted Plaintiffs'

motion for partial reconsideration of that opinion and allowed Plaintiffs to amend their pleadings to allege the mirror-image of their original claim, *viz.*, that TIAA had knowingly participated in fiduciary breaches committed by others. *Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.,* No. 21 Civ. 8384 (KPF), 2023 WL 5352402, at *9-12 (S.D.N.Y. Aug. 21, 2023) ("*Carfora II*"). Defendants then moved to dismiss Plaintiffs' Second Amended Complaint (the "SAC") for failure to state a claim, a motion the Court denied in *Carfora III*. *See Carfora* v. *Tchrs. Ins. Annuity Ass'n of Am.,* No. 21 Civ. 8384 (KPF), 2024 WL 2815980, at *10 (S.D.N.Y. May 31, 2024) ("*Carfora III*").

Before the Court now is Defendants' third motion to dismiss, this one challenging whether Plaintiffs have class standing to pursue a knowing participation claim on behalf of participants in approximately 9,900 plans in which Plaintiffs themselves did not participate; these plans are referred to by Defendants as the "stranger plans" and by Plaintiffs as the "other retirement plans." For the reasons set forth below, the Court concludes that Plaintiffs lack class standing to pursue claims on behalf of participants in these other retirement plans and grants Defendants' motion.

**BACKGROUND**[1]

**A.    Factual Background**

The Court previously summarized the factual allegations of this case in *Carfora I*, *II*, and *III*. *See Carfora I*, 631 F. Supp. 3d at 131-34; *Carfora II*, 2023

---

[1]    This Opinion draws its facts from the Second Amended Complaint ("SAC" (Dkt. #71)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). For ease of reference, the Court refers

2

WL 5352402, at *1-2; *Carfora III*, 2024 WL 2815980, at *1-3.  In *Carfora III* specifically, the Court discussed at length the allegations of the SAC, and how Plaintiffs' theory of liability had changed.  *See* 2024 WL 2815980, at *1-3.  As such, the Court presumes knowledge of the background of the case and the allegations in the SAC, and discusses only those facts pertinent to the instant motion.

### 1.      Plaintiffs and the ERISA-Governed Plans at Issue

Plaintiffs here are current or former researchers and university professors who are participants in ERISA-governed "defined contribution retirement plans" that were sponsored and administered by Plaintiffs' employers or related designated entities (the "Plan Sponsors").  (SAC ¶¶ 6, 12-14).  In defined contribution retirement plans, participants contribute pre-tax earnings into individual accounts and then "direct the contributions into one or more options on the plan's investment menu, which is assembled by the plan's fiduciaries" — in this case, the Plan Sponsors.  (*Id.* ¶¶ 19, 74).  Plaintiffs are suing on behalf of participants in approximately 9,900 retirement plans.  (Dkt. #107 ¶ 5 ("Based on available data, approximately 9,900 ERISA-governed retirement plans that retained TIAA to provide recordkeeping services had one or more participant rollovers to a TIAA non-plan product for the period January 1, 2015 to December 31, 2024.")).

---

to Defendants' memorandum of law in support of their motion to dismiss Plaintiffs' class claims as "Def. Br." (Dkt. #106); to Plaintiffs' memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #109); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #117).

### 2. TIAA's Cross-Selling Campaign and the Role of the Plan Sponsors

TIAA contracts with Plan Sponsors to provide administrative and investment-related services, the latter of which include assembling "TIAA-affiliated investment options in which [plan] participants can invest" and providing individual advisory services for plan participants. (SAC ¶¶ 15-16, 22). Plaintiffs allege that in recent years, TIAA has shifted its focus to the provision of individual advisory services. (*Id.* ¶¶ 26-27).

The centerpiece of TIAA's individual advisory services is "Portfolio Advisor," a managed account program that places the plan participant in a model portfolio, one that often includes TIAA-affiliated funds, and then provides ongoing investment advice. (SAC ¶¶ 29-30). Plaintiffs allege that Portfolio Advisor charged much higher fees than employer-sponsored retirement plans normally would. (*Id.* ¶ 31).

Plaintiffs further allege that, given Portfolio Advisor's potential to be a key revenue generator, TIAA schemed to cross-sell Portfolio Advisor to the participants in TIAA-administered employer-sponsored retirement plans, and thereby persuade those participants to roll over their assets from lower-fee, employer-sponsored plans to the higher-fee, individually managed Portfolio Advisor. (SAC ¶¶ 26, 29). The cross-selling plan involved TIAA wealth management advisors calling participants in TIAA-administered plans to pressure those participants to partake in Portfolio Advisor. (*Id.* ¶¶ 33-37). Plaintiffs allege that the system of cross-selling was misleading and fraught with conflicts of interest. (*Id.* ¶¶ 46-64). Worse yet, Plaintiffs claim, those who

participated in Portfolio Advisor had no better returns than those who remained in the employer-sponsored plans. (*Id.* ¶ 70).

According to Plaintiffs, their ERISA Plan Sponsors were unaware of TIAA's cross-selling campaign and did nothing, thereby violating the fiduciary duties the Plan Sponsors owed to their participants under ERISA. (SAC ¶¶ 116-141). Specifically, Plaintiffs argue that the Plan Sponsors' fiduciary duties obligated them to monitor TIAA's activities, such that they would have identified the cross-selling activities and acted to mitigate their problematic elements. (*Id.* ¶¶ 125-141).

## B.    Procedural Background

### 1.    *Carfora I*, *II*, and *III*

Plaintiffs commenced this lawsuit by filing a complaint against Defendants on October 11, 2021. (Dkt. #1). On September 27, 2022, in *Carfora I*, the Court granted Defendants' motion to dismiss the original complaint, rejecting Plaintiffs' original argument that TIAA was liable as an ERISA fiduciary. 631 F. Supp. 3d at 140-54, 156.

Soon thereafter, Plaintiffs filed a motion to alter or amend the judgment and for leave to file an amended complaint. (Dkt. #51). Ultimately, the Court granted in part Plaintiffs' motion in *Carfora II*. 2023 WL 5352402, at *9-12. Specifically, the Court recognized that Plaintiffs had identified a new theory of liability based on allegations of TIAA's knowing participation in the Plan Sponsors' breaches of their fiduciary duties. *Id.* at *12. The Court therefore

granted Plaintiffs leave to file an amended complaint as to the knowing participation claim only.  *Id.*

Plaintiffs filed the amended complaint on September 11, 2023 (Dkt. #64), and then filed the SAC on November 3, 2023 (Dkt. #71).  In accordance with the Court's decision in *Carfora II*, the SAC brought one claim against TIAA for being a non-fiduciary recipient of ill-gotten profits.  (SAC ¶¶ 162-170).  Defendants subsequently moved to dismiss the SAC.  (Dkt. #74).  On May 31, 2024, in *Carfora III*, the Court denied Defendants' motion to dismiss the SAC, holding that Plaintiffs had plausibly stated a claim that TIAA was a knowing participant in the Plan Sponsors' alleged breaches of their fiduciary duties.  2024 WL 2815980, at *4, 10.

### 2.    Post-*Carfora III* Proceedings

After *Carfora III*, Defendants filed their answer to the SAC on June 21, 2024.  (Dkt. #79).  The Court entered a case management plan on July 16, 2024, and discovery commenced.  (Dkt. #82).  On February 2, 2025, before the completion of discovery, Defendants requested a conference regarding an anticipated motion to dismiss Plaintiffs' claims on behalf of absent class members for lack of class standing.  (Dkt. #95).  The Court granted that request (Dkt. #97), and held the pre-motion conference on March 4, 2025 (March 4, 2025 Minute Entry; Dkt. #98).  The Court entered an amended case management plan on March 17, 2025.  (Dkt. #103).  On March 21, 2025, Defendants filed their motion to dismiss for lack of class standing, along with supporting papers.  (Dkt. #105-108).  Plaintiffs filed their opposition papers on

April 25, 2025.  (Dkt. #109-112).  Defendants filed their reply on May 9, 2025.

(Dkt. #117).

While this motion has been pending, the parties have proceeded with

discovery.  As anticipated, considerable time has been spent by the Court and

the parties on Plaintiffs' subpoena requests to Plan Sponsors, including those

who sponsored plans in which Plaintiffs did not participate.  Many of these

Plan Sponsors objected to Plaintiffs' subpoena requests, and on July 14, 2025,

Plaintiffs informed the Court that they planned to move to compel certain Plan

Sponsors to produce documents responsive to the subpoenas.  (Dkt. #122).

The Court decided to defer a conference on Plaintiffs' anticipated motions until

all actions related to the third-party subpoena requests had been transferred to

this District.  (Dkt. #130).  Eventually, after the transfer of all related cases, the

parties briefed Plaintiffs' consolidated motion to compel.  (Dkt. #141-143, 164-

165, 193).  Following oral argument (*see* Dkt. #196; January 6, 2026 Minute

Entry), and supplemental submissions (Dkt. #220-225), the Court largely

denied Plaintiffs' motion to compel on February 12, 2026 (Dkt. #234).

In response to the circumstances surrounding Plaintiffs' motion to

compel, Defendants filed a letter with the Court on October 9, 2025, explaining

their view that Plaintiffs' third-party subpoena requests supported their theory

that Plaintiffs lacked class standing to represent participants in the other

retirement plans.  (Dkt. #145).  Plaintiffs responded on October 14, 2025.  (Dkt.

#146).  Defendants' motion to dismiss is now fully briefed.

7

**DISCUSSION**

## A.    Applicable Law

### 1.    Motions to Dismiss for Lack of Standing Under Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000). For example, Article III's constitutional limit of federal-court jurisdiction to actual cases and controversies requires a plaintiff to "have standing to pursue his claims." *Bellocchio* v. *Garland*, 614 F. Supp. 3d 11, 15 (S.D.N.Y. 2022). Standing consists of three prongs: The plaintiff "must demonstrate that he has (i) suffered an injury in fact, (ii) that is fairly traceable to the challenged conduct of the defendant, and (iii) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 338 (2016)).

"On a Rule 12(b)(1) motion, the challenge to subject-matter jurisdiction may be facial or fact-based." *O'Shea* v. *P.C. Richard & Son, LLC*, No. 15 Civ. 9069 (KPF), 2017 WL 3327602, at *4 (S.D.N.Y. Aug. 3, 2017). In resolving a facial motion, which is based solely on the complaint and its attachments, the district court must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiff asserting jurisdiction." *Id.* In contrast, the court may consider evidence outside the pleadings when it is presented with a factual challenge. *Id.* To oppose a fact-based motion, the

8

plaintiff "must come forward with evidence of [her] own to controvert that presented by the defendant." *Equal Vote Am. Corp.* v. *Pelosi*, No. 19 Civ. 777 (KPF), 2020 WL 1467319, at *3 (S.D.N.Y. Mar. 26, 2020) (internal quotation marks omitted) (quoting *Katz* v. *Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017)).

### 2.    The Concept of Class Standing

The Second Circuit has recognized a "'tension' in [Supreme Court] case law as to whether 'variation' between [i] a named plaintiff's claims and [ii] the claims of putative class members 'is a matter of Article III standing … or whether it goes to the propriety of class certification.'" *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 160 (2d Cir. 2012) ("*NECA*") (quoting *Gratz* v. *Bollinger*, 539 U.S. 244, 263 & n.15 (2003)). Ultimately, in resolving this tension, the Second Circuit has advised that a named plaintiff must have class standing to assert claims on behalf of a putative class, an inquiry that is distinct from the class certification inquiry. *See In re Chantix (Varenicline) Mktg., Sales Pracs. and Prods. Liab. Litig.*, 735 F. Supp. 3d 352, 377 (S.D.N.Y. 2024) ("The class *standing* inquiry … 'derives from constitutional standing principles' and 'is thus distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a).'" (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi.* v. *Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014) ("*BNYM*"))).

To establish class standing in the Second Circuit, a named plaintiff must plausibly plead "[i] that he 'personally has suffered some actual … injury as a

9

result of the putatively illegal conduct of the defendant,' and [ii] that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA*, 693 F.3d at 162 (citation omitted) (first quoting *Blum* v. *Yaretsky*, 457 U.S. 991, 999 (1982); then quoting *Gratz*, 539 U.S. at 267); *see also BNYM*, 775 F.3d at 160-61.  Motions to dismiss for lack of class standing seek dismissal only of the named plaintiff's claims on behalf of absent class members.  *See BNYM*, 775 F.3d at 170 (dismissing plaintiffs' claims only as to trusts in which they did not invest but allowing their claims as to other trusts to proceed).[2]

The class standing inquiry seeks to determine whether "the named plaintiff ha[s] the right incentives" to represent the class as defined.  *BNYM*, 775 F.3d at 161.  "The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant."  *Id.* at 162-63.  The analysis involves consideration of whether "the proof contemplated for all of the claims would be sufficiently similar."  *Id.* at 161.  "When [*NECA*'s two-part test] is satisfied, the named plaintiff's litigation incentives are sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf."  *Id.* (citing

---

[2]      A sister court in this District has observed that, "[a]lthough some courts in this district have deferred the issue of class standing until class certification, others have addressed it on a motion to dismiss."  *Fletcher* v. *ConvergEx Grp. LLC*, 388 F. Supp. 3d 293, 296-97 (S.D.N.Y. 2019) (collecting cases); *see also Buonasera* v. *Honest Co.*, 208 F. Supp. 3d 555, 562-63 (S.D.N.Y. 2016) (collecting cases).  This Court sees no reason to defer resolution of the issue.

*Plumbers' Union Loc. No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011)).

Here, the parties and the Court agree that Plaintiffs have established the first prong:  Plaintiffs allege that they have suffered actual injury resulting from Defendants' conduct.  (*See* Pl. Opp. 7; Def. Br. 4-18 (discussing only the "same set of concerns" prong); *see also* SAC ¶¶ 11-14, 134-135, 155-156 (alleging harm)).  The Court will thus focus on the second prong — whether Defendants' conduct harming Named Plaintiffs implicates the same set of concerns as their conduct causing injury to other members of the putative class.  *See NECA*, 693 F.3d at 162.

### 3.    The Contours of the Class Standing Analysis in the Second Circuit

The Second Circuit's case law establishing the test for class standing has created some confusion among district courts.  *See In re Block, Inc. Sec. Litig.*, No. 22 Civ. 8636 (RA), 2024 WL 639470, at \*6 n.6 (S.D.N.Y. Feb. 15, 2024) (noting that *NECA* "is frequently misread" (internal quotation marks omitted) (quoting *Stadnick* v. *Vivint Solar, Inc.*, No. 14 Civ. 9283 (KBF), 2015 WL 8492757, at \*17 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017))).  Consequently, the Court thinks it prudent to discuss in depth the two Second Circuit decisions establishing the class standing test and the relevant case law that has followed.

#### a.    *NECA* and *BNYM*

In *NECA*, a retirement fund alleged that Goldman Sachs, as the underwriter for 17 different residential mortgage-backed securities ("RMBS")

offerings, made material misrepresentations about the guidelines followed by the originators of the mortgage loans underlying all of those offerings. 693 F.3d at 151-54. The named plaintiff had invested in some, but not all, of the 17 RMBS offerings, but it alleged that Goldman Sachs made nearly identical misrepresentations about the guidelines followed by the originators in the documents associated with each of the offerings. *Id.* at 151-54, 162.

Ultimately, the Second Circuit held that the plaintiffs had class standing to assert claims on behalf of purchasers of RMBS offerings backed by the same mortgage originators as the offerings that the plaintiffs had purchased. *NECA*, 693 F.3d at 167-68. But for those class members who purchased RMBS offerings backed by different originators, the Court found that the plaintiffs lacked class standing because "differences in the identity of the originators backing the Certificates matters for the purposes of assessing whether those claims raise the same set of concerns." *Id.* at 163.

Key to the Court's decision was its finding that "to the extent [Goldman Sachs's] representations ... were misleading with respect to one Certificate, they were not necessarily misleading with respect to others." *NECA*, 693 F.3d at 163. In other words, Goldman Sachs may have made the same representations about origination guidelines on documents relating to each of the 17 RMBS offerings, but those representations may have only been misleading with respect to the originator of the RMBS offerings that the plaintiffs purchased.

12

Consequently, the focus of proof would be not on defendant Goldman Sachs's conduct, but rather on the conduct of "the particular originators of the loans" — namely, whether those originators "had in fact abandoned [their] underwriting guidelines, rendering defendants' Offering Documents false or misleading." *NECA*, 693 F.3d at 163.  Given the now-multifaceted focus of proof, the named plaintiffs, apart from their lawyers, would not have "any stake in proving that [a different loan originator] failed to follow the underwriting guidelines described in the offering documents[.]" *BNYM*, 775 F.3d at 162 (discussing *NECA*, 693 F.3d at 163-64).  The Court thus found that the plaintiffs' claims gave rise to the same set of concerns as absent class members' claims when considering the same originators, but not when considering different originators.  *NECA*, 693 F.3d at 163-64.

Two years after deciding *NECA*, the Second Circuit returned to the topic of class standing in *BNYM*, 775 F.3d 154.  That case concerned alleged breaches of fiduciary duty by the Bank of New York Mellon ("BNYM"), which was trustee to 530 RMBS trusts.  *Id.* at 156.  Countrywide Home Loans, Inc. ("Countrywide") had originated the loans underlying all of the trusts.  *Id.*  The plaintiffs alleged that BNYM had breached its fiduciary duty with respect to each trust by failing (i) to notify certificate holders of Countrywide's breaches of governing agreements, (ii) to force Countrywide to repurchase defaulted mortgage loans, and (iii) to ensure that the mortgage loans held by the trusts were correctly documented.  *Id.* at 162.

13

The Second Circuit held that the plaintiffs "lack[ed] standing to assert claims against BNYM related to trusts in which they did not invest." *BNYM*, 775 F.3d at 159. The Court reasoned that the "nature of the claims … unavoidably generates significant differences in the proof that will be offered for each trust," such that absent class members' cases did not implicate the same set of concerns as the named plaintiffs' cases. *Id.* at 163.

In building on the *NECA* decision, the *BNYM* Court added its own gloss to the class standing analysis. As relevant here, the *BNYM* Court distinguished "*NECA*, where the defendants' alleged … violations inhered in making the *same* misstatements across multiple offerings," from the case before it, where "BNYM's alleged misconduct must be proved loan-by-loan and trust-by-trust." *BNYM*, 775 F.3d at 162. In other words, even though there was only one originator (Countrywide), assessing whether that originator had breached its duties would be fact-specific for each loan, for it was Countrywide's actions with respect to each loan, and not defendant BNYM's, that dictated whether BNYM had a duty to act. *Id.* As a result, the plaintiffs would have to establish BNYM's liability for each loan separately. *Id.*

Given this chain of events, the Second Circuit found that there was "no way in which answering … questions" about BNYM's conduct "for the trusts in which Plaintiffs invested will answer the same question[ ]" as "for the numerous trusts in which they did not invest." *BNYM*, 775 F.3d at 162. Further, it did not matter that the plaintiffs had alleged a universal policy of inaction because "even proof that BNYM *always* failed to act when it was required to do so would

14

not prove their case, because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place." *Id.*

### b.    District Court Cases Following *NECA* and *BNYM*

Since *NECA* and *BNYM*, district courts have grappled with the application of class standing principles to cases in which plaintiffs have alleged breaches of fiduciary duties under ERISA.  One group of cases follows a similar fact pattern:  The defendants are ERISA fiduciaries who sponsor a retirement plan that provides various investment options.  The plaintiffs hold certain, but not all, of the investments offered by the retirement plan.  The plaintiffs then sue the defendant fiduciaries on behalf of class members who participate in the same retirement plan as plaintiffs but hold different investments.  *See, e.g.*, *Leber* v. *Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 149-50, 155 (S.D.N.Y. 2017) (describing these circumstances).

Most courts in the Second Circuit to consider this scenario have held that the plaintiffs have class standing to assert claims against fiduciaries on behalf of class members who hold different investments in the same retirement plan.  *See, e.g.*, *Leber*, 323 F.R.D. at 157-58; *Moreno* v. *Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 9936 (LGS), 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017), *leave to appeal denied*, No. 17-2911, 2017 WL 6506349 (2d Cir. Dec. 19, 2017); *Cunningham* v. *Cornell Univ.*, No. 16 Civ. 6525 (PKC), 2019 WL 275827, at *3-4 (S.D.N.Y. Jan. 22, 2019), *appeal dismissed as moot*, 86 F.4th 961 (2d Cir. 2023); *Falberg* v. *Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910 (ER), 2022 WL 538146, at *5-6 (S.D.N.Y. Feb. 14, 2022), *leave to appeal denied sub*

15

*nom.*, *Goldman Sachs 401(k) Plan Ret. Comm.* v. *Falberg*, No. 22-404, 2022 WL 4126112 (2d Cir. June 29, 2022); *Ruilova* v. *Yale-New Haven Hosp., Inc.*, No. 3:22 Civ. 111 (MPS), 2023 WL 2301962, at *11-12 (D. Conn. Mar. 1, 2023). Those courts have noted that because the defendants are fiduciaries, and "[b]ecause the alleged harms are premised on the process [d]efendants used to manage the [retirement plans], the claims involve similar inquiries and proof, and thus implicate the same set of concerns." *Moreno*, 2017 WL 3868803, at *10; *see also, e.g.*, *Leber*, 323 F.R.D. at 156-57.[3]

Those cases are helpful to the Court's consideration of the instant case, but they are not on all fours:  Plaintiffs here assert claims against service providers who participated in the Plan Sponsors' alleged breaches of their fiduciary duties, *Carfora III*, 2024 WL 2815980, at *4, 10 — not, as in *Leber* and related cases, against the Plan Sponsors themselves.

Also relevant is *Fletcher* v. *ConvergEx Group LLC*, 388 F. Supp. 3d 293 (S.D.N.Y. 2019).  In that case, the plaintiff brought an ERISA action against a third-party brokerage firm, ConvergEx, that provided certain services to numerous ERISA plans, including the named plaintiff's plan.  *Id.* at 295.  The court held that the named plaintiff lacked class standing to bring the suit

---

[3]    The Court recognizes that there is a minority view in this Circuit that plaintiffs in these cases lack class standing to sue on behalf of class members who purchased investments or services in which plaintiffs did not invest.  *See Antoine* v. *Marsh & McLennan Cos.*, No. 22 Civ. 6637 (JPC), 2023 WL 6386005, at *7-9 (S.D.N.Y. Sept. 30, 2023); *In re Omnicom ERISA Litig.*, No. 20 Civ. 4141 (CM), 2021 WL 3292487, at *8-10 (S.D.N.Y. Aug. 2, 2021); *Patterson* v. *Morgan Stanley*, No. 16 Civ. 6568 (RJS), 2019 WL 4934834, at *6 (S.D.N.Y. Oct. 7, 2019).  The Court finds the majority view more persuasive, though it need not decide the issue here.

against ConvergEx on behalf of participants in plans other than his own because, as alleged in the complaint, ConvergEx's "conduct differed depending on each plan and trade order." *Id.* at 297-98. *Fletcher* appears to mirror the theory of liability in the instant lawsuit, but even it is not on all fours. While the plaintiffs in *Fletcher* sued a service provider rather than the plan fiduciary — as here — they alleged different conduct by the service provider vis-à-vis those fiduciaries.

This Court's deep dive into post-*BNYM* class standing case law discloses certain patterns: Where plaintiffs allege that defendants engaged in *different* conduct giving rise to the same claim across class members, class standing is often found to be lacking. *See BNYM*, 775 F.3d at 162 (emphasizing that class standing was lacking because "BNYM's alleged misconduct must be proved loan-by-loan and trust-by-trust"); *Fletcher*, 388 F. Supp. 3d at 297 (holding that class standing was lacking because plaintiffs alleged that "Defendants' conduct differed depending on each plan and trade order"). Where plaintiffs allege that defendants engaged in the *same* conduct across class members, however, class standing is often found to be present. *See BNYM*, 775 F.3d at 162 (noting that in *NECA*, "where the defendants' alleged … violations inhered in making the *same* misstatements across multiple offerings," plaintiffs had established class standing to assert claims on behalf of purchasers of RMBS offerings backed by the same mortgage originators); *Sullivan* v. *UBS AG*, 149 F.4th 206, 225 (2d Cir. 2025) (finding class standing when "any harm suffered by a party to [a forward rate agreement] as a result of … Euribor's

manipulation would have been caused by the identical misconduct of the identical parties" (internal quotation marks omitted) (quoting *Sullivan* v. *Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *8 (S.D.N.Y. Feb. 21, 2017), *aff'd in part, rev'd in part sub nom., Sullivan* v. *UBS AG*, 149 F.4th 206)).

Significantly, however, even where plaintiffs allege that defendants engaged in the same conduct across class members, class standing may still be lacking if the question of defendants' liability requires the court to perform a fact-specific analysis of some other party's conduct that dwarfs any consideration of defendants' conduct. *See NECA*, 693 F.3d at 163 (holding that class standing was lacking because even if Goldman Sachs's "representations … were misleading with respect to one Certificate, they were not necessarily misleading with respect to others"); *BNYM*, 775 F.3d at 162 (noting that "even proof that BNYM *always* failed to act when it was required to do so would not prove [plaintiffs'] case, because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place"). Conversely, secondary inquiries that do not require a fact-specific analysis of third-party conduct typically do not undermine class standing. *See, e.g., Moreno*, 2017 WL 3868803, at *10 (holding that class standing was present because the focus of the inquiry into harm would be "the process Defendants used to manage the [retirement plans]"). With this framework in mind, the Court now turns to the question of whether Defendants' conduct that allegedly caused Plaintiffs' injuries "implicates 'the same set of concerns'" as

Defendants' conduct that allegedly caused other class members' injuries.

*NECA*, 693 F.3d at 162 (quoting *Gratz*, 539 U.S. at 267).

**B.      Plaintiffs Lack Class Standing to Bring Their Knowing Participation Claim on Behalf of Participants in Different Retirement Plans**

In the parlance of the case law just discussed, the instant case can fairly be characterized as "*NECA*-plus."  In that earlier case, the defendants' liability depended on the conduct of third-party originators.  The contemplated inquiry into the third-party conduct was simple — did the particular originator "abandon[ ] its underwriting guidelines, rendering defendants' Offering Documents false or misleading."  *NECA*, 693 F.3d at 163.  Even so, the very fact of the inquiry caused the Second Circuit to conclude that the injuries suffered by holders of certificates backed by other originators were "sufficiently different in character and origin" to preclude class standing.  *Id.* at 164.  Here, by contrast, the inquiry into third-party conduct is infinitely more nuanced: How, if at all, did 9,900 Plan Sponsors, each a discrete organization with many moving parts, react to Defendants' sponsor-specific communications regarding Plan Advisor?  *NECA*'s concern that "while the alleged injury suffered … may 'flow from' … nearly identical misstatements … , each of those alleged injuries has the potential to be very different — and could turn on very different proof," *NECA*, 693 F.3d at 163, applies with even greater force here.

Alternatively, this case could be viewed as "*BNYM*-plus."  In that case, the Second Circuit declined to find class standing for certain breach of fiduciary duty claims involving a single trustee and a single originator, concluding that the nature of the claims alleged required individualized

inquiries and would yield significant differences in proof. *BNYM*, 775 F.3d at 162-63. Here, however, there are literally thousands of other Plan Sponsors, making the resulting inquiry that much more complicated and, more importantly, ensuring that absent class members' cases from those plans would not implicate the same set of concerns as Plaintiffs' cases. Taken together, *NECA* and *BNYM* foreclose class standing for those plans in which Plaintiffs did not participate.

### 1.    The Elements of the Knowing Participation Claim

To review, Plaintiffs bring this action against Defendants for knowingly participating in Plan Sponsors' breaches of their fiduciary duties. *See Carfora III*, 2024 WL 2815980, at *4 (citing SAC ¶¶ 162-170). The first element of that cause of action is the predicate breach of fiduciary duty by another party. *See Trs. of Upstate N.Y. Eng'rs Pension Fund* v. *Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016). The second element is that the defendant knowingly participated in that breach. *See Harris Tr. & Savings Bank* v. *Salmon Smith Barney, Inc.*, 530 U.S. 238, 248-51 (2000).

Because the consideration of whether the non-party Plan Sponsors breached their fiduciary duties — the first element of Plaintiffs' cause of action — is a fact-specific inquiry that must be proven "[plan]-by-[plan]," Plaintiffs, apart from their lawyers, would appear to "have [no] stake," in asserting their claim as a class action. *BNYM*, 775 F.3d at 162 (citing *Nomura Asset Acceptance Corp.*, 632 F.3d at 770). As such, class standing is lacking under *NECA* and *BNYM*. More pointedly, class standing is lacking despite

Defendants' common conduct, because the requisite analysis of the conduct of numerous nonparty fiduciaries overshadows consideration of Defendants' conduct in determining whether that conduct is unlawful.

Plaintiffs offer several arguments in opposition to this analysis, all of which are ultimately unavailing. The Court considers them seriatim in the remainder of this Opinion.

### 2. Plaintiffs Have Alleged That Defendants Engaged in the Same Conduct With Respect to All Class Members, But That Is Not Enough to Establish Class Standing in This Setting

In their opposition, Plaintiffs point out that here, the SAC alleges that "Defendants engaged in the same course of conduct for all [class members]," which the Court must accept at this stage. (Pl. Opp. 12-15). *See Carfora III*, 2024 WL 2815980, at *2-3, 7, 9 (discussing TIAA's alleged "multi-year campaign of cross-selling" "at an institutional scale"). Plaintiffs argue that this commonality should be enough to establish class standing because the class standing inquiry focuses on Defendants' alleged conduct, not the conduct of any relevant third parties. (Pl. Opp. 7-11). In so arguing, Plaintiffs miss a key component of Second Circuit case law.

The class standing inquiry involves consideration of whether "the putatively illegal conduct of the defendant" with respect to named plaintiffs "implicates the same set of concerns as the conduct alleged to have *caused injury* to other members of the putative class by the same defendants." *BNYM*, 775 F.3d at 161 (internal quotation marks omitted and emphasis added) (quoting *NECA*, 693 F.3d at 162). When the conduct by defendants that

21

"caused injury" depends on additional acts of a third party, the class standing inquiry must necessarily consider those third-party acts in determining whether Plaintiffs have class standing.

Both *NECA* and *BNYM* make this point clear.[4]  In *NECA*, the Second Circuit acknowledged that Goldman Sachs had made "similar if not identical statements" across different documents, but the Court still held that plaintiffs lacked class standing with respect to certain class members because "to the extent [Goldman Sachs's] representations … were misleading with respect to one [document], they were not necessarily misleading with respect to others." *NECA*, 693 F.3d at 162-63.  Similarly, in *BNYM*, the Court recognized that even if Plaintiffs "pro[ve] that [the defendant] *always* failed to act when it was required to do so," they "would not prove their case, because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place." *BNYM*, 775 F.3d at 162.  Consequently, Plaintiffs' suggestion that this Court should not consider the Plan Sponsors' actions (*see* Pl. Opp. 7-11, 15), even if those actions are what made Defendants' conduct unlawful, cannot be squared with binding Second Circuit precedent.

---

[4]    The Court recognizes, as Defendants do, that other Circuits have adopted more permissive approaches to class standing.  *See, e.g.*, *Fallick* v. *Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998) (holding that identical conduct by a defendant alone supports class standing).  The Court here, however, is bound to follow the Second Circuit's approach in *NECA*, which specifically considered and rejected *Fallick* and related cases.  *NECA*, 693 F.3d 145, 159 & n.10 (2d Cir. 2013).

### 3.    Consideration of Whether Plan Sponsors Breached Their Fiduciary Duties Would Be Context- and Plan-Specific

As alleged in the SAC, Defendants' conduct potentially subjects them to liability only if the Plan Sponsors breached their fiduciary duties.  Under ERISA, a plan sponsor must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(B).  If the fiduciary does not act with prudence "according to the objective prudent person standard developed in the common law of trusts," they have breached their duty.  *Sacerdote* v. *N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Katsaros* v. *Cody*, 744 F.2d 270, 279 (2d Cir. 1984)).  "Because the content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific."  *Fifth Third Bancorp* v. *Dudenhoeffer*, 573 U.S. 409, 425 (2014) (citation omitted) (quoting 29 U.S.C. § 1104(a)(1)(b)).

When a claim for breach of fiduciary duty is based on the decisions of a plan sponsor, courts look to the process the plan sponsor followed, not the results of their decisions.  *See, e.g.*, *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan*  v. *Morgan Stanley Invest. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) ("*PBGC*") (noting that a plaintiff plausibly pleads an ERISA claim if courts "may reasonably 'infer from what is alleged that the [fiduciary's] process was flawed'" (quoting *Braden* v. *Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009))); *Sacerdote*, 9 F.4th at 107 (noting that the

objective prudent person "standard focuses on a fiduciary's conduct in arriving at an investment decision, not on its results" (internal quotation marks omitted) (quoting *PBGC*, 712 F.3d at 716)).

Here, class standing is ultimately lacking because the inquiry into whether each Plan Sponsor breached its fiduciary duty is highly context- and plan-specific.  For starters, this inquiry will generate significant differences in the evidence necessary to prove that Defendants are subject to liability through the breach of each Plan Sponsor.  *See Sacerdote* v. *N.Y. Univ.*, 328 F. Supp. 3d 273, 286 (S.D.N.Y. 2018) (explaining that "a prudence claim … must be supported by facts that take the particular circumstances into account," including facts that go to a fiduciary's "conscientiousness" (internal quotation marks omitted) (quoting *Krinsk* v. *Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989))), *aff'd*, 9 F.4th 95.

Proof that a Plan Sponsor breached the duty of prudence by permitting cross-marketing requires an analysis of many factors, including (i) the extent of the cross-marketing activity as to the specific plan, (ii) the number of participant rollovers out of the plan; (iii) the Plan Sponsor's process for monitoring the activity; and (iv) the interactions the Plan Sponsor had with TIAA regarding its cross-marketing.  *See Cunningham* v. *Cornell Univ.*, 86 F.4th 961, 983-84 (2d Cir. 2023) (explaining that the evaluation of whether a plan sponsor breached its ERISA duties is a "context-sensitive inquiry"), *reversed and remanded on other grounds*, 604 U.S. 693 (2025).

24

As Defendants note (Def. Br. 10), there will be many ways in which the inquiry will differ from plan to plan.  For example, prudence may look different for plans with only a handful of participant rollovers when compared to those with hundreds of rollovers.  In addition, whether and to what extent a particular Plan Sponsor discussed cross-marketing with TIAA or outside consultants will speak directly to the prudence of Sponsor's process.  Finally, efforts to either obtain (or to avoid) awareness of TIAA's activities would bear heavily on whether a Plan Sponsor discharged its fiduciary duty.

What is more, there is no common proof for these various inquiries into whether Plan Sponsors breached their fiduciary duties.  Evidence instead turns on, at the very least, (i) each Plan Sponsor's internal fiduciary processes, (ii) the material before their fiduciary committees, (iii) how participants in each plan responded to TIAA's cross-marketing activities, (iv) any actions taken by consultants that the Plan Sponsors hired, and (v) the specifics of each Plan Sponsors' agreements with TIAA.

Plaintiffs attempt to explain away the context-specific nature of the inquiry by claiming that they have "allege[d] identical fiduciary breaches" and that they will prove each breach with "generalized proof" (Pl. Opp. 15-18), but Plaintiffs mischaracterize both their factual allegations and the elements of their claim.  The generalized proof they offer relates to TIAA's conduct and whether it would *trigger* a fiduciary's duty to act; it says nothing about the Plan Sponsors' conduct in response.

For example, Plaintiffs allege that TIAA offered a "standard package of services" (SAC ¶ 113), and they posit that a "prudent expert in the field would have been aware of the issue of cross-selling" (*id.* ¶ 119).  But tellingly, nowhere do Plaintiffs suggest that generalized proof could show whether the fiduciaries adequately discharged their duties *once they were triggered.* Instead, Plaintiffs only argue that evidence for each breach may be found in the same places — namely, TIAA documents listing the different restrictions that fiduciaries placed on TIAA's activity.  (*See* Pl. Opp. 17).  But finding evidence in similar types of documents does not amount to generalized proof.  Plus, this evidence would not be enough to establish breaches of Plan Sponsors' fiduciary duties because it speaks little to each Sponsor's internal "process[es]."  *PBGC,* 712 F.3d at 718 (internal quotation marks omitted) (quoting *Braden,* 588 F.3d at 596).

Plaintiffs do not allege "identical fiduciary breaches" (Pl. Opp. 15); at most, they allege identical fiduciary duties.  In other words, their generalized proof relates not to Defendants' liability, but rather to whether Defendants' conduct triggered the Plan Sponsors' duty to act.  But it is the subsequent inquiry — whether (and if so, how) the 9,900 Plan Sponsors adequately discharged that duty — that determines Defendants' liability, and *that* Plaintiffs cannot show with anything resembling generalized proof.

Undaunted, Plaintiffs deflect from their inability to advance common allegations regarding Plan Sponsors by offering facile factual assertions and dogmatic legal conclusions.  Plaintiffs argue, for example, that the Court must

26

take at face value their allegations that "the absent plans did not prohibit, restrict or monitor TIAA's cross-selling activities as a prudent fiduciary would have done." (Pl. Opp. 17 (citing SAC ¶¶ 131-141)).

The Court is skeptical that it can impute these allegations to each of the 9,900 plan fiduciaries. As an initial matter, it strains *Twombly*'s plausibility standard to assume that this patchwork of fiduciaries would or could act as one. *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007) (requiring plaintiffs to provide sufficient factual support to "nudge[ ] their claims across the line from conceivable to plausible"). In addition, Plaintiffs' refusal to specify what these Plan Sponsors actually did to breach their fiduciary duties (and thereby bring about Defendants' liability) would seem to contravene Federal Rule of Civil Procedure 8. *Cf. Williams* v. *City of New York*, No. 23 Civ. 2700 (JPO), 2024 WL 3967307, at *2 (S.D.N.Y. Aug. 28, 2024) (noting that at the motion to dismiss stage, "Plaintiff must … make 'specific factual allegations against the individual defendants,' and may not 'rely on group pleading'" (quoting *Bertuglia* v. *City of New York*, 839 F. Supp. 2d 703, 723 n.4 (S.D.N.Y. 2012))).

At the conference the Court held to discuss this motion, Plaintiffs acknowledged to the Court that they were in discovery "trying to … see which plans were addressing this problem and which ones weren't and how they were handling them," suggesting that even they recognize that they cannot plead uniform breach among Plan Sponsors. (Dkt. #98 at 13:25-14:6). But even if Plaintiffs were right that each of the 9,900 fiduciaries breached its duty in the

27

exact same manner, an assertion Plaintiffs implicitly recognize as implausible (*see id.* at 13:25-14:10), a context-specific inquiry would still be necessary to establish that fact.  In other words, it is the thousands of inquiries into the fiduciary breaches themselves — irrespective of the results of those inquiries — that undermines class standing as to the other retirement plans.[5]

Plaintiffs also conclusorily assert that the inquiry necessitated here would not be context-specific "because no prudent fiduciary would have allowed unrestricted cross-selling" of TIAA's products.  (Pl. Opp. 20-21).  But Plaintiffs have not established, and this Court's independent research has not disclosed, legal support for the proposition that unrestricted cross-selling constitutes a *per se* breach of a plan sponsor's fiduciary duties.  To the contrary, Plaintiffs specifically state in the SAC that they "are not asserting that every failure to categorically prohibit cross-selling is a *per se* breach of fiduciary duty."  (SAC ¶ 123).

---

[5]    Plaintiffs also point to this Court's prior opinion in *Carfora III*, in which the Court held that Plaintiffs plausibly alleged that the Plan Sponsors had breached their fiduciary duties.  *See* No. 21 Civ. 8384 (KPF), 2024 WL 2815980, at *8 (S.D.N.Y. May 31, 2024) ("Plaintiffs … identify[ ] TIAA's significant increase in revenues, relative to its projected earnings under its contracts with the plans, as circumstantial evidence that Plan Sponsors must have breached their duty to monitor TIAA's compensation.").  (*See* Pl. Opp. 17-18).  But that opinion resolved whether Plaintiffs' allegations "plausibly stated a claim," *Carfora III*, 2024 WL 2815980, at *4, not whether Plaintiffs "have the right incentives" to raise that claim as a class action as to other plans, *BNYM*, 775 F.3d 154, 161 (2d Cir. 2014).

In other words, the fact that Plaintiffs' allegations "support[ ] a reasonable inference that the Plan Sponsors" breached their fiduciary duties, *Carfora III*, 2024 WL 2815980, at *9, has no bearing on whether actually proving those fiduciary breaches will be context-specific.  And as discussed, that actual proof will vary substantially depending on the fiduciary.

Their clarification only underscores the inappropriateness of class standing with respect to the other plans:

> [G]iven the 2011 GAO Study's findings that conflicts of interest can result in rollover advice that is contrary to the interests of plan participants, prudent fiduciaries at the start of the class period, at a minimum, would have realized that cross-selling was a significant issue in defined-contribution plans and thus would have monitored their recordkeepers' cross-selling activities while implementing measures to mitigate conflicts of interest. At a minimum, a prudent fiduciary, if not prohibiting cross-sales outright, would have required the recordkeeper and its representatives to fully and adequately disclose its financial incentives and all information material to the rollover decision. Information material to the rollover decision would include, without limitation, comparisons of the fees that the participant would incur by executing the rollover versus remaining invested in the employer-sponsored plan; comparative performance information; whether managed account services were available through the employer-sponsored plan; and the cost of such plan-based services compared to the cost of the service outside of the plan.

(SAC ¶ 123; *see also* Dkt. #98 at 13:25-14:10 (discussing Plan Sponsors' various responses)). As Plaintiffs concede, proving different breaches by different fiduciaries is necessarily context-specific because the "nature of the claims … unavoidably generates significant differences in the proof that will be offered" to prove each fiduciary breach. *BNYM*, 775 F.3d at 163.

> **4. Defendants' Conduct Giving Rise to Named Plaintiffs' Claims Does Not Implicate the Same Set of Concerns as Defendants' Conduct Giving Rise to Other Putative Class Members' Claims**

The plan-specific evidence necessary to prove Plaintiffs' cause of action makes this case indistinguishable from *NECA* and *BNYM*. Specifically, even if Plaintiffs could prove that TIAA engaged in the same cross-marketing conduct

with respect to each plan, that is not enough to prove a breach of fiduciary duty by each Plan Sponsor, because Defendants' liability would still have to be established "[plan]-by-[plan]," a specific feature of the SAC's lone cause of action. *BNYM*, 775 F.3d at 162.[6]  In other words, even if Defendants' actions were uniform, the Plan Sponsors' reactions to them were not; but even if the reactions were uniform, the need for the Court to inquire into those reactions precludes class standing.

As noted, the SAC appears to recognize this very reality.  (*See, e.g.*, SAC ¶ 123).  And as discussed above, Plaintiffs acknowledged to the Court that they were trying to determine how various plans had responded to TIAA's activity.  (Dkt. #98 at 13:25-14:6).  In their limited discovery, Plaintiffs have "already" seen that "different plans have treated th[e] issue" distinctly.  (*Id.* at 15:23-16:7).  If Plaintiffs can bring their claim on behalf of the class defined in the SAC, they would have to make that same inquiry into 9,900 plans, an inquiry

---

[6]    It is worth noting, however, that the Court rejects any attempt by Defendants to liken this case to *Fletcher*, 388 F. Supp. 3d 293.  (See Def. Br. 7, 11 (analogizing to *Fletcher*)). Defendants argue that *Fletcher* stands for the proposition that class standing is lacking if "[i]ndividualized inquiry would be required at the plan level, and the relevant proof would vary by plan."  (Def. Br. 7).

But their read of *Fletcher* is wrong.  The question for class standing is not whether individualized inquiry is required — that is a class certification question under Federal Rule of Civil Procedure 23(b)(3) — but rather whether a *defendant's misconduct* differs on an individual basis.  Indeed, in *Fletcher*, the court found class standing lacking "because Defendants' conduct differed depending on each plan," as alleged in the complaint.  388 F. Supp. 3d at 297.  Here, Plaintiffs have alleged that Defendants' conduct was consistent across all plans, so *Fletcher* is not on point.  *See supra* B.2.

30

that Named Plaintiffs cannot possibly be "incentiv[ized]" to perform given the time and cost associated with each inquiry. *BNYM*, 775 F.3d at 161.[7]

As in *NECA*, "to the extent" TIAA's actions led to a Plan Sponsor's breach of its fiduciary duties "with respect to one [plan]," they did "not necessarily" have the same effect "with respect to others." *NECA*, 693 F.3d at 163. And, given the claim alleged, the focus of "proof" would not center on Defendants' conduct, but rather on the conduct of "the particular [fiduciaries]." *Id.* As in *BNYM*, Plaintiffs' claims will have to be proved "[plan]-by-[plan]," and there is "no way in which answering these questions for" Plaintiffs' plans "will answer the same question for" the other retirement plans. *BNYM*, 775 F.3d at 162. The evidence offered to prove that one Plan Sponsor breached its fiduciary duty will not "tend to prove" violations by other Plan Sponsors. *Id.* Rather, a breach by one Plan Sponsor "might well have had nothing to do with" a breach by another plan sponsor. *Id.*

The Court also agrees with Defendants that this case is unlike *Moreno*, *Leber*, *Cunningham*, and other similar cases. (Def. Br. 15-16). In those cases, the defendants themselves were fiduciaries, and the harms related to the defendants' fiduciary processes. *See, e.g.*, *Moreno*, 2017 WL 3868803, at *10; *see also, e.g.*, *Leber*, 323 F.R.D. at 156-57. As such, the claims in those cases involved "similar inquiries and proof." *Moreno*, 2017 WL 3868803, at *10. Contrary to *BNYM*, in *Moreno* and related cases, "answering … questions"

---

[7]    Things might be different, for example, if Plaintiffs pointed to some central fiduciary body that acted across all the Plan Sponsors, but they do not and cannot allege anything of the sort.

related to the named plaintiffs' claims necessarily "w[ould] answer the same question for" absent class members' claims because each claim turns on the fiduciary's processes. *BNYM*, 775 F.3d at 162. Not so here.

The inquiry required in this case — which features fiduciaries not as defendants but as third parties — would be different. The focus would still be on fiduciary processes, but because those fiduciaries are third parties rather than defendants, the focus would center on those third parties, not Defendants. *See NECA*, 693 F.3d at 163 (holding that class standing was lacking because "proof" would be on third parties' conduct rather than defendants' conduct). In consequence, Plaintiffs lack "a sufficiently personal and concrete stake in proving other[ class members'] claims against the defendant." *BNYM*, 775 F.3d at 162-63.

### 5. The Court Rejects Defendants' Argument That Plaintiffs Lack Standing Because They Were Not Injured by Each Plan Sponsor

As explained, the Court agrees with Defendants that class standing is lacking as to plans in which Plaintiffs did not participate because Defendants' conduct giving rise to Plaintiffs' claims does not implicate the same set of concerns as Defendants' conduct giving rise to those other class members' claims. Defendants argue in the alternative that Plaintiffs lack standing to bring claims on behalf of absent class members because Plaintiffs were not injured by the conduct of other class members' Plan Sponsors. (Def. Br. 18-20). This argument, by contrast, fails at the outset. As Plaintiffs point out, Defendants' argument on this point "confuse[s] the requirements of Article III standing and class standing." (Pl. Opp. 21-23).

32

As the Second Circuit stated, class standing "does not turn on whether [the named plaintiff] would have statutory or Article III standing to seek recovery for" the absent class members' injuries. *NECA*, 693 F.3d at 158. The cases Defendants cite are inapposite because they concern scenarios in which plaintiffs were not harmed by *defendant* plans, and thus "lack[ed] the requisite redressability or injury-in-fact to give [them] standing to sue." *Dezelan* v. *Voya Ret. Ins. & Annuity Co.*, No. 3:16 Civ. 1251 (VAB), 2017 WL 2909714, at *6 (D. Conn. July 6, 2017) (collecting cases).

Here, Plaintiffs are suing a service provider, not the Plan Sponsors, so standing doctrine does not require them to establish that they were harmed by each Plan Sponsor. *See, e.g., Ass'n of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 172 n.5 (1970) (Brennan, J., concurring in part and dissenting in part) ("Thus, for purposes of standing, it is sufficient that a plaintiff allege damnum absque injuria, that is, he has only to allege that he has suffered harm as a result of the *defendant's* action." (emphasis added) (citing *Scenic Hudson Pres. Conf.* v. *Fed. Power Comm'n*, 354 F.2d 608 (2d Cir. 1965))). Plaintiffs need only have suffered injury-in-fact due to TIAA's actions, which they sufficiently allege. (*See* SAC ¶¶ 11-14, 134-135, 155-156).

## CONCLUSION

For the above reasons, Defendants' motion to dismiss Plaintiffs' claim as to absent class members for lack of standing is GRANTED.  Plaintiffs may not attempt to pursue classwide claims for those plans in which they did not participate.

The Clerk of Court is directed to terminate the pending motion at docket entry 105.  The parties are directed to submit a joint letter concerning proposed next steps in the case on or before **March 27, 2026**.

SO ORDERED.

Dated:    March 4, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge